UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                         :

BASIL SEGGOS, as Commissioner of the New York State  :
Department of Environmental Conservation and Trustee of  :  Case 2:17-CV-02684-SJF-ARL
New York State's Natural Resources, and the STATE OF  :
NEW YORK,  :
                         :

            Plaintiffs,        :

                         :

          - against -       :

                         :

THOMAS DATRE, JR.; CHRISTOPHER GRABE; 5  :
BROTHERS FARMING CORP.; DAYTREE AT  :
CORTLAND SQUARE INC.; IEV TRUCKING CORP.;  :
COD SERVICES CORP.; ALL ISLAND MASONRY &  :
CONCRETE, INC.; BUILDING DEV CORP.; DIMYON  :
DEVELOPMENT CORP.; NEW EMPIRE BUILDER  :
CORP.; CIPRIANO EXCAVATION INC.; TOUCHSTONE  :
HOMES LLC; SAMS RENT AND CONSTRUCTION;  :
SAM'S RENT, INC.; NEW YORK MAJOR  :
CONSTRUCTION INC.; EAST COAST DRILLING NY  :
INC.; TRITON CONSTRUCTION COMPANY, LLC;  :
SUKRAM AND SONS LTD.; M & Y DEVELOPERS INC.;  :
"JOHN DOE"; ATRIA BUILDERS, LLC; WOORI  :
CONSTRUCTION INC.; PLUS K CONSTRUCTION INC.;  :
NY FINEST ENTERPRISES INC.; MONACO  :
CONSTRUCTION CORP.; ALEF CONSTRUCTION INC.;  :
158 FRANKLIN AVEN. LLC; LUCIANO'S  :
CONSTRUCTION, INC.; ILE CONSTRUCTION GROUP,  :
INC.; EAST END MATERIALS INC.; SPARROW  :
CONSTRUCTION CORP.; CIANO CONCRETE CORP.;  :
FREEDOM CITY CONTRACTING CORP.; and TOTAL  :
STRUCTURE SERVICES INC.,  :
                         :

            Defendants.      :

                         :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**OMNIBUS REPORT AND RECOMMENDATIONS OF THE SPECIAL MASTER**

# Table of Contents

**Page**

I.    Introduction ........................................................................................................ 1

II.   Statutory Background ....................................................................................... 2

III.  The Complaint .................................................................................................. 4

IV.  The Motions Before the Court ......................................................................... 5

V.   Discussion of Issues Before the Court ............................................................. 7

    A.    Standing ................................................................................................. 7

          1.    Contentions of the Parties ......................................................... 7

          2.    Discussion of the Issue .............................................................. 8

          3.    Recommendation Regarding Standing ..................................... 14

    B.    Timeliness of the CERCLA Claim ..................................................... 15

          1.    Contentions of the Parties ....................................................... 15

          2.    Discussion of the Issue ............................................................ 17

          3.    Recommendation Regarding CERCLA Statute of Limitations ............... 22

    C.    Timeliness of The Public Nuisance and Negligence Claims ............................... 22

          1.    Contentions of the Parties ....................................................... 22

          2.    Discussion of the Issue ............................................................ 24

          3.    Recommendation Regarding Timeliness of the Common Law Claims ............. 27

    D.    Failure to State a Claim Under CERCLA ............................................ 28

          1.    Contentions of the Parties ....................................................... 28

          2.    Discussion of the Issue ............................................................ 28

              a.    Background Discussion of CERCLA liability under Pre-*Burlington Northern* Caselaw .......................... 29

              b.    Discussion of *Burlington Northern* ................................. 32

              c.    Discussion of *Appleton Papers* ...................................... 36

              d.    Discussion of Other Considerations Addressed in *Town of Islip* ................................. 37

                  i.    Statutory Language ................................................ 37

                  ii.   Statutory Objectives ............................................. 38

          3.    Waste Broker Liability – Element of "Control" for Arranger Liability .......................... 41

      4.      Recommendation Regarding Elements of Arranger Liability ................. 43

      5.      Discussion of Adequacy of the Allegations Against COD, IEV and New Empire. ....................................................................... 43

E.     Failure to State A Claim Under the Common Law Doctrine of Public Nuisance ............................................................................................. 46

      1.      Contentions of the Parties ......................................................... 47

      2.      Discussion of the Issue .............................................................. 47

          a.     Plaintiffs' Standing To Seek Damages From The Alleged Public Nuisance ................................................ 47

          b.     Adequacy of the Pleading as to the Nuisance Claim. .................... 50

      3.      Recommendation Regarding Public Nuisance Claim .............................. 56

F.     Failure to State A Claim Under the Common Law Doctrine of Negligence ........ 56

      1.      Contentions of the Parties. ........................................................ 56

      2.      Discussion ............................................................................... 56

      3.      Recommendation Regarding Negligence Claim ....................................... 58

G.     Discussion of the Adequacy of the Allegations Against Daytree ....................... 58

      1.      Contentions of the Parties ......................................................... 58

      2.      Discussion of the Issue .............................................................. 59

      3.      Recommendation Regarding the Daytree Motion .................................. 60

H.     First-to-File Rule ................................................................................ 60

      1.      Contentions of the Parties ......................................................... 60

      2.      Discussion of the Issue .............................................................. 62

      3.      Recommendation Regarding the First-to-File Rule .................................. 65

VI.    Conclusion ...................................................................................................... 66

## I.      Introduction

This case involves claims brought by the State of New York and Basil Seggos as Commissioner of the New York State Department of Environmental Conservation ("DEC") and trustee of New York's natural resources (collectively, "Plaintiffs") for "natural resource damages" under the Comprehensive Environmental Response, Compensation and Liability Act, as amended ("CERCLA"), 42 U.S.C. § 9601 *et seq*.  Common law public nuisance and negligence claims are also pleaded.  Among the damages Plaintiffs are seeking are those alleged to have resulted from the public's loss of the use of Roberto Clemente Park in Brentwood, Town of Islip, New York (the "Park") for an approximately four year period as a result of the alleged disposal of construction waste containing hazardous substances in the Park; each defendant (collectively, "Defendants") is alleged to have participated, in one way or another, in the disposal of the construction waste.  *See* Complaint ¶¶ 1, 2.  The Complaint was filed on May 4, 2017.

Plaintiffs' claims arise from the same basic set of facts as those currently being litigated in this Court under the caption *Town of Islip v. Datre*, Case 2:16-cv-02156-JFB-AYS (the "Islip Action").  In that case, the Town of Islip (the "Town") is seeking "money damages, fees and costs, and special damages" from a number of the same defendants pursuant to the Racketeer Influenced and Corrupt Organizations Act and CERCLA, as well as the common law. *See* First Amended Complaint in the Islip Action (the "Islip Complaint").  As relevant to the issues addressed in this report, the Town in the Islip Action has asserted a claim under Section 107(a)(4)(A) of CERCLA, 42 U.S.C. § 9607(a)(4)(A), to recover the costs the Town incurred in remediating the contamination at the Park (*see* Islip Complaint ¶¶ 188–202), contribution for those costs under Section 113(f)(3)(b) of CERCLA, 42 U.S.C. § 9613(f)(3)(B) (*see* Islip Complaint ¶¶ 203–210), and damages under theories of common law public nuisance, private nuisance and negligence.  *See* Islip Complaint ¶¶ 211–254.  In a decision and order issued on

1

March 28, 2017  (the "Islip Decision"), the Court in the Islip Action dismissed certain of the claims upon the motions of several parties, but afforded the Town the opportunity to file an amended complaint.  *See Town of Islip v. Datre*, 245 F. Supp. 3d 397 (E.D.N.Y. 2017).  The Town thereafter repleaded its case in the First Amended Complaint, and a number of the defendants there have filed renewed motions to dismiss.  Oral argument has been heard on those motions and a decision is pending.

Certain of the Defendants here have filed motions to dismiss and/or for judgment on the pleadings, raising many of the same issues that were adjudicated in the Islip Action.  By orders issued on November 27, 2017 and December 19, 2017 (the "Orders"), the Court appointed me as special master and directed that I submit an omnibus report and recommendations with respect to those motions.  I am filing this report in accordance with the Orders.

## II.    Statutory Background

Under Section 107(a) of CERCLA, certain identified categories of persons who are responsible for a release of hazardous substances "shall be liable for": (i) "all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan," 42 U.S.C. § 9607(a)(4)(A); (ii) "any other necessary costs of response incurred by any other person consistent with the national contingency plan," *id.* § 9607(a)(4)(B); and (iii) "damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release [of hazardous substances]."  *Id.* § 9607(a)(4)(C).

As relevant to this action, the persons who may incur liability under CERCLA for such removal or remedial costs and natural resource damages are: (i) "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of" (the "owner" or "operator," upon whom liability is imposed by

2

Section 107(a)(2) of CERCLA); (ii) "any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility … owned or operated by another party or entity and containing such hazardous substances" (the "arrangers," upon whom liability is imposed by Section 107(a)(3) of CERCLA); or (iii) "any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities … or sites selected by such person, from which there is a release, or a threatened release" (the "transporters," upon whom liability is imposed by Section 107(a)(4) of CERCLA). *See* 42 U.S.C. § 9607(a)(2), (a)(3) and (a)(4).

Plaintiffs in this action are not seeking to recover the cost of removal or remedial actions under Section 107(a)(4)(A) or (B) of CERCLA. Rather, their federal claim is brought under Section 107(a)(4)(C) of CERCLA for "natural resource damages, including the lost use of the Park during the time it was closed, and the costs of assessing the injury to, destruction of, or loss of natural resources, including the costs of an expert to make such an assessment." Complaint ¶ 230.

Section 107(f)(1) of CERCLA provides that "[i]n the case of an injury to, destruction of, or loss of natural resources under [Section 107(a)(4)(C) of CERCLA] liability shall be to the United States Government and to any State for natural resources within the State or belonging to, managed by, controlled by, or appertaining to such State…." 42 U.S.C. § 9607(f)(1). The same provision states that the "President, or the authorized representative of any State, shall act on behalf of the public as trustee of such natural resources to recover for such damages." *Id.*; *see also id.* § 9607(f)(2)(B). The Complaint alleges that Commissioner Seggos is the authorized representative of the State of New York for this purpose. *See* Complaint ¶ 5.

The term "damages" is defined in CERCLA as "damages for injury or loss of natural resources…." 42 U.S.C. § 9601(6).  The term "natural resources" is defined as "land, fish, wildlife, biota, air, water, ground water, drinking water supplies, and other such resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States …, any State or local government…."  *Id.* § 9601(16).

Thus, in order to establish a *prima facie* case for natural resource damages under CERCLA, a plaintiff must be a trustee authorized to bring such a claim, must prove that a defendant is a responsible party (an owner, operator, arranger or transporter as set forth in Section 107(a)) for the release or threat of release of hazardous substances from the facility, and demonstrate that there have been "damages for injury to, destruction of, or loss of natural resources … from such a release."  42 U.S.C. § 9607(a)(4)(C).

## III.    The Complaint

The Complaint was filed against 34 defendants, each of which is alleged to have participated in the disposal of construction waste containing hazardous substances at the Park. Eleven of those defendants defaulted.  *See* Dkt. 238 (Clerk's Entry of Default).  Plaintiffs were unable to serve another defendant, and have dismissed voluntarily a "John Doe" defendant. Thus, there are 21 parties actively defending this lawsuit.

According to the Complaint, the Park is owned by the Town and covers about thirty acres.  *See* Complaint ¶¶ 67, 69.  It is located in a residential area of Brentwood and provides a number of amenities, including among other things green space, playgrounds, baseball fields, basketball courts and soccer fields.  *Id.* ¶ 69.  The Park is "frequently used by the public for outdoor recreational activities."  *Id.* ¶ 70.

The Complaint alleges that after a local church had been granted permission by the Town to rehabilitate the Park's soccer fields through the placement of topsoil and grass seed,

"the Datres" (a term defined in the Complaint to include defendants Thomas Datre, Jr., 5 Brothers Farming Corp., and Daytree at Cortland Square Inc. ("Daytree")) disposed of "several thousands of tons of construction waste" at the Park "[b]etween August 2013 and April 2014." *Id.* ¶¶ 75, 76, 79.  According to the Complaint, the waste "had been transported by the Datres from construction sites in the New York City metropolitan area."  *Id.* ¶ 80.  Plaintiffs assert that "[o]n May 5, 2014, the Park was closed to investigate the unlawful dumping," *id.* ¶ 87, and a few days later, on May 8 and 9, sampling revealed the presence of numerous hazardous substances "in excess of DEC's 'soil cleanup objectives' for the remediation of contaminated sites."  *Id.* ¶¶ 88, 90.  Beginning in 2015, a contractor engaged by the Town remediated the contamination in the closed Park under the supervision of DEC.  *Id.* ¶ 97.  As of the date the Complaint was filed, restoration of the Park was still ongoing, with an anticipated reopening in 2017.  *Id.* ¶ 101.

With respect to the CERCLA claim, the Complaint sets forth allegations directed against two categories of defendants: "Operator/Transporters" which include the defendants therein defined as "the Datres," *id.* ¶¶ 8–12, and "Arrangers," which include numerous general and/or excavation contractors and two waste "brokers," all of which are alleged to have "arranged by contract or otherwise for construction waste containing hazardous substances to be disposed by other parties, who transported waste to the Park*." Id.* ¶¶ 13–43.

## IV.    The Motions Before the Court

Motions to dismiss the Complaint have been filed by the following parties: (i) Daytree, which is identified in the Complaint as an "Operator/Transporter Defendant"[1] (Dkt. 268); (ii) C.O.D. Services Corp. ("COD") and IEV Trucking Corp. ("IEV"), each of which is alleged to be a waste broker and which are identified in the Complaint as "Arranger Defendants"

---

[1]    By letter dated July 19, 2017, the attorney for Thomas Datre, Jr. and 5 Brothers Farming Corp. (the other "Datre Defendants") joined in Daytree's motion to dismiss.  *See* Dkt. 51.

(Dkt. 277 and Dkt. 284, respectively); (iii) New Empire Builder Corp. ("New Empire"), alleged to be the "contactor for general construction and excavation services at 65 Park Place, Brooklyn, New York" that allegedly arranged for construction waste containing hazardous substances to be disposed by other parties at the Park and which is identified in the Complaint as an "Arranger Defendant" (Dkt. 272); and (iv) Building Dev Corp. and Dimyon Development Corp. (the "96 Wythe Defendants") which also are identified in the Complaint as "Arranger Defendants" due to their alleged participation in the waste disposal activities as contractors for construction at 96 Wythe Avenue in Brooklyn, New York, another site where some of the waste disposed in the Park allegedly originated (Dkt. 279).[2]

The movants assert various grounds for dismissal.  Among the issues raised by one or more of the movants are that:

- Plaintiffs lack standing to assert the CERCLA claims;

- the CERCLA claims were not brought within the 3-year limitations period established by Section 113(g)(1) of CERCLA;

---

[2]    In addition, COD included a short argument in its memorandum of law as to why all cross-claims against it should be dismissed.  *See* Memorandum of Law in Support of Defendant C.O.D. Services Corp's Motion to Dismiss the Complaint Pursuant to Fed. R. Civ. P. 12(b)(1) and (6) ("COD Mem.") at 17 (Dkt. 277-5).  I find that this issue is not properly before the Court because COD's Notice of Motion made no reference to a motion seeking dismissal of the cross-claims; the Notice of Motion stated only that dismissal would be sought as to the Plaintiffs' Complaint.  *See* Dkt. 277.  Local Civil Rule 7.1(a) states that a "notice of motion … shall specify the relief sought by the motion."  Since COD's Notice of Motion did not specify dismissal of the cross-claims as relief to be sought, I believe it would be unfair to adjudicate the arguments raised by COD in the absence of briefing by all parties who might potentially be affected by such adjudication.  I note, in this regard, that only one of the 15 Defendants that filed cross-claims responded to the argument included in COD's initial memorandum.  For these reasons, this report does not include a recommendation with respect to COD's assertions that the cross-claims against it should be dismissed.

- the public nuisance and negligence claims were not brought within the 3-year limitations period established by Section 214(4) of the New York Civil Practice Law and Rules (the "CPLR");

- the Complaint fails to state a claim under  Section 107(a)(3) of CERCLA;

- the Complaint fails to state a claim under the New York common law of public nuisance and negligence; and

- this case is substantially the same as the previously commenced Islip Action and should be dismissed under the "first to file" rule.

## V.     Discussion of Issues Before the Court

### A.     Standing

#### 1.     Contentions of the Parties

IEV contends that Plaintiffs do not have standing to bring their claim under CERCLA for natural resource damages.  In its opening memorandum of law, IEV asserts that such a claim may be brought only with respect to natural resources that are *owned or otherwise controlled* by the State – *i.e.*, "only … if the damage at issue pertains to injury to the government's property."  IEV Trucking Corp.'s Memorandum of Law in Support of its Motion to Dismiss ("IEV Mem.") at 12 (Dkt. 284-1).  IEV argues that it "is undisputed that the Park is solely owned and controlled by Islip," and that at the time the Park was being remediated by Islip, *id.* at 13, and asserts that the Complaint does not allege that "the dumping of materials in the Park has caused any damage to any of the State's natural resources, such as groundwater." *Id.*  IEV further argues that since the Plaintiffs have not alleged injury to "New York State's property," the natural resource damages claim fails for lack of standing.  *Id.*

Among other things Plaintiffs respond that they have standing because CERCLA provides that "natural resources" include "land" that is "held in trust" by "any State," 42 U.S.C.

§ 9601(16), and municipal park land in New York is subject to the public trust doctrine.  *See, e.g.*, *Friends of Van Cortlandt Park v. City of New York,* 95 N.Y.2d 623, 631 (2001) ("*Friends of Van Cortlandt Park*").

### 2.    Discussion of the Issue

Neither the statutory language nor caselaw supports IEV's argument as to standing.  CERCLA defines "natural resources" to include "land … and such other resources *belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by* the United States …, [or] any State or local government …."  42 U.S.C. § 9601(16) (emphasis added).  This language cannot be interpreted as requiring ownership, because "[i]f that were the meaning of § 101(16), then all the phrases other than 'belonging to' would be surplusage."  *State of Ohio v. U.S. Dep't of the Interior*, 880 F.2d 432, 460 (D.C. Cir. 1989) ("*Ohio v. DOI*").  The statute "clearly does not limit the definition of 'natural resources' to resources *owned* by a government."  *Id.* (emphasis in original).

In any event, the Complaint alleges that the Park is owned by the Town of Islip, so it is alleged to be land "belonging to" a local government.  This is sufficient to provide Plaintiffs with standing, because CERCLA "permits a state to recover damages not only for resources owned by, managed by, appertaining to or otherwise controlled by the state government, but also for resources owned by, managed by, appertaining to or otherwise controlled by a *local* government [within the state]."  *Id.* at 459 n.43 (emphasis in original).

Moreover, the land is also held "in trust" because public parks are held in trust for the benefit of the people of the State, and may be "alienated" from such use only with the approval of the State legislature.  *See Avella v. City of New York*, 29 N.Y.3d 425, 431 (2017) ("The public trust doctrine is ancient and firmly established in our precedent. …when a municipality takes land 'for the public use as a park, … [it holds] it in trust for that purpose....'"

8

(citation omitted)); *Friends of Van Cortlandt Park,* 95 N.Y.2d at 630 ("[O]ur courts have time and again reaffirmed the principle that parkland is impressed with a public trust, requiring specific legislative approval before it can be alienated or used for an extended period for non-park purposes." (citations omitted))[3]; *Brooklyn Park Comm'rs v. Armstrong*, 45 N.Y. 234, 243 (1871); *Miller v. City of New York*, 15 N.Y.2d 34, 37 (1964); *Williams v. Gallatin*, 229 N.Y. 248, 253 (1920).  Since the land in the Park belongs to a local government and is held in trust under the public trust doctrine, it fits within CERCLA's definition of a natural resource.

As noted in Section II above, CERCLA provides that liability for natural resource damages "shall be to the United States Government and to any State for natural resources within the State or belonging to, managed by, or appertaining to such State," 42 U.S.C. § 9607(f)(1); and  further provides that "the authorized representative of any State, shall act on behalf of the public as trustee of such natural resources to recover for such damages."  *Id.*  As Plaintiffs point out in their opposition memorandum, the governor of New York State has authorized the Commissioner of DEC to do so pursuant to authority granted by 42 U.S.C. § 9607(f)(2)(B).  *See* Plaintiffs' Memorandum of Law in Opposition to the Motions to Dismiss by Defendants Thomas Datre, Jr., 5 Brothers Farming Corp., Daytree at Cortland Square, Inc., IEV Trucking Corp., COD Services Corp., Building Dev Corp., Dimyon Development Corp., and New Empire Building Corp. ("P. Mem.") at 23 (Dkt. 269); *see also* Complaint ¶ 5.

The cases cited by IEV are consistent with the statutory scheme reviewed above.  In *Oklahoma v. Tyson Foods, Inc.*, 258 F.R.D. 472 (N.D.Okl. 2009), the State of Oklahoma's

---

[3]     IEV seeks to distinguish *Friends of Van Cortlandt Park* by noting that the claim there did not arise under CERCLA.  *See* IEV Mem. at 14.  But Plaintiffs cite *Friends of Van Cortlandt Park* as affirming the public trust doctrine, which is squarely relevant to the question of whether a public park qualifies as a natural resource under CERCLA because it is "held in trust" by a State or local government.

natural resource damage claims were dismissed for lack of standing where the resources at issue were owned and controlled by the Cherokee Nation, and were neither owned nor held in trust by the State trustee.  *Id.* at 483 ("[T]he State does not have standing to prosecute monetary damage claims for injury to the Cherokee Nation's substantial interests in lands, water and other natural resources.…  A plaintiff does not have standing to assert a claim of injury to property it does not own or hold in trust." (citations omitted)).  Viewed in isolation, the quoted language would appear to lend some support to IEV's argument that the State lacks standing because it does not own the Park and may not hold it in trust.[4]  However, the facts in *Oklahoma v. Tyson Foods* are distinguishable from the case before the Court because there the natural resources were under the jurisdiction of a sovereign Indian tribe.  Under CERCLA there are three categories of natural resource trustees, including not only State, but also Federal and Indian tribe trustees.  42 U.S.C. § 9607(f)(1); 40 C.F.R. § 300.600-610.  Indian tribe trustees – rather than State trustees – are authorized to act as trustees "for natural resources belonging to, managed by, controlled by, or appertaining to such tribe, or held in trust for the benefit of such tribe, or belonging to a member of such tribe if such resources are subject to a trust restriction on alienation."  42 U.S.C. § 9607(f)(1); *see also* 40 C.F.R. § 300.610.  Thus, the court in *Oklahoma v. Tyson Foods* found that the state "has no standing … to seek damages for injury to lands and natural resources … that fall within the Cherokee Nation's sovereign interests."  258 F.R.D. at 483.  Such circumstances differ from those here, in that State trustees *are* authorized to seek damages for natural resources owned by local governments "within the State."  42 U.S.C. § 9607(f)(1).

       IEV also cites *Ohio v. DOI*, *supra*, but that case also lends no support to its standing argument.  As noted above, *Ohio v. DOI* rejected the contention that a natural resource

---

[4]     The Town of Islip holds title to the Park, but that title is "impressed" with a public trust. *Friends of Van Cortlandt Park*, 95 N.Y.2d at 630.

trustee must own the natural resource.  The Court held that "a substantial degree of government regulation, management or other form of control over the property would be sufficient to make the CERCLA natural resource damage provisions applicable."  880 F.2d at 461.[5]  In the circumstances here – unlike those where the resource is owned by a private party – the Park belongs to and is managed by the Town of Islip, a local government.  Moreover, as discussed above, the State also controls the use of the land for non-park purposes under the public trust doctrine.  This is so even "where a municipality holds title to land for public uses" because under the public trust doctrine, "the power to regulate those uses (is) vested solely in the legislature."  *Friends of Van Cortlandt Park*, 95 N.Y.2d at 632.

IEV cites certain CERCLA provisions and cases to argue that a natural resource trustee may *only* recover damages for a loss of the use of a natural resource where such "loss of use" damages are being sought *in addition to* restoration damages.  *See* IEV Trucking Corp.'s Reply Memorandum of Law ("IEV Reply Mem.") at 9 (Dkt. 287).  Here, the Town of Islip has remediated the Park, so Plaintiffs' claims are limited to "loss of use" damages for the interim period when the Park was closed for testing and remediation (and, potentially, assessment costs).  Under such circumstances, IEV contends that "Plaintiffs have not properly alleged that they are entitled to collect under CERCLA for natural resource damages" because they are "based entirely upon a claim of loss of use of the Park by the residents of the Town of Islip."  *Id.*  It seeks support for this argument in Section 107(f)(1) of CERCLA, but that provision limits the

---

[5]     Observing that "in some … States[,] … even where tidelands are privately held[,] … public rights to use the tidelands for the purposes of fishing, hunting, bathing, etc., have long been recognized," the D.C. Circuit noted that such "a state law requiring owners of tideland property to permit public access could well bring the land within the ambit of CERCLA's natural resource damage provisions."  *Ohio v. DOI*, 880 F.2d at 461 (citation and internal quotation marks omitted).  This example is analogous to a parkland held in trust, title to which is not held by the State but to which the public also has access.

*utilization* of damages secured by a natural resource trustee as follows: "[s]ums recovered by a State as trustee … shall be available for use only to restore, replace, or acquire the equivalent of such natural resources by the State."  42 U.S.C. § 9607(f)(1).  The same provision goes on to state that "[t]he measure of damages … shall *not* be limited by the sums which can be used to restore or replace such resources."  *Id.* (emphasis added).  I  see nothing in this statutory language to limit a trustee's recovery of lost use damages to circumstances where restoration damages also are available.

Thus, under CERCLA a natural resource trustee may seek to recover the "use value" of the natural resource damaged by a release of hazardous substances.  *See Ohio v. DOI*, 880 F.2d at 454 n.34 ("Congress intended that trustees in some cases be permitted to recover damages greater than the sum required to restore the resource.  The excess would represent interim use value, the value of the lost uses from the time of the [release or] spill until the completion of the restoration project."); *Kennecott Utah Copper Corp. v. U.S. Dep't of Interior,* 88 F.3d 1191, 1227 (D.C. Cir. 1996).  In *Ohio v. DOI*, the court had before it a challenge to a provision of DOI's natural resource damage assessment regulations ("NRD assessment regulations") that had limited a trustee's recovery to "the lesser of" restoration damages and damages for "loss of use."  880 F.2d at 456.  Noting that in many circumstances such a provision would cap the damages at a value less than what would be needed to restore the affected resource, the Court invalidated the "lesser of" rule.  *Id.* at 459.  In doing so, the Court held that "CERCLA unambiguously mandates a distinct preference for using restoration cost as the measure of damages, and so precludes a 'lesser of' rule which totally ignores that preference." *Id.* at 444.  However, the Court went on to note that "the statute lists three legitimate uses of the money (restoration, replacement, or acquisition of an equivalent resource) and then states that the

measure of damages shall not be limited by the amount of the first two listed purposes." *Id.* at 448.  Thus, "the measure of damages … may in some cases exceed restoration cost by incorporating interim lost use value as well." *Id.*  Although the Court discerned a "distinct preference" for restoration costs to be the measure of damages, its ruling does not support the conclusion that restoration damages are a *precondition* to a trustee's eligibility for loss of use damages.  *Id.* at 444.

The decision in *State of New Mexico v. General Elec. Co.* involved common law claims asserted by the State of New Mexico for natural resource damages (including "loss of use" damages), seeking more than a billion dollars in compensation "earmarked for the State's general treasury fund."  467 F.3d 1223, 1237 (10th Cir. 2006).  The Court ruled that common law claims having such a broad scope were preempted by CERCLA because their recovery and dedication to a State's general fund would frustrate the Congressional objective of targeting natural resource damage recoveries to restoration, replacement or acquisition of an equivalent resource.  In reaching its decision the court made clear that it had "no quarrel with the general proposition that the State, in its capacity as trustee of the State's groundwaters, *is entitled to recover for all interim loss-of-use damages on behalf of the public from the time of any hazardous waste release until restoration:* [and that] lost use damages incurred by the public prior to cleanup … remain on the debit side of the ledger after cleanup, and are, in fact, unredressed damages for which the trustee[ ] may recover." *Id.* at 1251 n.39 (emphasis added).[6] Again, this ruling does not suggest that restoration damages are a precondition to damages for

---

[6]     The court cited a House Committee report issued at the time Section 107(f)(1) was enacted, indicating  that "the total amount of damages includes the costs of restoration and the value of all the lost uses of the damaged resources … from the time of the release up to the time restoration."  H.R. No. 253, 99th Cong., 1st Sess., pt. 4, p. 50 (1985).

loss of use.  On the contrary, it holds that a trustee may recover such "unredressed damages" after a cleanup is completed.  *Id.*

In *Alaska Sport Fishing Ass'n v. Exxon Corp.*, 34 F.3d 769 (9th Cir. 1994), a private sports group asserted common law claims for natural resource damages for the loss of fisheries damaged by the Exxon Valdez oil spill during the period prior to cleanup.  Since the State and Federal trustees had entered into a consent decree resolving their natural resource damage claims under CERCLA, Exxon argued that the plaintiffs' claim was barred by *res judicata*.  Plaintiffs responded that interim period loss of use damages cannot be recovered by natural resource trustees under CERCLA, and therefore could not have been included in the settlement.  In rejecting that contention, the Court emphasized that Congress intended natural resource trustees to be compensated for "*all* the lost uses of the damaged resources … *from the time of the release up to the time of restoration*."  *Id.* at 772 (internal quotation marks and citation omitted, emphasis in original).

Thus, the cases cited by IEV establish that there is a "distinct preference" in CERCLA for restoration damages, but they do not support an argument that a natural resource trustee may recover pre-remediation "lost use" damages *only* where restoration damages are also available.  Any other interpretation would result in denying the public compensation for interim period damages any time a claim for such damages is commenced after remediation efforts have succeeded in restoring the resource.  Such a result would be contrary to the principle that the trustee is entitled to recover the value of "all the lost uses of the damaged resources … from the time of the release up to the time of restoration."  *Id.*

### 3.    Recommendation Regarding Standing

I recommend that the Court hold that the Plaintiffs have standing to seek statutory natural resource damages.  At the same time I note that IEV is correct in stating that natural

14

resource damages recovered under CERCLA may only be put to use for three purposes: restoration, replacement and acquisition of equivalent resources.  42 U.S.C. § 9607(f)(1).

**B.      Timeliness of the CERCLA Claim**

Defendants argue that Plaintiffs' natural resources damage claim under CERCLA is barred by the statute's three-year limitations period, which in relevant part states that:

> no action may be commenced for damages ... unless that action is commenced within 3 years after the … date of the discovery of the loss and its connection with the release [of hazardous substances] in question.

42 U.S.C. § 9613(g)(1)(A).

**1.      Contentions of the Parties**

Defendants note that the Complaint alleges that it was in April 2014, more than 3 years prior to the commencement of this lawsuit on May 4, 2017, that the District Attorney began investigating dumping at the Park.  *See* Complaint ¶ 86.  Defendants also cite news reports and other documents outside the Complaint to argue that Plaintiffs learned of the dumping in the Park in March 2014 and April 2014, more than 3 years prior to the commencement of this action.[7]  Defendants also assert that Plaintiffs were aware in April 2014 that the Park would be closed for an investigation into the dumping activity.[8]

---

[7]      Defendants cite, *inter alia*, an article from *Newsday* dated April 22, 2014 with the headline "DA probes allegations of illegal dumping at Brentwood park."  Sarah Armaghan and Sarah Crichton*, DA probes allegations of illegal dumping at Brentwood park*, Newsday (April 22, 2014) ("Newsday Article"), Dkt. 280-1.  Citing a written statement from DEC said to have been provided to *Newsday*, the article states that DEC "is investigating what has been going on at the park" and "is looking into the 'placement of fill alleged to be solid waste.'"  *Id.*  The article also states that "DEC inspectors" had performed "a walk-through of the site" and "said they were going to take soil samples."  *Id.*  While news articles may be judicially noticed for the fact of their publication, they may not be judicially noticed for the truth of the matter asserted – that is, as "adjudicative facts" – unless the contents of the article are "not subject to reasonable dispute."  Fed. R. Evid. 201; *In re Merrill Lynch Tyco Research Sec. Lit.*, 03-CV-4080, 2004 WL 305809 at

In opposition, Plaintiffs argue that they received the first "scientific report" showing "a connection between the loss and the release of hazardous substances" after May 4, 2014, and that the limitations period should be deemed not to accrue until a plaintiff receives "scientific reports or similar documents."  P. Mem. at 13.  Plaintiffs assert that they did not have "scientific samples … until the soil samples taken on May 8 and May 9, 2014 had been tested." *Id.* at 14.  On that basis, Plaintiffs assert that they commenced this lawsuit within 3 years from the "date of the discovery of the loss and its connection with the release in question."  42 U.S.C. § 9613(g)(1)(A).

A dispute also exists among the parties as to the meaning of the statutory term "discovery" used in Section 113(g)(1)(A) of CERCLA.  According to Defendants, by using the term "discovery," the statute of limitations "'embodies a constructive knowledge standard,'" so that the limitations period would begin to run on the date Plaintiffs knew or should have known about the loss.  Memorandum of Law in Support of Building Dev Corp.'s and Dimyon Corp.'s Motion to Dismiss the Complaint ("Building and Dimyon Mem.") at 4 (Dkt. 281) (quoting *Commissioner of the Dep't of Planning and Natural Resources v. Century Alumina Co., LLC*, CV No. 05-0062, 2010 WL 2772695 at \*4 (D.C. D.V.I. July 13, 2010), *amended on other grounds*, Civil Action No. 05-0062, 2010 WL 3310726 (D.C. D.V.I. Aug. 20, 2010) ("*Century*

---

\*4 n.3 (S.D.N.Y. Feb. 18, 2004).  I recommend that the Court not take judicial notice of purported statements in the *Newsday* article on the motions to dismiss before the Court.

[8] Defendants present an *undated* news release posted on the Town of Islip web site stating that at "the suggestion of State and County authorities," the Park will be "temporarily closed to the public" for a "full investigation into alleged misuse of the public park by a private entity" and present a "screen shot" from the same web site suggesting that this news release was created on April 24, 2014.  *See* Town of Islip, *Roberto Clemente Park Temporarily Closed to the Public*, Dkt. 280-2.  I recommend that on the motions to dismiss, the Court not take judicial notice of the "screen shot" and the inferences Defendants seek to draw from it.  *See* Fed. R. Evid. 201, Advisory Committee Notes ("A high degree of indisputability is the essential prerequisite [for judicial notice].").

*Alumina*")).  Plaintiffs assert that "actual knowledge" rather than "constructive knowledge" is required, contrasting the language of Section 113(g)(1)(A) with the language used in a different CERCLA provision providing that the limitations period for certain state law claims accrues only upon "the date the plaintiff knew (or reasonably should have known)" certain facts.  42 U.S.C. § 9658(b)(4)(A).  According to Plaintiffs, "the absence of similar language in section 9613(g)(1)(A) shows that [the constructive knowledge standard] … does not apply here."  P. Mem. at 12.

Finally, the parties dispute the meaning of the term "loss."  According to Defendants, that term refers to "the injury to the natural resource."  Reply Memorandum of Law in Further Support of Building Dev Corp.'s and Dimyon Development Corp.'s Motion to Dismiss ("Building and Dimyon Reply") at 8 (Dkt. 282).  By implication, Defendants argue that Plaintiffs were required to commence the suit within 3 years of their discovery of injury to the Park from the dumping activity and associated release of hazardous substances.  Plaintiffs, on the other hand, argue that the term "loss" should be understood "[i]n this case … [to be] the lost use of the Park while it was closed for cleanup of hazardous substances."  P. Mem. at 11.  In this regard, they assert that the Park was closed on May 5, 2014 "to investigate the dumping" and then continued to be closed for a cleanup after the testing of soil samples on May 8 and May 9, 2014 "showed hazardous substances, necessitating that the Park remain closed for cleanup of those hazardous substances."  *Id.*

### 2.    Discussion of the Issue

The key issue to decide at the outset is the last one mentioned above: the nature of the "loss" alleged in this action.  Under CERCLA, a trustee plaintiff may seek "damages for injury to, destruction of, or loss of natural resources…." 42 U.S.C. § 9607(a)(4)(C).  In a typical case, the trustee plaintiff may bring suit to recover damages for "injury" to a natural resource

resulting from its contamination by a hazardous substance released from a facility, in order to obtain funds "to restore" the injured resource. *Id.* § 9607(f)(1). In such actions, the accrual date of the statute of limitations may be keyed to the discovery of the "injury" to the natural resource and the injury's connection to a release of a hazardous substance from the facility in question. *See United States v. Montrose Chem. Corp. of Cal.*, 883 F. Supp. 1396, 1403 (C.D. Cal. 1995), *rev'd on other grounds sub nom. State of Cal. v. Montrose Chem. Corp. of Cal.*, 104 F.3d 1507 (9th Cir. 1997).

In the case at bar, however, the "loss" claimed by Plaintiffs is the "lost use of the Park during the time it was closed." Complaint ¶ 230; *see also id.* ¶ 7 ("The State of New York brings this Action under CERCLA … to recover damages relating to the closure of the Park as a result of the release of hazardous substances.").[9] The term "loss" is not defined in CERCLA.

However, it is apparent from the language of Section 107(a)(4)(C) that a "loss" may mean something other than an "injury" because that provision imposes liability for "injury to, destruction of, *or* loss of natural resources. 42 U.S.C. § 9607(a)(4)(C) (emphasis added); *see also* 42 U.S.C. § 9607(f)(1) (stating that "[i]n the case of an injury to, destruction of, *or* loss of natural resources … liability shall be to the United States Government and to any State …"). In the absence of a statutory definition, I have looked to the common understanding of the term "loss" to discern its meaning. *Accord Burlington Northern and Santa Fe Ry. v. United States,* 556 U.S. 599 (2009) (*"Burlington Northern"*) ("Because CERCLA does not specifically define what it means to 'arrange for …' we give the phrase its ordinary meaning.").

---

[9]    It is not clear from the allegations of the Complaint whether the alleged loss was due to a finding by a government official that the Park was too contaminated to be open prior to a cleanup, or a finding that the cleanup activities themselves precluded public use of the Park during the cleanup, or due to both findings.

Following this approach I see that the term "loss" can mean, among other things, "destruction, ruin" or "the harm or privation resulting from loss or separation." *See* Merriam-Webster's Collegiate Dictionary 706 (10th ed. 1993) (*Loss* (usage 1, usage 3)).  In light of that definition, I believe that the date of the discovery of the "loss" and its connection with the release of hazardous substances for purposes of triggering the 3-year CERCLA statute of limitations should not be the date Plaintiffs discovered that some "injury" had been caused to the Park as a result of the alleged disposal.  Rather, under the circumstances here that date should be the date Plaintiffs discovered that such disposal caused the introduction of hazardous substances to the Park at levels precluding its safe utilization for public recreation.[10]

The next issue to be decided is the meaning of the term "discovery."  I find persuasive the analysis of this term presented in *Century Alumina*, *supra*.  In that case, the court observed that the U.S. Supreme Court (in *Merck & Co., Inc. v. Reynolds*, 559 U.S. 633 (2010)) has held that the term "discovery" – when used in a federal statute of limitations – is generally interpreted as a term of art relating to the "discovery rule":

> We recognize that one might read the statutory words "after the discovery of the facts constituting the violation" as referring to the time a plaintiff *actually* discovered the relevant facts. But in the statute of limitations context, the word "discovery" is often used as a term of art in connection with the "discovery rule," a doctrine that delays accrual of a cause of action until the plaintiff has "discovered" it. ….
>
> Legislatures have codified the discovery rule in various contexts. In doing so, legislators have written the word "discovery" directly into the statute.  And when they have done so, state and federal

---

[10]    The court in *Century Alumina* determined that the plaintiff natural resource trustees had knowledge of the "loss" caused to groundwater resources when it had abundant reason to know that the defendants had released specific hazardous substances into the environment.  However, the plaintiff there was not making a claim for the loss of the natural resource, but had alleged that "the defendants have damaged the natural resources of St. Croix by releasing hazardous substances …"  *Century Alumina*, 2010 WL 2772695 at *1.

> courts have typically interpreted the word to refer not only to
> actual discovery, but also to the hypothetical discovery of facts a
> reasonably diligent plaintiff would know.
>
> Thus, treatise writers now describe "the discovery rule" as
> allowing a claim "to accrue when the litigant first knows *or with*
> *due diligence should know* facts that will form the basis for an
> action." ….
>
> We normally assume that, when Congress enacts statutes, it is
> aware of relevant judicial precedent….  We consequently hold that
> "discovery" as used in this statute encompasses not only those
> facts the plaintiff actually knew, but also those facts a reasonably
> diligent plaintiff would have known.

*Merck & Co., Inc. v. Reynolds*, 559 U.S. at 644-48 (emphasis in original and citations omitted).

Accordingly, I recommend that the Court interpret the phrase "date of the discovery" in 42 U.S.C. § 9613(g)(1)(A) to mean the date that Plaintiffs first knew or with reasonable diligence would have known of the loss and its connection with the release of hazardous substance in question.[11]  Putting this "discovery rule" together with the discussion above as to the meaning of the term "loss," I conclude that, as applied in this case, the statutory limitations period required Plaintiffs to commence an action seeking natural resource damages under CERCLA within 3 years of the date that they first knew or with reasonable diligence would have known that the dumping caused contamination in the Park at levels precluding its safe use as a recreational resource.[12]

---

[11]   The unrelated statutory provision cited by Plaintiffs – 42 U.S.C. § 9658(b)(4)(A), containing the language "knew (or reasonably should have known)" – does not use the term "discovery" and therefore is not probative as to the meaning of that term in 42 U.S.C. § 9613(g)(1)(A).

[12]   I do not endorse Plaintiffs' contention that a "loss" for purposes of the trigger date for the CERCLA statute of limitations should be the actual closure of the Park for remediation. If that were the rule a plaintiff could – through its own action or inaction – control the accrual date for the running of the limitations period.  I also do not endorse Plaintiffs' contention that, as a matter of law, a "scientific report" is necessarily required for the discovery of an actionable loss.  Some releases (for example, the wreck of the Exxon

In order to apply this guideline to the motions before the Court, note must be taken of the applicable standard of review on a motion to dismiss:

> Because the statute of limitations is an affirmative defense, [a] Defendant carries the burden of showing that Plaintiffs failed to plead timely claims.  Dismissing claims on statute of limitations grounds at the complaint stage "is appropriate only if a complaint clearly shows the claim is out of time."

*HLP Properties, LLC v. Consolidated Edison Co. of New York, Inc.*, 14-CV-01383-LGS, 2014 WL 6604741 at *4 (S.D.N.Y. Nov. 21, 2014) (citing *Harris v. City of New York*, 186 F.3d 243, 250 (2d Cir. 1999), and *S.E.C. v. Gabelli*, 653 F.3d 49, 60 (2d Cir. 2011), *rev'd on other grounds*, 133 S. Ct. 1216 (2013)).

Defendants have not established that the Complaint is "clearly" time barred.  The information as to DEC's knowledge proffered with Defendants' motions consists of items such as newspaper articles and press releases issued by entities other than DEC, as well as an allegation in the Complaint filed in the Islip Action.  In my view, reliable evidence must be developed in discovery to determine the date Plaintiffs first knew (or with reasonable diligence would have known) of the alleged "loss" and its connection with the alleged release of hazardous substances at the Park.  The mere fact that Plaintiffs apparently knew of  the illegal dumping of construction debris at the Park in or before April 2014 does not itself establish that Plaintiffs discovered at that time that the Park could not be used safely for public recreation due to the release of hazardous substances.  Although the Complaint alleges (at ¶ 62) that "[c]onstruction waste from the New York City metropolitan area typically contains hazardous substances," the alleged presence of unspecified levels of contamination in such waste does not necessarily establish the "loss" alleged in this lawsuit.  Hazardous substances such as metals are ubiquitous

---

Valdez oil tanker, spilling millions of gallons of oil and immediately befouling Prince William Sound in Alaska) may cause a natural resource damages claim to accrue upon discovery, prior to receipt of sampling data and "scientific reports."

in the environment at low concentrations.  The "loss" alleged here would be triggered by the dumping of waste only if that waste contained sufficient concentrations of a hazardous substance to result in a "loss" that deprived the public of the safe use of the natural resource.  The exact date that Plaintiffs first knew (or with reasonable diligence would have known) of the alleged "loss" at issue here, and its connection with the alleged release of hazardous substances at the Park, requires fact-based elucidation and should not be resolved on the motions to dismiss before the Court.

### 3.   Recommendation Regarding CERCLA Statute of Limitations

I recommend that the Court deny the motions to dismiss the Complaint's CERCLA claim as time barred.  Such a decision would not preclude Defendants from raising the statute of limitations issue after the conclusion of discovery.

### C.   Timeliness of The Public Nuisance and Negligence Claims

The Complaint alleges that "[t]he disposal of construction waste containing hazardous substances at the Park, and their presence in the environment, including in soil at the Park, constitutes a public nuisance…."  Complaint ¶ 38.  It also alleges that Defendants "negligently caused or allowed hazardous substances to be disposed at the Park, thereby breaching Defendants' duty and endangering the public's health and safety, injuring the natural resources in the Park, and interfering with the public's use of the natural resources in the Park." *Id.* ¶ 237.  Defendants move to dismiss these common law claims as barred by the statute of limitations requiring that "an action to recover damages for an injury to property" be "commenced within three years."  CPLR § 214(4).

### 1.   Contentions of the Parties

Defendants cite caselaw holding that the 3-year limitations period codified in CPLR § 214(4) begins to run at the time that the alleged hazardous substance is introduced to a

site.  Thus, for example, an action for asbestos property damage to a building accrues upon the installation of the asbestos materials in the building, and not when it becomes "friable" so as to pose a danger to occupants.  *See MRI Broadway Rental, Inc. v. United States Mineral Products Co.*, 92 N.Y.2d 421, 426 (1998).  Although "injuries to property caused by a continuing nuisance involve a 'continuous wrong' and, therefore, generally give rise to successive causes of action that accrue each time a wrong is committed," *Town of Oyster Bay v. Lizza Industries, Inc.*, 22 N.Y.3d 1024, 1031 (2013) (citations omitted), the continuing-wrong doctrine does not apply to tortious conduct that consisted of discrete acts that occurred in the past, merely because those acts result in "'continuing consequential damages.'"  *Id.* at 1032 (quoting *New York Seven–Up Bottling Co. v. Dow Chem. Co.*, 96 A.D.2d 1051, 1052 (2d Dep't 1983), *aff'd*, 61 N.Y.2d 828 (1984)).  Thus, Defendants argue that the nuisance and negligence claims accrued at the time the construction debris was allegedly dumped at the Park, which was more than 3 years before the commencement of this action.

In opposition, Plaintiffs present three arguments:

First, they contend that their common law claims are not "property damage" claims and thus are not subject to CPLR § 214(4).  According to Plaintiffs, their common law claims are for harm to the public's "usufructuary interest" in the Park, not damage to the Park. P. Mem.at  14.  Based on this suggested distinction, Plaintiffs argue that "[s]ince this is not an action for an injury to property, it is governed by the six-year statute of limitations in CPLR §  213(1)."  *Id.*

Second, Plaintiffs cite CPLR § 214-c(2), which imposes a discovery rule for property damage claims involving an "injury to property caused by the latent effects of exposure to any substance or combination of substances, in any form, … upon or within property…."

23

CPLR § 214-c(2).  If applicable, CPLR § 214-c(2) would defer the accrual date of the limitations period to the date that Plaintiffs discovered or through the exercise of reasonable diligence should have discovered contamination at the Park.

Finally, Plaintiffs argue that even if their claims are barred by the statute of limitations codified in State law, the "federally required commencement date," 42 U.S.C. § 9658, preempts State law in this context and provides for a later accrual date.

### 2.    Discussion of the Issue

Generally, the three year statute of limitations to recover damages for injury to property (*see* CPLR 214[4]) accrues when the injury occurs, "'irrespective of when the damage was actually discovered.'"  *Village of Lindenhurst v. J.D. Posillico, Inc.*, 94 A.D.3d 1101, 1101 (2d Dep't 2012) (quoting *Suffolk County Water Auth. v J.D. Posillico, Inc.*, 267 A.D.2d 301, 302 (2d Dep't 1999) (citations omitted)).  As discussed above, Defendants correctly point out that the "continuing public nuisance" doctrine does not apply to discrete, non-recurring acts.  *Id.* at 1102; *Town of Oyster Bay v. Lizza Industries, Inc.*, 22 N.Y.3d at 1032.  Thus, the threshold issue is Plaintiffs' assertion that the three year statute of limitations for property damage claims does not apply at all, because their common law claims allege harm to the public's "usufructuary interest" in the Park.[13]

Plaintiffs do not cite any caselaw holding that damage to property that is alleged to harm a usufructuary interest therein is exempt from the 3-year statute of limitations applicable to property damage claims.  The caselaw appears to be to the contrary.  *See In re MTBE Prods. Liab. Lit.*, 725 F.3d 65, 111 (2d Cir. 2013) (applying a 3-year limitations period to usufructuary interest in use of groundwater); *Inc. Vill. of Garden City v. Genesco Inc.*, 596 F. Supp. 2d 587,

---

[13]     A "usufruct" is the "right to use another's property for a time without damaging or diminishing it."  Black's Law Dictionary 1542 (7th ed. 1999).

604 (E.D.N.Y.) (rejecting application of the six-year statute of limitations in CPLR § 213(1) to a claim seeking damages from groundwater contamination and applying 3-year limitations period to damage claim), *on reconsideration of other issues*, No. 07-CV-5244 (JFB)(ETB), 2009 WL 3081724 (E.D.N.Y. 2009).

   The issue of which statute of limitations to apply should not turn on the nature of the interest asserted by Plaintiffs – be it a usufructuary interest (as asserted in Plaintiffs' brief) or the State's interest in protecting resources held in public trust (as alleged in paragraph 6 of their Complaint).  What is determinative, in my view, is that Plaintiffs' *claims* arise out of alleged damage to the Park and thus are property damage claims for statute of limitations purposes, no matter how the Plaintiffs may conceptualize the interest they seek to vindicate through these claims.

   The next issue to address is whether CPLR § 214-c(2) should  apply to defer the date that the 3-year limitations period accrued.  That provision states as follows:

> Notwithstanding the provisions of section 214, the three year period within which an action to recover damages for personal injury or injury to property caused by the latent effects of exposure to any substance or combination of substances, in any form, upon or within the body or upon or within property must be commenced shall be computed from the date of discovery of the injury by the plaintiff or from the date when through the exercise of reasonable diligence such injury should have been discovered by the plaintiff, whichever is earlier.

CPLR § 214-c(2).

   In applying this provision to property damage cases, courts have focused on the distinction between patent and latent injury.  An example of patent injury is the installation of asbestos insulation in a building.  *See Germantown C.S.D. v. Clark, Clark, Millis & Gilson, AIA*, 100 N.Y.2d 202, 206-207 (2003).  Claims arising out of patent injury are not subject to the discovery rule codified in CPLR § 214-c(2).  Latent injuries occur where, as a result of the nature

of the contamination, the plaintiff may not have had adequate notice of the property injury at the time that it occurred.  *See, e.g., Suffolk County Water Authority v. Dow Chemical Co.*, 121 A.D.3d 50, 58 (2d Dep't 2014) ("latent injury" to property under CPLR § 214-c(2) is injury that is "concealed"); *Bano v. Union Carbide Corp.*, 361 F.3d 696, 713 (2d Cir. 2004) (accrual date under CPLR § 214-c(2) is the "date on which [the plaintiff] knew or with reasonable diligence should have known that her property was contaminated"); *Germantown C.S.D. v. Clark, Clark, Millis & Gilson, AIA*, 100 N.Y.2d at 207 (CPLR § 214-c(2) applies to "hazardous waste or chemical spill contamination cases where the property damage results from the seepage or infiltration of a toxic foreign substance over time"); *MPM Silicones, LLC v. Union Carbide Corp.*, 1:11-CV-1542-BKS-ATB, 2016 WL 3962630 at *32 (N.D.N.Y. July 7, 2016) (CPLR § 214-(c)(2)  applies to "injury to property … caused by exposure to contamination").

For the reasons discussed in Section V.B.2, *supra*, the facts in this case are not yet sufficiently developed to determine whether the injury was patent (so that the 3 year limitations period would run from the date of the injury) or latent (in which case the discovery rule in CPLR § 214-(c)(2) would apply).  Moreover, even it were to be concluded that the injury was latent, there are not yet sufficient facts in the record to determine the accrual date for the running of the limitations period under CPLR § 214-c(2).  It may be, as Defendants seek to establish through materials outside of the Complaint, that Plaintiffs were aware that construction waste had been disposed at the Park in March or April, 2014.  And as Plaintiffs themselves allege, such wastes typically contain hazardous substances.  Complaint ¶ 62.  Nevertheless, the facts before the Court do not "clearly" show that with the exercise of reasonable diligence Plaintiffs would have discovered that – under the circumstances here – Defendants had caused a public nuisance by contaminating the Park.  I note in this regard that, according to Plaintiffs, in certain

circumstances DEC regulations allow construction waste to be placed in non-permitted sites when not contaminated.  *See* Complaint ¶¶ 54, 55.

Likewise, the facts now in the record are not sufficient to determine whether a "federally required commencement date" should preempt the accrual date under state law pursuant to Section 309 of CERCLA, or whether Plaintiffs' claims would be timely as measured from such a date.  Under that provision, "[i]n the case of any action brought under State law for personal injury, or property damages … if the applicable limitations period for such action (as specified in the State statute of limitations …) is earlier than the federally required commencement date, such period shall commence at the federally required commencement date in lieu of the date specified in such State statute."  42 U.S.C. § 9658(a)(1).  While disputing any characterization of their common law claims as an action for property damages, Plaintiffs assert that if their claims are barred by the CPLR, the claims would be timely under this provision. CERCLA defines the "federally required commencement date" as the date that "plaintiff[s] knew (or reasonably should have known) that the … property damages … were caused or contributed to by the hazardous substance or pollutant or contaminant concerned."  *Id.* § 9658(b)(4)(A).  The factual issues raised by this language – *i.e.*, the date that Plaintiffs knew or reasonably should have known of damage to the Park from a hazardous substance contained in the alleged construction waste – similarly cannot be resolved on a motion to dismiss.

### 3. Recommendation Regarding Timeliness of the Common Law Claims

I recommend that the Court not find the public nuisance or negligence claims to be untimely.  Such a decision would not preclude the defendants from raising the statute of limitations issue after the conclusion of discovery.

### D.     Failure to State a Claim Under CERCLA

Several Defendants have moved to dismiss on the grounds that the Complaint

fails to state a claim with respect to CERCLA liability.

### 1.     Contentions of the Parties

COD, IEV and New Empire contend that the Complaint is deficient in its

assertions that they are liable as "arrangers" under CERCLA because it fails to allege that each

of them knew or should have known that the construction waste disposed of at the Park was

contaminated with hazardous substances.  *See* COD Mem. at 6-9; IEV Mem. at 14-16;

Memorandum of Law in Support of Defendant New Empire Builder Corp.'s Motion to Dismiss

("New Empire Mem.") at 3-4 (Dkt. 272-4).[14]  Plaintiffs respond that such knowledge is not

required under applicable caselaw, and that even if it were required, under the facts here

Defendants knew or should have known of the nature of the substances that they allegedly

arranged to dispose.  *See* P. Mem. at 29-34.

### 2.     Discussion of the Issue

The COD, IEV and New Empire motions raise a fundamental issue of CERCLA

liability: whether a complaint alleging arranger liability must include a fact-based allegation that

the defendant knew or had reason to know that the waste at issue contained a hazardous

---

[14]     There is no dispute among the parties about the basic principles to be applied in deciding
the Fed. R. Civ. P. (12)(b)(6) motions, which are laid down in *Bell Atlantic Corp. v.
Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).  Under those
principles, "a formulaic recitation of a cause of action's elements will not do."  *Bell
Atlantic v. Twombly*, 550 U.S. at 545.  A complaint must "state a claim to relief that is
plausible on its face" and must include allegations that are "enough to raise a right to
relief above the speculative level on the assumption that all of the complaint's allegations
are true."  *Id.*  Thus, courts conduct a two-pronged analysis, in which they: (i) "identify[]
pleadings that, because they are no more than conclusions, are not entitled to the
assumption of truth[;]" and (ii) assume the veracity of "well-pleaded factual allegations"
and "determine whether they plausibly give rise to an entitlement to relief."  *Ashcroft v.
Iqbal*, 556 U.S. at 679.

substance.  As the movants point out, this Court dismissed the Town of Islip's initial complaint

in the Islip Action for failure to allege such knowledge.  *See Town of Islip v. Datre*, 245 F. Supp.

3d at 425 ("the Court concludes that, for 'arranger' liability to apply under CERCLA, the

Complaint must allege that an arranger knew, or should have known, that the material in

question was hazardous").  The Court did so after considering the statutory purposes of

CERCLA, and examining in detail two critical decisions: the U.S. Supreme Court's ruling in

*Burlington Northern, supra,* and a subsequent decision by the U.S. District Court for the Eastern

District of Wisconsin in *Appleton Papers Inc. v. George A. Whiting Paper Co.,* No. 08-C-16,

2012 WL 2704920 (E.D. Wis. July 3, 2012), *aff'd sub nom. NCR Corp. v. George A. Whiting

Paper Co.,* 768 F.3d 682 (7th Cir. 2014) ("*Appleton Papers*").

      Notwithstanding the close relation this case bears to the Islip Action, I believe I

am obligated to consider the issue raised by the movants *de novo*.  Accordingly, I have reviewed

the *Burlington Northern* decision carefully, as well as other decisions (handed down both before

and after *Burlington Northern*) on the elements of arranger liability under CERCLA.  Based on

that review, I respectfully disagree with the Court's decision in the Islip Action, and recommend

that the Court here determine that the Complaint need not have alleged, as an element of arranger

liability under CERCLA, that COD, IEV or New Empire knew or should have known that

construction waste contains hazardous substances.  My reasons for this recommendation are

discussed below.

      a.      **Background Discussion of CERCLA liability under Pre-
*Burlington Northern* Caselaw**

      The caselaw has held CERCLA to be a "broad remedial statute," *B.F. Goodrich

Co. v. Murtha*, 958 F.2d 1192, 1197 (2d Cir. 1992), which was enacted so that "those responsible

for any damage, environmental harm, or injury from chemical poisons bear the cost of their

29

actions." *General Electric Co. v. AAMCO Transmissions, Inc.,* 962 F.2d 281, 285 (2d Cir. 1992) (citing S. Rep. No. 848, 96th Cong., 2d Sess. 13 (1980)); *see also Morton Int'l, Inc. v. A.E. Staley Mfg. Co.,* 343 F.3d 669, 678 (3d Cir. 2003); *Chitayat v. Vanderbilt Assocs.,* 702 F. Supp. 2d 69, 76 (E.D.N.Y. 2010). Thus, the Courts "construe CERCLA liberally to advance its 'dual goals of cleaning up hazardous waste and holding polluters responsible for their actions." *New York State Electric and Gas Corp. v. FirstEnergy Corp.,* 766 F.3d 212, 220 (2d Cir. 2014); *B.F. Goodrich Co. v. Murtha,* 958 F.2d at 1198. The Courts have long recognized that "Congress intended that responsible parties [identified in Section 107(a) of CERCLA] be held *strictly liable*" for costs and damages incurred as a result of a release of hazardous substances, subject to certain statutory affirmative defenses. *State of New York v. Shore Realty Corp.,* 759 F.2d 1032, 1042 (2d Cir. 1985) (emphasis added).[15]

In a number of cases decided prior to *Burlington Northern,* parties were found to be subject to arranger liability where their knowledge of the hazardous nature of the substances involved was not raised as an issue.[16] To give one example, in *Mainline Contracting Corp. v. Chopra-Lee, Inc.,* 109 F. Supp. 2d 110 (W.D.N.Y. 2000), a party was subject to arranger liability even though the material involved (transformer oil) had been tested prior to disposal and mistakenly found to be *non-hazardous.* It was only after the release occurred that the material was re-tested and determined to be a hazardous substance. The court found the defendant to be

---

[15]     The movants do not take issue with the fundamental principle that responsible parties are strictly liable for costs and damages under the statute. Rather, they dispute whether they can be found to be responsible parties subject to CERCLA's strict liability scheme at all without allegations in the Complaint – and ultimately proof – that they had, or should have had, knowledge that the construction waste disposed of at the Park contained hazardous substances.

[16]     In seeking to distinguish the cases cited by Plaintiffs on this point, COD draws a distinction between "arrangers" and "generators." COD Mem. at 12. But "generators" are "arrangers" under Section 107(a)(3), so the cases Plaintiffs cite are relevant to the issue of arranger knowledge.

liable as an arranger without any discussion of its state of knowledge concerning the hazardous nature of the transformer oil.

Before the Second Circuit in *B.F. Goodrich Co. v Murtha* were facts bearing some similarity to those now before this Court.  There several municipalities were alleged to be arrangers because they had entered into transactions for the disposal of municipal solid waste, including household waste, "loads of tires," "bulky waste," and "rubbish."  754 F. Supp. 960, 968-70 (D. Conn. 1991).  The waste had not been tested prior to disposal, and evidence demonstrating that it may have contained hazardous constituents was not produced until *after* the case had been filed.  *Id.* at 972.  Finding that "[t]he evidence submitted by the parties indicates a question of fact exists as to whether the waste disposed of by the municipalities contained hazardous substances," *id.*, the District Court denied the municipalities' motions for summary judgment and concluded that they "may be held liable under Section 107(a)(3) as 'arrangers....'" *Id.* at 974.  The Second Circuit affirmed that ruling without any discussion of whether the municipalities did or did not have knowledge of the hazardous constituents in the waste.  *B.F. Goodrich Co. v. Murtha,* 958 F.2d at 1197.

The issue of whether knowledge is required for arranger liability was squarely at issue in *United States v. Bliss*, No. 84-1148C(1), 1988 WL 169818 (E.D. Mo. 1988).  There the defendant – who had arranged for the disposal of several unmarked drums of industrial waste – contended that "he cannot be held liable under CERCLA because he ... did not know that the materials for which he arranged disposal were hazardous substances."  *Id.* at *5.  The court rejected that argument, holding that the defendant "cannot avoid liability under Section 107(a) by contending that he did not know that the substances disposed of were hazardous substances.  CERCLA imposes strict liability upon responsible parties without regard to the defendant's

culpability or state of mind subject only to the … limited defenses" specified in the statute.  *Id.* at

*6.

In a different context,[17] the Second Circuit articulated the rationale against

requiring knowledge as a precondition for arranger liability under CERCLA:

> [p]eople and companies often dispose of waste without knowing its
> contents.  In future lawsuits, once hazardous substances were
> discovered in a given facility, the generators would only need to
> say that they could not recall what was in their waste. Because
> plaintiffs usually lack direct evidence that a defendant dumped
> hazardous substances, the potentially responsible parties would
> only be found liable in those instance in which a so-called
> 'smoking gun' is discovered.

*B.F. Goodrich v. Betkoski*, 99 F.3d 505, 526 (2d Cir. 1996) (citation omitted).

Thus, it seems to have been well-settled prior to *Burlington Northern* that

knowledge of the hazardous nature of the waste at issue is not a precondition to arranger liability

under CERCLA.  That is not to say, however, that the issue was deemed to be irrelevant under

CERCLA's liability scheme, since it had been considered, where appropriate, in *allocating*

CERCLA liability among responsible parties.  Thus, in *United States. v. Consolidation Coal Co.*,

345 F.3d 409 (6th Cir. 2003), the court affirmed an equitable allocation where the trial court had

"assigned the industrial generators and transporters … an equitable share of 60% of past and

future costs, finding they were the most culpable.  Their culpability arose from the fact that they

knew or should have known, of the hazardous substances present in their waste…."  345 F.3d at

414.

### b.    Discussion of *Burlington Northern*

*Burlington Northern* involved a claim against Shell Oil Company ("Shell") for

response costs as an "arranger" under Section 107(a)(3) of CERCLA.  Shell had sold certain

---

[17]    The court was considering a challenge to the admissibility of an expert's affidavit opining
as to the hazardous constituents likely to be found in municipal solid waste.

pesticides and other chemical products to Brown & Bryant ("B&B"), a company in the agricultural chemical distribution business. From time to time, B&B would purchase the products from Shell, and Shell would arrange for their delivery by common carrier. Upon their arrival, B&B would first transfer the products to a storage tank, and thereafter transfer them again as needed for distribution. Shell was aware that spills and leakage would occur over the course of B&B's handling of the product. Before the Court was a decision by the Ninth Circuit that had found Shell to be an arranger since spills were a foreseeable consequence of the transaction, and CERCLA defines a "disposal" as including "leaking" and "spilling." *United States v. Burlington N. & Santa Fe Ry. Co.*, 520 F.3d 918, 949 (9th Cir. 2008).

 The Supreme Court reversed. *Burlington Northern*, 556 U.S. at 618. In doing so, the Court observed that the issue of whether a party is an arranger under CERCLA is sometimes clear-cut, as when a party assumes liability by arranging for the disposal of a "used or no longer useful hazardous substance," or – at the opposite end of the spectrum – when a party does *not* incur such liability because it sells a "new and useful" product that is later disposed of by the purchaser in a way that causes contamination. *Id.* at 610. "Less clear" according to the Court, are "the many permutations of 'arrangements' that fall between these two extremes." *Id.* In those circumstances, a "fact-specific inquiry" must be performed to discern whether the transaction was "one Congress intended to fall within the scope of CERCLA's strict-liability provisions." *Id.* (citations omitted). In approaching that inquiry in *Burlington*, the Court looked first to the statutory language, which designates as a potentially responsible party one who "arrange[s] for disposal of a hazardous substance." Noting that the common meaning of the word "'arrange' implies action directed to a specific purpose," the Court found that "under the plain language of the statute, an entity may qualify as an arranger under § 9607(a)(3) when *it*

33

*takes intentional steps to dispose of a hazardous substance*." *Id.* at 611 (emphasis added).[18] Thus, the defendant would have been subject to arranger liability, according to the Court, if it had entered into a transaction with "the intention that at least a portion of the product be disposed of … by one or more of the methods described" in CERCLA. *Id.* at 612. Since that was not the case on the facts before it, the Court found Shell not to be liable as an arranger.

Read in its context, it is clear that the decision in *Burlington Northern* was limited to whether a defendant's *intent to dispose* is a necessary element for arranger liability under Section 107(a)(3) of CERCLA. The Court simply did not consider whether knowledge of the nature of the substance is *also* a necessary element for liability.

In the Islip Action, this Court (Bianco, J.) read the critical sentence in the *Burlington Northern* decision more broadly than I do, finding that "the language in *Burlington Northern* suggests that the alleged arranger must know the substance in question was hazardous." *Town of Islip*, 245 F. Supp. 3d at 423. The Court reasoned that:

> … if, as the Town argues, knowledge of the hazardous nature of the material were irrelevant—and the only inquiry was whether the alleged arranger intended for the disposal of some material—the Supreme Court could have omitted the term "hazardous" from its holding, in which case the holding would have read, "[U]nder the plain language of the statute, an entity may qualify as an arranger … when it takes intentional steps to dispose of a … substance." *See Burlington N.*, 556 U.S. at 611, 129 S.Ct. 1870. Instead, the Court required "intentional steps to dispose of a *hazardous*

---

[18]   *Burlington Northern* held that knowledge that there would be a spill in the process of transportation of a corporation's product is insufficient to constitute arranger liability. Rather, arranger liability requires that the defendant "'planned for' the disposal." 556 U.S. at 612. This holding was based on the Court's citation to a dictionary definition of "arrange" as "'to make preparations for: plan….'" *Id.* at 611 (quoting Merriam-Webster's Collegiate Dictionary 64 (10th ed. 1993)). The Court cited with favor a Seventh Circuit decision that held that "arranged for" implies an intent to dispose of a product or waste. *Amcast Indus. Corp. v. Detrex Corp.*, 2 F.3d 746, 751 (7th Cir. 1993). *Burlington Northern* did not hold that a person must know that its product or waste contains a hazardous substance to be an arranger.

substance." [(citing *Burlington N.*, 556 U.S. at 611)] (emphasis added).

*Id.*

It is true that *Burlington Northern* used the term "hazardous substance" in articulating the principle that intent to dispose is required for arranger liability. However, the only apparent reason for its doing so is that this is the term used in the statute, and no liability would arise at all if the material were not hazardous. Given the fact that the nature of the material was not at issue there was no purpose to be served by deviating from the statutory language. Thus, I do not infer from *Burlington Northern*'s use of the term "hazardous substance" an intention to require a plaintiff to prove *two* knowledge-based elements – intent to dispose and *also* knowledge that the material to be disposed of is hazardous – in establishing arranger liability. This is particularly so because such a ruling would upend the caselaw existing at the time of the decision, which indicated that such knowledge is *not* required. Likewise, the fact that courts following *Burlington Northern* used the same statutory term does not appear to me to reflect an intention to extend the ruling to require a second element of intention relating to the hazardous nature of the material. *See United States v. Gen. Elec. Co.*, 670 F.3d 377, 383 (1st Cir. 2012); *Team Enterprises, LLC v. W. Inv. Real Estate Trust*, 647 F.3d 907, 908 (9th Cir. 2011); *Consolidation Coal Co. v. Georgia Power Co.*, 781 F.3d 129, 149 (4th Cir. 2015); *but cf. Morton Int'l, Inc. v. A.E. Staley Mfg. Co.*, 343 F.3d 669, 678 (3d Cir. 2003).

For these reasons I view *Burlington Northern* as having no bearing on the issue of whether an arranger must be aware of the hazardous nature of the material at issue. Rather, the Court there articulated two relevant legal principles: that (i) arranger liability arises when there is an "intent to dispose"; and (ii) the fundamental issue in determining whether a transaction gives rise to arranger liability is whether the "arrangement was one Congress intended to fall within the scope of CERCLA's strict-liability provisions." 556 U.S. at 610.

c.      **Discussion of** *Appleton Papers*

This Court's decision in *Town of Islip* was informed in large measure by *Appleton Papers*.[19]  *See Town of Islip*, 245 F. Supp. 3d at 421-425.  In *Appleton Papers*, the court found that a defendant that had sold PCB-coated paper scraps (known as "broke") to paper recyclers was not subject to arranger liability under CERCLA.  In doing so, it focused on the sentence in *Burlington Northern* that required "intentional steps to dispose of *a hazardous substance*" and observed that "[i]t seems doubtful that a defendant can *ever* be found to be an arranger if he did not know the substance in question is hazardous."  *Town of Islip*, 245 F. Supp. 3d at 422 (emphasis added and in original, citations omitted).

As Plaintiffs here point out, the court's above-quoted observation was not critical to its decision in *Appleton Papers*.  P. Mem. at 33.  They note that the court went on to rule that "[e]ven if ignorance about the hazardous nature of a product is not dispositive of arranger liability, I conclude that it is at least strong evidence suggestive of the disposer's lack of the requisite intent."  *Appleton Papers*, 2012 WL 2704920 at *12.  Plaintiffs argue that the "real issue" for the court in *Appleton Papers* was "whether the arranger intended to dispose of its product or only sell it."  P. Mem. at 33.

Plaintiffs are correct that much of the focus of the court in *Appleton Papers* was on whether the defendant intended to dispose of the broke in selling it to the recyclers, and that one reason the court examined so closely whether the defendant knew of the hazardous nature of the material was to determine whether there was an intent to dispose.  Thus, the court listed

---

[19]      Because the Supreme Court's focus in *Burlington Northern* was on the need for an intent to dispose, this Court in *Town of Islip* acknowledged that "*Burlington Northern* provides no direct guidance on the issue presented here, *i.e.*, whether an alleged arranger must know … whether the material was hazardous."  *Town of Islip*, 245 F. Supp. 3d at 419 (emphasis in original).  Nevertheless, the Court stated that it "agrees with the analysis in *Appleton Papers*" in holding that knowledge is a prerequisite to arranger liability.  *Id.* at 423.

several reasons for its conclusion that the defendant was not an arranger, including not only lack of knowledge regarding the nature of the material, but others that demonstrated the material "had far more characteristics of a useful product than of a waste product, and [the defendant] was thus indifferent, at best, about what might happen to the broke waste products after the broke was recycled."[20] *Appleton Papers*, 2012 WL 2704920 at *12.

As Plaintiffs also correctly observe, the basis for the Seventh Circuit's affirmation in *Appleton Papers* was that the transaction was intended as a sale, rather than a disposal of the material. *See* 768 F.3d at 705 ("The district court … found that [Appleton Paper's] main purpose in selling broke was not to get rid of it, but … to place it on a competitive market.… This is a factual finding, and thus one we would disturb only if it were clearly erroneous.  It is not."). *Cf. Georgia-Pacific Consumer Prods. LP v. NCR  Corp.*, 980 F. Supp. 2d 821, 831 (W.D. Mich, 2013) (where in a post-*Burlington Northern* decision the court found defendant NCR to incur arranger liability when it continued to "unload" broke on paper recyclers after it knew the material to be hazardous, and "understood the … broke … was no longer anything but waste and was no longer useful to any paper recycler….").

### d.   Discussion of Other Considerations Addressed in *Town of Islip*

#### i.   Statutory Language

In *Town of Islip*, the Court held "the imposition of the knowledge requirement concerning the hazardous nature of the substance" to be "consistent with the language of the

---

[20]   The court concluded that Appleton Papers was "not an arranger because it: (1) lacked knowledge that broke, a byproduct of its manufacturing process, could be hazardous; (2) invested money and labor in treating, sorting and selling its broke; (3) always sold the broke, rather than sometimes sending it to a landfill or otherwise disposing of it; (4) sold the broke through brokers in a well-established secondary market; and (5) treated the broke, for accounting and other purposes, as an asset that was integral to its business model."  *Appleton Papers*, 2012 WL 2704920 at *12

statute." 245 F. Supp. 3d at 424.  Focusing on the statutory words "who … arranged for disposal or treatment of hazardous substances" (in Section 107(a)(3)), the Court reasoned that "the word 'arrange' implies action directed to a particular purpose" and that  "just as the term 'arrange' implies a specific intent to dispose of the substance … so too does it imply knowledge that the substance is hazardous."  *Id.* (internal citations omitted).  But the language is ambiguous because there is another plausible reading: that a person assumes arranger liability when it has a particular purpose to dispose of a substance, under circumstances where that substance – as a matter of fact – is hazardous.  As discussed in Section V.D.2.a *supra*, this second interpretation is reflected in a number of arranger liability cases decided prior to *Burlington Northern*.  As explained below, it also advances the fundamental purposes of the statute.  *See Asarco LLC v. Atl. Richfield Co.*, 866 F.3d 1108, 1119 (9th Cir. 2017) ("In ascertaining the meaning of an ambiguous [statutory] term, we may use canons of statutory construction, legislative history, and the statute's overall purpose to illuminate Congress's intent." (citations omitted)).

## ii. Statutory Objectives

In *Town of Islip*, the Court found that "requiring knowledge of the substance's hazardous nature comports with CERCLA's purpose of preventing responsible parties from 'contracting away' their liability and deterring them from attempting to do so" since "[i]t cannot be said … that [a party lacking such knowledge] was attempting to 'contract away' its responsibility for polluting if it did not even realize it was polluting."  245 F. Supp. 3d at 423 (citations omitted).

It is true that one reason CERCLA imposes arranger liability is to deter parties from avoiding their responsibility by arranging with others to dispose of waste containing hazardous substances.  *State of New York v. Gen. Elec. Co.*, 592 F. Supp. 291, 297 (N.D.N.Y. 1984) ("[P]ersons cannot escape liability by 'contracting away' their responsibility or alleging

that the incident was caused by the act or omission of a third party.").  But the fact that such statutory purpose may not be served where a party is unaware of the material's hazardous nature simply means that deterrence would not be a relevant concern under every set of facts.  I do not find that to be a compelling basis for establishing the general principle that an arranger does not incur liability where it does not know or have reason to know that the material being disposed of is a hazardous substance.  In fact, there is good reason grounded in the statutory purposes of CERCLA to come to a different conclusion.

As noted in Section V.D.2.a, *supra,* a fundamental objective of the statute is to ensure that polluters responsible for a release of hazardous substances pay for the costs and damages resulting from that release.  *Burlington Northern*, 556 U.S. at 602; *United States v. Bestfoods*, 524 U.S. 51, 56 n.1 (1998); *B.F. Goodrich v. Betkoski*, 99 F.2d at 514.  CERCLA's strict liability scheme "is intended to make sure that those who 'benefit financially from a commercial activity' internalize the environmental cost of the activity as a cost of doing business." *B.F. Goodrich v. Betkoski*, 99 F.2d at 514.  These purposes would be served by holding a defendant who intended to dispose of waste that (in fact) contained hazardous substances liable for the costs and damages resulting from the later release of those substances.  The reason for this is that such a defendant has some "responsibility" for the release, regardless of the person's knowledge of the chemical composition of the waste or "culpability."  *Town of Islip,* 245 F. Supp. 3d at 423.

A different interpretation, requiring proof of the defendant's mental state concerning the hazardous nature of the waste at issue, does not seem to me to square with the strict liability scheme under CERCLA.  "'CERCLA … imposes the costs of the [environmental] cleanup on those responsible for the contamination.'"  *United States v. Bestfoods*, 524 U.S. at 56

n.1 (quoting *Pennsylvania v. Union Gas Co.*, 491 U.S. 1, 7, 21 (1989) (plurality opinion of Brennan, J.)).  In my view, two persons who arrange for the disposal of similar quantities of the same type of hazardous waste at a site are equally "responsible for the contamination" at the site. It would not serve the purpose of the statute to construe the term "arrange for" to distinguish between an arranger who samples the waste and is thus aware of its chemical composition and an arranger who does not engage in sampling of the same type of waste.

Moreover, in order to effectuate CERCLA's "broad remedial purpose," the courts have applied its liability provisions retroactively, to reach back to conduct that occurred well prior to its enactment.  *See United States v. Northeastern Pharmaceutical & Chemical Co., Inc.*, 810 F.2d 726, 733 (8th Cir. 1986).[21]  Because CERCLA's application is retroactive, conduct that occurred before Congress had defined the term "hazardous substance" in section 101(14) of CERCLA, 42 U.S.C. § 9601(14), has given rise to liability.  *See, e.g., United States v. Alcan Aluminum Corp.*, 315 F.3d at 188.  But it would be impossible for a person who arranged for the disposal of a waste prior to 1980 to know that Congress would later define a substance in the waste to be a "hazardous substance."  Thus, interpreting *Burlington Northern* to require such knowledge has the potential to hobble the statute's retroactive application and undermine its remedial objectives.

In *Town of Islip*, the Court cites *Morton International, Inc. v. A.E. Stanley Mfg. Co.*, 343 F.3d 669 (3d Cir. 2003) ("*Morton*"), as indicating that "arranger liability should not extend to an entity that is innocent of any wrongdoing by virtue of its lack of knowledge about

---

[21]     More particularly, in many cases parties have been held liable as *arrangers* in connection with the disposal of wastes that occurred prior to the enactment of the statute in 1980. *See, e.g., United States v. Monsanto Co.*, 858 F.2d 160, 167 (4th Cir. 1988); *United States v. Alcan Aluminum Corp.*, 315 F.3d 179, 190 (2d Cir. 2003); *Cooper Indus., Inc. v. Agway, Inc.*, 92-cv-0748, 1996 WL 550128 at *17 (N.D.N.Y. Sept. 23, 1996).

the pollution that could result from its arrangements."  245 F. Supp. 3d at 424.  I do not read

*Morton* so broadly.  In a pre-*Burlington Northern* decision seeking to define the parameters for

arranger liability, the Third Circuit drew on the precedent then existing to find that "the most

important factors in determining [such liability] are (1) ownership or possession; and (2)

knowledge; *or* (3) control."  *Morton*, 343 F.3d at 677 (emphasis added).  Although the court

explained why knowledge that contamination would result from an arrangement "provides a

good reason" for such liability, *id.* at 678, it *also* found that "proof that the defendant had control

over the process [leading to the contamination] could establish that the defendant was

responsible for the resulting release of hazardous wastes."  *Id.* at 679.[22]  Thus, the court

concluded that "[a] plaintiff is also required to demonstrate *either* knowledge *or* control" in

establishing a defendant's responsibility for a release.  *Id.* (emphasis added).  This conclusion is

in line with the fundamental statutory purpose of "assuring that those responsible for any

damage, environmental harm, or injury from chemical poisons bear the costs of their actions."

*B.F. Goodrich v. Betkoski*, 99 F.2d at 514.

        Thus, the Third Circuit's decision in *Morton* does not support the conclusion that

knowledge of the hazardous nature of a material is a precondition to arranger liability.  It does,

however, raise a final point that requires some discussion in connection with the adequacy of the

Complaint in alleging the elements of an arranger claim under CERCLA.

> **3.**     **Waste Broker Liability – Element of "Control" for Arranger Liability**

        Section 107(a)(3) of CERCLA identifies a person as a responsible party "who by

contract, agreement or otherwise arranged for disposal or treatment … of a hazardous substance

---

[22]     The court in *Morton* did note, however, that "[i]n many instances, proof of control could also create an inference that the defendant had knowledge" of the potential for contamination suggesting that the "two factors" are "somewhat interrelated."  343 F.3d at 679.

41

*owned or possessed by such person*, by any other party or entity, at any facility owned or

operated by another party or entity and containing such hazardous substances."  42 U.S.C. §

9607(a)(3) (emphasis added).  The statutory language "owned or possessed" has been construed

broadly by the courts to go beyond "actual physical possession."  *Mainline Contracting Corp. v.*

*Chopra-Lee, Inc.,* 109 F. Supp. 2d at 118 (citations omitted).  Nevertheless, "there must be some

nexus between the potentially responsible party and the disposal of the hazardous substance …

premised upon the … party's conduct with respect to the disposal or transport of hazardous

wastes."  *General Electric Co. v. AAMCO Transmissions, Inc.*, 962 F.2d 281, 286 (2d Cir. 1992).

The court there held that for there to be such a nexus, a party that has not actually participated in

the disposal must have "'*assumed responsibility* for determining'" the fate of such wastes.  *Id.*

(quoting *CPC Int'l, Inc. v. Aerojet-General Corp.*, 759 F. Supp. 1269, 1278 (W.D. Mich. 1991)

(emphasis in original)).

   Some courts have characterized such nexus as a defendant's having "constructive

possession" of a hazardous substance, noting that "[i]n the CERCLA context, as in all other

contexts, constructive possession of an item is established once a party exercises dominion or

control other than by taking possession…."  *Agere Systems, Inc. v. Advanced Env. Tech. Corp.*,

CV No. 02-3830, 2006 WL 3366167 at * 4 (E.D. Pa. Nov. 20, 2006).  In that case, the court held

the broker defendant liable as an arranger, when it had "agreed by contract to dispose of the

waste and independently hired [a different party] to perform the removal and disposal."  *Id.*

Similarly, the court in *United States v. Bliss*, 667 F. Supp. 1298, 1307 (E.D.Mo. 1987), held a

defendant liable as an arranger where "[defendant] acted as a broker between a chemical

manufacturer and a disposal company.  Under its arrangement … [defendant] had authority to

control the place and manner of disposal; for example [defendant] could have chosen [co-defendant] or any other party to dispose of the waste."

### 4.    Recommendation Regarding Elements of Arranger Liability

I recommend that the Court decline to follow *Town of Islip* with respect to the need for a defendant to know or have reason to know of the hazardous nature of the material disposed of to incur arranger liability.  Accordingly, I recommend that the Court reject the argument advanced by COD, IEV and New Empire that the Complaint is deficient in failing to plead that the arranger defendants had or should have had such knowledge.[23]  However, I do believe that sufficient facts must be pleaded to make a plausible claim that each such defendant exercised control over the construction waste sufficient to create the "nexus" required by the Second Circuit for arranger liability.

### 5.    Discussion of Adequacy of the Allegations Against COD, IEV and New Empire.

As discussed in Section II, *supra*, a party is responsible as an arranger under Section 9607(a)(3) of CERCLA if the party "by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any

---

[23]    Although I do not find such allegations to be an essential element of Plaintiffs' arranger claim, I note that with respect to each such Defendant, the Complaint alleges among other things, that it "knew or should have known that the construction waste … contained hazardous substances."  *See* Complaint ¶¶ 116, 124, 132, 140, 151, 160, 168, 176, 186, 194, 201, 210.  It also alleges that the movants are either brokers "for the removal and disposal of construction waste" in the case of COD and IEV, *see id.* ¶¶ 13,14, or in the case of New Empire, a contractor for general construction and excavation services.  *See id.* ¶ 18.  The Complaint also describes the regulatory scheme created by Title 6 of the New York Code of Rules and Regulations, which restricts the disposal of construction and demolition debris that has "been in contact with spills from petroleum products, hazardous waste, or industrial waste."  *Id.* ¶ 54.  It is plausible that firms engaged in such activities should be cognizant of those regulations and their obligation to know the nature of the material they are disposing.

facility … owned or operated by another party or entity and containing such hazardous substances." 42 U.S.C. § 9607(a)(3).  Under the caselaw discussed in Section V.D.3, a party "owns or possesses" hazardous substances if it exercises sufficient control over their disposal to create the requisite nexus between the defendant's conduct and the disposal or transport of hazardous substances.

Assuming, as I must, the truth of the allegations in the Complaint, I conclude that the facts it alleges set out a plausible case that COD, IEV and New Empire did exercise such control.  Thus, it asserts that COD and IEV each acted as brokers for the disposal of construction waste between contractors or subcontractors at various construction sites and the Datres, Complaint ¶¶ 13, 14, 80; and arranged by contract or otherwise for that waste "to be disposed of by the Datres, who transported the waste to the Park." *Id.* ¶ 14.  It specifies each of the construction sites involved, and identifies the contractors and subcontractors with which such alleged arrangements were made by COD[24] and IEV.[25]

I believe such allegations are sufficient to "raise above the speculative level" the claim that such defendants exercised control over the disposal of hazardous substances by making arrangements for such disposal, and thereby playing a key role in "determining their fate." *CPC Int'l, Inc. v. Aerojet-General Corp.*, 759 F. Supp. at 1278.  I note in this regard that

---

[24]   In particular, the Complaint alleges that "COD arranged with the Datres to dispose" of construction waste originating at 32 Sinclair Drive in Kings Point, *see* Complaint ¶ 131; 35-39 Cooper Square in Manhattan, *see id.* ¶ 148; 585-587 Central Avenue in Brooklyn, *see id.* ¶ 159; 636 Louisiana Avenue in Brooklyn, *see id.* ¶ 167; 209-43 45th Road in Queens, *see id.* ¶ 175; 158 Franklin Street in Brooklyn, *see id.* ¶ 185; and 867-869 45th Street in Brooklyn, *see id.* ¶ 217.

[25]   With respect to IEV the Complaint alleges such arrangements were made to dispose of construction waste originating at 96 Wythe Avenue in Brooklyn, *see* Complaint ¶ 112; 65 Park Place in Brooklyn, *see id.* ¶123; 115-121 Liberty Avenue in Brooklyn, *see id.* ¶139; and 194 Stuyvesant Avenue in Brooklyn, *see id.* ¶193; and 56 Classon Avenue in Brooklyn, *see id.* ¶ 209.

under certain circumstances brokers have been found to be liable under CERCLA as arrangers. *See, e.g., Am. Cyanamid Co. v. Capuano*, 381 F.3d 6, 25 (1st Cir. 2004); *MEMC Pasadena, Inc. v. Goodgames Indus. Solutions, LLC*, 143 F. Supp. 3d 570, 581 (S.D. Tex. 2015); *Gould, Inc. v. A & M Battery and Tire Service*, 954 F. Supp. 1014, 1020 (M.D.Pa. 1997); *Agere Systems, Inc. v. Advanced Env. Tech. Corp.*, 2006 WL 3366167 at *4.

    The Complaint alleges that New Empire "was the contractor for general construction and excavation services at 65 Park Place, Brooklyn, … and arranged by contract or otherwise for construction waste containing hazardous substances by other parties, who transported the waste to the Park," Complaint ¶ 18, and "identified the construction waste that would be disposed and determined the means of disposal." *Id.* ¶ 121. In particular, the Complaint alleges that "[a]t least thirty-five times … the Datres transported construction waste containing hazardous substances from 65 Park Pl. to the Park, where they disposed of it," *id.* ¶ 117; that New Empire arranged with IEV, one of the two brokers that worked with the Datres, for the disposal of the waste; and that IEV arranged for disposal with the Datres. *Id.* ¶¶ 122, 123. Assuming these allegations to be true, I find them to state a plausible claim that New Empire played a role in "determining the fate" of the construction waste when they made arrangements for its disposal. "[A]n arranger is not required to be aware of the disposal site." *State of N.Y. v. SCA Services, Inc.*, 844 F. Supp. 926, 928 (S.D.N.Y. 1994); *see also MEMC Pasadena, Inc. v. Goodgames Indus. Solutions, LLC*, 143 F. Supp. 3d 570, 580 (S.D. Tex. 2015); *United States v. Ward*, 618 F. Supp. 884, 895 (E.D.N.C. 1985); *Ekotek Site PRP Committee v. Self*, 932 F. Supp.

1328, 1334 (D. Utah 1996); *City of N.Y. v. Exxon Corp.*, 744 F.Supp. 474, 481 n.11 (S.D.N.Y. 1990).[26]

For the reasons discussed above, I believe the Complaint states a plausible claim that IEV, COD and New Empire exercised control over the disposition of the hazardous substances at issue in this case, and that they made arrangements with other Defendants to transport for disposal such hazardous substances, which allegedly were deposited in the Park. Accordingly, I recommend that their motions to dismiss for failure to state a claim that they are liable under Section 107(a)(3) of CERCLA as arrangers be denied.

**E.  Failure to State A Claim Under the Common Law Doctrine of Public Nuisance**

The Complaint alleges that the disposal of construction waste containing hazardous substances at the Park endangers public health and safety, damages the Park, interferes with the public's use and enjoyment of the Park and thereby constitutes a public nuisance, *see* Complaint ¶ 232, and further alleges that the "Defendants participated in the creation and/or maintenance of this public nuisance." *Id.* ¶ 233.  Plaintiffs seek "all costs, damages, and expenses arising from the public nuisance, including the value of the public's lost use of the Park during the time that it was closed due to the nuisance." *Id.* ¶ 234.

---

[26]  New Empire argues that the Complaint does not properly allege that the waste from 65 Park Place contained hazardous substances.  In particular, it contends that no inference can be drawn to this effect by Plaintiffs' allegation that construction waste from the New York City metropolitan area typically contains hazardous substances, because there "is no factual basis alleged to indicate that the materials that were allegedly transported" from that site "contained 'construction waste.'"  New Empire Reply Mem. at 1.  But New Empire does not explain why it is not plausible to infer that 35 truck loads of material removed form a construction site included construction waste.  Moreover, the Complaint alleges that soils excavated from construction sites in New York City contain hazardous substances.  *See* Complaint ¶¶ 63, 64.

### 1.  Contentions of the Parties

Defendants move to dismiss the public nuisance claim for lack of standing, arguing that Plaintiffs, who do not own the Park and are not seeking reimbursement for cleanup costs, may not seek damages from any alleged public nuisance there.  They also seek dismissal for failure to state a claim, on the basis that the Complaint fails to plead adequate facts that, assuming their truth, would establish liability for a public nuisance.  Plaintiffs assert that they do have standing, and that the Complaint adequately alleges the elements of public nuisance.

### 2.  Discussion of the Issue

#### a.  Plaintiffs' Standing To Seek Damages From The Alleged Public Nuisance

The State of New York "has standing to bring suit to abate … a nuisance 'in its role as guardian of the environment.'"  *State of New York v. Shore Realty Corp.*, 759 F.2d at 1051 (citations and internal quotation marks omitted).  The lawsuit before the Court, however, is not one seeking abatement of a nuisance.  Rather, it seeks damages under the common law theory of public nuisance, even though Plaintiffs – the State of New York and the Commissioner of DEC – do not hold title to the Park and are not seeking to recover costs expended on abatement.  *See* P. Mem. at 38 ("[T]he State's public nuisance claim seeks damages for the lost use of the Park").  Defendants argue that under such circumstances, Plaintiffs are not the proper parties to recover damages for any alleged public nuisance at the Park.

In the ordinary case the State of New York might be a stranger to damages from a public nuisance on property that it does not own and has not remediated.  But this is not an ordinary case, because the State is asserting a claim "on behalf of itself and as parens patriae, trustee, guardian and representative" of the public, Complaint ¶ 6, for damages alleged to have

47

been caused by a "public nuisance which … interferes with the public's use and enjoyment of [a public] Park." *Id.* ¶ 232.

Thus, Plaintiffs' claim is for damages from an alleged public nuisance that violates the public trust limitations on the use of a public park. *See Capruso v. Village of Kings Point*, 23 N.Y.3d 631, 638 (2014) ("The State's 'legislative approval is required when there is a substantial intrusion on parkland for non-park purposes.'" (quoting *Friends of Van Cortlandt Park*, 95 N.Y.2d at 630) (citation omitted)).[27]  The State asserts standing to seek such damages for this alleged public nuisance: (i) as "trustee," and (ii) in its capacity as a sovereign that may assert *parens patriae* standing on behalf of all residents and citizens of the State of the New York.  Complaint ¶ 6; P. Mem. at 39-40.

A State's right to bring suit as *parens patriae*, particularly in public nuisance lawsuits arising from pollution, is well established, even if the polluted property is not owned by the State.  *See, e.g., State of Missouri v. State of Illinois*, 180 U.S. 208, 241 (1901) (Missouri permitted to sue Illinois and a Chicago sanitation district on behalf of Missouri citizens to enjoin the discharge of sewage into the Mississippi River); *State of Georgia v. Tennessee Copper Co.*, 206 U.S. 230, 237 (1907) (Georgia entitled to sue to enjoin noxious fumes from a copper plant injuring land in five Georgia counties); *State of New York v. State of New Jersey*, 256 U.S. 296, 302 (1921) (New York could sue to enjoin the discharge of sewage into New York harbor).

In *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592 (1982), the Court held that in order to maintain a *parens patriae* action, "the State must articulate an interest apart from the interests of particular private parties….  The State must express a quasi-

---

[27]   In *Capruso*, the Court of Appeals held that the State of New York's lawsuit to eject a non-park use from a municipal park was one where the State was "acting in a governmental capacity to protect a public interest" and upheld a lower court judgment granting the State relief in the lawsuit.  23 N.Y.3d at 642.

sovereign interest."  458 U.S. at 607.  A State has such an interest in the "health and well-being" of its residents.  *Id.*  It is on this basis that States (or other sovereigns, such as Indian Tribes) have been granted *parens patriae* standing to seek damages in public nuisance arising from the pollution of properties subject to the public trust doctrine.  *See, e.g., Quapaw Tribe of Oklahoma v. Blue Tee Corp.*, 653 F. Supp. 2d 1166, 1181 (N.D. Ok. 2009); *State of Maine v. M/V Tamano*, 357 F. Supp. 1097, 1101-02 (D. Me. 1973); *State of Maryland, Dep't of Nat. Resources v. Amerada Hess Corp.*, 350 F. Supp. 1060, 1067 (D. Md. 1972).

In *Century Alumina*, the Government of the U.S. Virgin Islands sought natural resource damages under the common law from defendants' release of hazardous substances into the groundwater and Caribbean Sea.  The court there ruled that the plaintiff had standing to assert such a claim, because "[w]hen natural resources are held in trust, the *parens patriae* may bring common law claims for natural resource damages."  2008 WL 4809897 at *9.  According to the court:

> As *parens patriae*, the Government … has an independent interest in the property it holds in public trust.  Its sovereign interests in its natural resources 'are separate and distinct from the interests of its individual citizens.' … Thus, the Government … can state a cause of action against Defendants for causing a public nuisance.

*Id.* at *10 (citations omitted).

We have found no Second Circuit or New York precedent that is directly on point.  However, I am persuaded by the logic of the cases cited above that the State of New York should be entitled to bring a *parens patriae* suit seeking damages for a public nuisance causing harm to a park subject to the public trust doctrine.  This conclusion is consistent with the Second Circuit's decision in a case brought by the State of New York arising from the Love Canal disaster.  *See United States v. Hooker Chemicals & Plastics Corp.*, 749 F.2d 968, 984 (2d Cir. 1984) ("Once quite limited, the concept of *parens patriae* has been expanded to include actions

in which a state seeks to redress quasi-sovereign interests, such as damage to its … environment, even where the injury is to a fairly narrow class of persons." (citations omitted)).

However, the damages that may be recovered by the State in such a suit are limited to those to its quasi-sovereign interests, independent of whatever individual damages may have been sustained by its citizens or the Town.  *See State of Georgia v. Tennessee Copper Co.*, 206 U.S. at 237; *State of Maine v. M/V Tamano*, 357 F. Supp. at 1102; *Quapaw Tribe of Oklahoma v. Blue Tee Corp.*, 653 F. Supp.2d at 1181.[28]

### b.    Adequacy of the Pleading as to the Nuisance Claim.

A public nuisance is an unreasonable and substantial interference with the rights common to the public, or which offends public morals or endangers the health, safety or property of a large number of people.  *See* Restatement (Second) of Torts, Public Nuisance § 821B(1); *State of New York v. Shore Realty Corp.*, 759 F.2d at 1051; *Copart Industries, Inc. v. Consolidated Edison Co. of New York, Inc.*, 41 N.Y.2d 564, 568 (1977).  Allegations of environmental harm such as the seepage of an allegedly toxic gasoline additive or chemical waste into a public drinking water supply, or water pollution resulting in harm to aquatic organisms, have been held to be sufficient to support a claim of public nuisance.  *See, e.g., State of New York v. Shore Realty Corp.*, 759 F.2d at 1051; *In re MTBE Prods. Liab. Lit.*, 175 F. Supp. 2d 593, 627-629 (S.D.N.Y. 2001); *United States v. Hooker Chemicals & Plastics Corp.*, 722 F. Supp. 960, 968 (W.D.N.Y. 1989); *State v. Schenectady Chemicals, Inc.*, 103 A.D.2d 33, 37 (3d Dep't 1984); *Leo v. General Elec. Co.*, 145 A.D.2d 291, 294 (2d Dep't 1989).

---

[28]    At this stage of the litigation, it is not appropriate to address whether any State recovery of damages with respect to public trust assets that results in an unrestricted award would conflict with and thereby be preempted by Section 107(f)(1), 42 U.S.C. § 9607(f)(1).  *See generally State of New Mexico v. Gen. Elec. Co.*, 467 F.3d at 1247-48.

The Complaint alleges that prior to the alleged dumping of construction waste, the Park was used by the public for a variety of recreational activities.  Complaint ¶ 70.  It further alleges that construction waste was dumped at the Park, *id.* ¶¶ 76, 79, and that such waste contained hazardous substances resulting in exceedance of NYSDEC's soil cleanup objectives and endangered public health and safety.  *Id.* ¶¶ 88, 232.  According to the Complaint the alleged dumping activity and consequent hazardous substance contamination resulted in the closure of the Park for a lengthy remediation period, thereby harming the public, which was unable to use the Park during the time that it was closed.  *Id.* ¶¶ 96, 97, 101, 103.  Assuming their truth, I believe that these factual allegations adequately plead the existence of a public nuisance resulting from the alleged dumping and consequent contamination of the Park.

The next issue to be considered is the class of persons who are liable for a public nuisance.  "Under New York law, '[e]very one who creates a nuisance or participates in the creation or maintenance thereof is liable for it.'"  *In re MTBE Prods. Liab. Lit.*, 725 F.3d 65, 121 (2d Cir. 2013) (quoting *Penn Central Transp. Co. v. Singer Warehouse & Trucking Corp.*, 86 A.D.2d 826, 828 (1st Dep't 1982)); *State v. Fermenta ASC Corp.*, 166 Misc. 2d 524, 532 (Sup. Ct. Suffolk Cnty. 1995), *aff'd*, 238 A.D.2d 400 (2d Dep't 1997); *State v. Schenectady Chemicals, Inc.*, 117 Misc. 2d 960, 966 (Sup. Ct. Rensselaer Cnty. 1983), *aff'd as modified*, 103 A.D.2d 33, 37 (3d Dep't 1984); *In re MTBE Prods. Liab. Lit.*, 175 F. Supp. 2d at 628.  Moreover, a defendant need not have control over the waste or chemical at the moment it was "released" into the environment.  *In re MTBE Prods. Liab. Lit.*, 725 F.3d at 121; *In re MTBE Prods. Liab. Lit.*, 175 F. Supp. 2d at 628; *State v. Fermenta ASC Corp.*, 166 Misc. 2d at 532; *State v. Schenectady Chemicals, Inc.*, 117 Misc. 2d at 966.  A defendant may be liable for creating a nuisance even if it does not possess the land or otherwise carry on or maintain the nuisance at the time of the

51

litigation.  *Id.*; *United States v. Hooker Chemicals & Plastics Corp.*, 722 F. Supp. at 965; *State v. Schenectady Chemicals, Inc.*, 103 A.D.2d at 38.  Liability is strict, and does not require proof of a defendant's mental state or negligence.  *See McFarlane v. City of Niagara Falls*, 247 N.Y. 340, 343 (1928); *State v. Fermenta ASC Corp.*, 160 Misc. 2d 187, 195 (Sup. Ct. Suffolk Cnty. 1994); *State of New York v. Shore Realty Corp.*, 759 F.2d at 1051; *United States v. Hooker Chemicals & Plastics Corp.*, 722 F. Supp. at 968; *State v. Schenectady Chemicals, Inc.*, 117 Misc. 2d at 965.[29]

The Complaint alleges that each defendant "participated in the creation and/or maintenance" of the public nuisance at the Park.  Complaint ¶ 233.  This allegation recites the necessary elements, but under contemporary pleading standards more is required.  "Conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to [defeat] a motion to dismiss."  *Achtman v. Kirby, McInerney & Squire, LLP*, 464 F.3d 328, 337 (2d Cir. 2006) (citation omitted).  Thus, other allegations of the Complaint must be reviewed to determine whether the Complaint pleads "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. at 570.

The Complaint alleges that construction waste "typically contains hazardous substances."  Complaint ¶ 62.  It goes on to spell out in some detail the types of hazardous substances alleged to be present in such waste, and provides some information about the potential toxicity of such substances.  *Id.* ¶¶ 63-65.  The Complaint also cites New York State regulations that allegedly require that construction waste be disposed of at a properly licensed facility, and alleges that the Park was not such a facility, making the disposal of the construction waste in the Park a violation of applicable environmental regulations.  *Id.* ¶¶ 53-55, 81.  In

---

[29]   Defendants cite *Town of Islip v. Datre*, 245 F. Supp. 3d at 428, for the proposition that a public nuisance claim in this context requires pleading and proof of either negligence or intentional pollution by the defendants.  I believe this conclusion to be contrary to the weight of authority, particularly in pollution lawsuits brought by the State of New York.

addition, the Complaint alleges that sampling at the Park identified the presence of hazardous substances, naming with specificity the hazardous substances found there.  The Complaint further alleges that approximately 39,000 tons of construction waste were removed from the Park.  *Id.* ¶¶ 88-97.

In addition, the Complaint sets forth allegations as to the actions undertaken by each Defendant, which are alleged to have constituted participation in the creation of the alleged public nuisance.  Certain Defendants are alleged to have transported the construction waste to the Park and dumped it there.  *Id.* ¶¶ 8-12.  Other Defendants are alleged to have acted as brokers in making arrangements for the disposal of construction waste at the Park.  *Id.* ¶¶ 13-14.  Finally, other Defendants are alleged to have been contractors at various identified construction sites who made arrangements for the disposal of construction waste that was unlawfully dumped at the Park.  *Id.* ¶¶ 15-43, 104-210.

IEV argues in its motion that the Complaint is deficient because it fails to plead that IEV intentionally contributed to the nuisance, because there is no allegation that IEV knew that the construction waste dumped at the Park was hazardous.  The Complaint does allege, however, that IEV "knew or should have known that the construction waste … disposed in the Park contained hazardous substances."  Complaint ¶ 116.  More fundamentally, as discussed above, the public nuisance doctrine is one of strict liability, and does not require proof of intent or negligence.

Likewise, COD argues that the Complaint fails to allege any plausible facts that COD was aware that the materials dumped at the Park contained hazardous substances, that it intended to dispose hazardous substances there, that it was the actual cause of the materials being dumped there, or that it was negligent.  The Complaint alleges, however, that COD made

arrangements for the transport of waste that it "knew or should have known … contained hazardous substances," and that this waste was transported to the Park for unlawful disposal. Complaint ¶ 132.  Contrary to COD's contention, this allegation is not implausible.  COD is alleged to be in the business of brokering construction waste for disposal – activities that are subject to detailed environmental regulation.  *See* Complaint ¶¶ 53-61.  It is plausible to infer that a company engaged in such business knew or should have known that waste it brokers may contain hazardous substances.  In any event, New York law does not require proof of intent or negligence as an element of a claim brought by the State for the creation of a public nuisance, as noted above.  COD's contention that its alleged actions did not proximately cause the disposal of the construction waste at the Park (and thus did not contribute to the creation of the public nuisance) requires the resolution of factual issues that cannot be resolved on a motion to dismiss.

New Empire – an alleged excavation contractor at one of the sites where the construction waste originated – argues that its alleged conduct was too remote from the creation of the public nuisance for it to be liable as having participated in its creation:

> the State does not allege any facts which show that defendant New Empire caused or contributed to a nuisance.  The mere fact that New Empire "arranged" for materials to be removed from a job site at 65 Park Place in and of itself is not factually sufficient to maintain an action for nuisance.  The complaint is devoid of any facts indicating that New Empire caused or contributed to the acts which ultimately led to the dumping of hazardous waste in the Park.  The very act of arranging for materials to be removed from a site without anything more cannot serve as the basis for contributing to a nuisance.  The alleged act that constituted the "nuisance" was the alleged dumping of materials in the Park.  The complaint is devoid of any facts or allegations that New Empire planned, coordinated or in any way contributed to the actual act of dumping materials in the Park.  Absence of such factual allegations shown that New Empire's actions caused and contributed to the alleged "dumping," the actual act that caused the alleged public nuisance, the cause of action of public nuisance fails as a matter of law.

54

New Empire Mem. at 5.

New Empire's argument is well stated, but I believe it to be insufficient to warrant dismissal of the public nuisance claim.  As discussed in Section V.D.5, *supra*, the Complaint alleges that New Empire "identified the construction waste that would be disposed and determined the means of disposal," Complaint ¶ 121, and "arranged with IEV … to dispose the construction waste from the property that was disposed at the Park." *Id.* ¶ 124.  A plausible inference can be drawn from these factual allegations – which assert that New Empire took actions that initiated a process that concluded with dumping contaminated construction debris at the Park – that New Empire *did* contribute to the creation of the public nuisance.  To the extent that New Empire is asserting that it should be absolved of liability because it may have assumed that the waste material would be disposed of legally, its argument is implicitly premised on an absence of negligence, which is not a necessary element to the State's public nuisance claim.  This is not to say that Plaintiffs ultimately will prevail in establishing that New Empire participated in the creation of a public nuisance.  Rather, my conclusion goes no further than that the allegations in the Complaint are sufficient to establish a plausible claim, so that factual issues relevant to that claim should not be decided on a motion to dismiss.  *Cf. In re MTBE Prods. Liab. Lit.*, 725 F.3d at 121 (upholding a jury verdict against an oil company for creating a public nuisance by supplying gasoline to service stations with leaking underground storage tanks).[30]

---

[30]    Moreover, if the Plaintiffs prevail on their public nuisance claim, New Empire would have the opportunity to argue that its relative degree of culpability in creating the alleged public nuisance should be considered in any allocation of liability that may occur in later stages of this litigation.

### 3.    Recommendation Regarding Public Nuisance Claim

I recommend that the Court deny the motions to dismiss the public nuisance claim.[31]

### F.    Failure to State A Claim Under the Common Law Doctrine of Negligence

The Complaint seeks damages from Defendants' alleged negligence in damaging the Park.  Defendants move to dismiss these allegations for failure to state a claim.

### 1.    Contentions of the Parties.

To prevail on a negligence claim under New York law, a plaintiff must show "[1] a duty on the part of the defendant; [2] a breach of that duty by conduct involving an unreasonable risk of harm; [3] damages suffered by the plaintiff, and [4] causation, both in fact and proximate, between the breach and the plaintiff's harm."  *In re MTBE Prods. Liab. Lit.*, 725 F.3d at (quoting *McCarthy v. Olin Corp.*, 119 F.3d 148, 161 (2d Cir.1997) (internal quotation marks and citations omitted)).  Citing *532 Madison Avenue Gourmet Foods, Inc. v. Finlandia Center, Inc.*, 96 N.Y.2d 280 (2001) ("*532 Madison Avenue*"), Defendants argue that they had no duty to Plaintiffs, or the general public.  Plaintiffs assert that Defendants had a duty not to contaminate the environment and endanger public health.  P. Mem. at 42-43.

### 2.    Discussion

In *532 Madison Avenue*, the Court of Appeals considered a negligence claim arising from a construction accident causing the closure of a portion of Madison Avenue in midtown Manhattan.  The closure resulted in significant economic losses to several local businesses, which were forced to close due to lack of access.  The businesses brought suit against the owner of the construction site seeking damages, alleging that negligent management of the

---

[31]    Plaintiffs' contention that such liability is joint and several, *cf. City of New York v. Milhem Attea & Bros., Inc.*, 550 F. Supp. 2d 332, 352 (E.D.N.Y. 2008), need not be resolved at this early stage of the lawsuit.

construction work resulted in the accident, proximately causing their economic losses.  The plaintiffs in *532 Madison Avenue* argued that the property owner had a duty to keep its premises in a reasonably safe condition.  The Court of Appeals agreed that the defendants had such a duty, but held that it extended only to those who suffered personal injury or property damage as a result of the alleged breach of the duty of care.  It held that the duty "does not extend to members of the general public."  *Id.* at 289.  Thus, a property owner does not "owe[] a duty to protect an entire urban neighborhood against purely economic losses."  *Id.* at 290.  On this basis, the Court of Appeals dismissed the negligence claim because the plaintiffs – who had suffered neither personal injury nor property damage – were members of the general public to whom no duty was owed.

Likewise, here Plaintiffs have suffered neither personal injury nor property damage.  They neither own the Park nor seek to recover cleanup costs under a theory of negligence.  They seek to recover "the value of the public's lost use of the Park during the time that it was closed due to the disposal of hazardous substances."  Complaint ¶ 238.  But like the defendants in *532 Madison Avenue*, the Defendants here did not owe a duty to the general public, and therefore no damage claim can be brought on its behalf.  That the Park is land held in the public trust does not distinguish this case from *532 Madison Avenue*, because a city street is also land held in the public trust.  *See City of New York v. Rice*, 198 N.Y. 124, 128 (1910); *Baker v. Village of Elmsford*, 70 A.D.3d 181, 185 (2d Dep't 2009); *Acme Realty Co. v. Schinasi*, 154 A.D. 397, 406-07 (1st Dep't 1913).

Plaintiffs cite *Baker v. Saint-Gobain Performance Plastics Corp.*, 232 F. Supp. 3d 233 (N.D.N.Y. 2017), but the court there held that the defendants had "a duty not to pollute *a plaintiff's* drinking water."  *Id.* at 245 (emphasis added).  Contrary to Plaintiffs' contention, *see*

57

P. Mem. at 42, the court did not hold that a defendants' duty of care extends to the general

public. *See Baker v. Saint-Gobain Performance Plastics Corp.*, 232 F. Supp. 3d at 246

("[N]othing in *532 Madison* prevents *a person whose water supply was contaminated* … from

recovering in tort …" (emphasis added)).

### 3.      Recommendation Regarding Negligence Claim

I recommend that Plaintiffs' negligence claim be dismissed for failure to state a

claim upon which relief may be granted.  I note that dismissal of the negligence claim would not

be inconsistent with holding that the Complaint states a viable public nuisance claim because a

"public nuisance is a violation against the State and is subject to abatement or prosecution by the

proper governmental authority." *532 Madison Avenue*, 96 N.Y.2d at 292.[32]

### G.      Discussion of the Adequacy of the Allegations Against Daytree

### 1.      Contentions of the Parties

Daytree contends that the Complaint fails in that it lumps Daytree together with

the other Defendants defined as "the Datres" and directs its allegations against that group

collectively, without "a single allegation" that Daytree *itself* either transported construction

waste, or acted as an operator at the Park.  *See* Memorandum of Law in Support of Defendant

Daytree at Cortland Square Inc.'s Motion to Dismiss ("Daytree Mem.") at 11-14 (Dkt. 268).

Daytree asserts that it is a separate corporate entity that is legally distinct from the other Datre

Defendants.  *Id.*  Plaintiffs' response is that "the fact that Daytree is grouped together with other

defendants does not show that the State's allegations are insufficient."  P. Mem. at 37.

---

[32]     Plaintiffs also seek to recover the "costs of assessing the injury to, destruction of, or loss
of the natural resources."  Complaint ¶ 238.  But if Defendants are not liable for damages
to the State or general public under a negligence theory, they also cannot be liable under
a negligence theory for the cost of assessing those damages.

### 2.        Discussion of the Issue

A complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  The complaint must give the defendant "fair notice" of the claim being made against it and the "grounds" upon which it rests.  *Bell Atlantic v. Twombly*, 550 U.S. at 555.  Thus, the critical issue in addressing Daytree's argument is whether the allegations against the multiple Datre Defendants provides each of them with fair notice of the claims being made against them, and the grounds for those claims.  *See Sprint Solutions, Inc. v. Fils-Amie*, 44 F. Supp. 3d 1224, 1227 (S.D.Fla. 2014) (A "plaintiff may plead claims against multiple defendants by referring to them collectively, for example by referring to a group of defendants as 'defendants.'  These collective allegations are construed as applying to each defendant individually.  The practice only runs afoul of the applicable pleading standard where it results in a complaint that fails to give each defendant notice of the claims against it." (citations omitted)); *Hudak v. Berkley Group, Inc.*, No. 3:13-cv-00089-WWE, 2014 WL 354676 at *4 (D. Conn. Jan. 23, 2014) ("Nothing in Rule 8 prohibits collectively referring to multiple defendants where the complaint alerts defendants that identical claims are asserted against each defendant."); *Laing v. Cordi*, No. 2:11-cv-566-FtM-29SPC, 2012 WL 2999700 at *3 (M.D.Fla. July 23, 2012) ("Although a complaint against multiple defendants is usually read as making the same allegation against each defendant individually … factual allegations must give each defendant 'fair notice' of the nature of the claim and the 'grounds' on which the claim rests" (quoting *Bell Atlantic v. Twombly*, 550 U.S. at 555 n.3)).

I believe that the Complaint here provides the requisite fair notice to Daytree, since its allegations are straightforward – that "the Datres" – a term defined to include all of the named Datre Defendants – entered into arrangements with other Defendants to transport and dispose of construction waste, and disposed of that waste at the Park.  *See, e.g.,* Complaint ¶ 117

("[a]t least thirty-five times between August 2013 and April 2014, the Datres transported construction waste containing hazardous substances from 65 Park Pl. to the Park, where they disposed of it"); *id.* ¶ 76 (Datres disposed of "several thousands of tons of construction waste" at the Park "[b]etween August 2013 and April 2014").  Such allegations are written so as to apply to every one of the Defendants named in the group and thereby notifies each of them as to the nature of  Plaintiffs' claims.

### 3.        Recommendation Regarding the Daytree Motion

I recommend that Daytree's motion to dismiss for failure to state a claim be denied.  Of course, Daytree, and the other Datre Defendants joining in that motion, may seek through discovery more specificity as to the factual basis for Plaintiffs' allegations.

### H.        First-to-File Rule

### 1.        Contentions of the Parties

Several of the Defendants assert that the Complaint should be dismissed under the "first-to-file rule."  *See* COD Mem. at 14; Daytree Mem. at 7; IEV Mem. at 9.  Under that rule, "[w]here two courts have concurrent jurisdiction over an action involving the same parties and issues, … the court which first has possession of the action decides it."  *800-Flowers, Inc. v. Intercontinental Florist, Inc.,* 860 F. Supp. 128, 131 (S.D.N.Y. 1994) (citation omitted).  Thus, the courts will dismiss a lawsuit that they find to be duplicative of one that was previously filed. *See, e.g., Lexico Enterprises, Inc. v. Cumberland Farms, Inc.*, 686 F. Supp. 2d 221, 224 (E.D.N.Y. 2010) ("The general rule among federal district courts is to avoid duplicative litigation.").  The rule has been applied frequently in the Second Circuit where the subsequent case is "essentially the same lawsuit involving the same parties and the same issues.… "  *Factors Etc., Inc. v. Pro Arts, Inc.*, 579 F.2d 215, 218 (2d Cir. 1978).

According to Defendants, the basis for the application of the first-to-file rule here is that the Islip Action and the instant proceeding are based upon the "same alleged events," Reply Memorandum of Law in Support of Defendant Daytree at Cortland Square Inc.'s Motion to Dismiss ("Daytree Reply Mem.") at 3 (Dkt. 270), and involve "the same subject matter, the same claims and substantially the same parties." *Id.* at 4. As Daytree correctly points out, "[p]roper application of the first-filed rule requires that the first and subsequently filed cases have substantially similar – but not identical – parties and claims." Daytree Mem. at 8 (citing *Michel v. Petco Animal Supplies Stores, Inc.*, 16-cv-1838-LDH-PK, 2017 U.S. Dist. LEXIS 75892 at *6 (E.D.N.Y. 2017)).

Plaintiffs respond that the first-to-file rule usually is applied with respect to "mirror image lawsuits between the same parties," as where one party files an action for damages and another files one "seeking a declaratory judgment that there has been no wrongdoing." P. Mem. at 6 (citing *Sana Zara Bukhari v. Deloitte & Touche LLP,* 12-Civ.-4290-PAE, 2012 U.S. Dist. LEXIS 167315 at *8 (S.D.N.Y. 2012)).[33] They contend that the rule should not be applied here because the parties to the two actions differ and the claims they assert are substantively different. Defendants contend that such differences are of no consequence, since the courts apply the rule when there is "substantial overlap" with respect to parties and claims. *Wyler-Wittenberg v. MetLife Home Loans, Inc.* 899 F. Supp. 2d 235, 244 (E.D.N.Y. 2012). Among the concerns expressed by Defendants in seeking dismissal of the instant action under the first-to-file

---

[33]   Plaintiffs note that the "cases cited by Movants demonstrate that the rule is usually applied to actions in different courts, and that, when it is applied to actions in the same court, the plaintiff was the same in both actions." P. Mem. at 6-7. The movants dispute this and respond that this is a false distinction, because if there is good reason to find that a subsequently filed case in the same court is duplicative, judicial administration would weigh in favor of its dismissal. *See* Reply Memorandum of Law in Further Support of Defendant C.O.D. Services Corp.'s Motion to Dismiss the Complaint and Cross-Claims Pursuant to Fed. R. Civ. P. 12(b)(1) and (6) ("COD Reply Mem.") at 4 (Dkt. 277-9).

rule is that there is a risk of double recovery, duplicative discovery and inconsistent rulings by the respective courts.

### 2.    Discussion of the Issue

A court has wide discretion on whether to apply the first-to-file rule to dismiss or transfer a case. *See Kerotest Mfg. Co. v. C-O-Two Fire Equipment Co.*, 342 U.S. 180, 183-84 (1952) ("Wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation, does not counsel rigid mechanical solution of [duplicative lawsuits]. The factors relevant to wise administration here are equitable in nature. Necessarily, an ample degree of discretion, appropriate for disciplined and experienced judges, must be left to the lower courts."). Courts are guided in the exercise of such discretion by considerations of judicial efficiency in the administration of justice, considering the identity and interests of the parties, and the nature of the claims asserted in each of the cases. *See Byron v. Genovese Drug Stores, Inc.*, 10-CV-03313, 2011 U.S. Dist. LEXIS 120210 at *7 (E.D.N.Y. 2011) ("Although district courts have discretion to determine whether one action is duplicative, actions are considered [duplicative] … where the 'claims, parties, and available relief do not significantly differ between the actions.'" (citations omitted)).

It is fair to say that the question of Defendants' liability in this case turns on many of the same alleged facts as those before the Court in the Islip Action. It is also correct – given my recommendation in Section V.D, *supra* – that there is a risk of inconsistent decisions with respect to the critical issue of liability under CERCLA, as to certain Defendants. Nevertheless, there are strong reasons why the first-to-file rule should not be applied in this case. I discuss those reasons below.

First, although the Town and Plaintiffs both have asserted claims under the same federal statute, those claims are substantively different and are grounded in separate statutory

authority.  As discussed above, the Town has asserted claims under Sections 107(a)(4)(B) and

113(f) of CERCLA, 42 U.S.C. §§ 9607(a)(4)(B), 9613(f), seeking recovery of  response costs it

has incurred in remediating the Park.  *See* Islip Complaint ¶¶ 188–202.  Plaintiffs, on the other

hand, are not asserting claims under these statutory provisions, nor are they seeking to recover

costs incurred in investigating or remediating the Park.  Rather, Plaintiffs are proceeding: (i)  as

trustees of New York's natural resources, to recover "natural resource damages, including the

lost use of the Park during the time it was closed, and … [assessment] costs [pursuant to Sections

107(a)(4)(C) and 107(f) of CERCLA, 42 U.S.C. §§ 9607(a)(4)(C), 9607(f)]," Complaint ¶ 230;

and (ii) as *parens patriae*, to recover the value of the public's lost use of the Park during the time

it was closed, under the common law.  *Id.* ¶¶ 231-38.  These claims differ substantially from

those pleaded by the Town in the Islip Action.  Defendants seek to conflate these different claims

as both seeking money, but there is a significant difference as to the use of any monies paid in

the two actions.  The costs recovered by the Town may be directed to the Town's general fund,

while natural resource damages recovered by the Plaintiffs must be earmarked for restoration,

replacement, or acquisition of an equivalent resource under CERCLA, *see* Section 2.a.2, *supra*,

and damages under the common law must relate to harm to the State's "quasi-sovereign

interests."  Accordingly, I do not agree with Defendants' contention that the "State's claims are

essentially the same as the Town's claim for costs …."  COD Mem. at 15.  *See Castillo v. Taco

Bell of America LLC*, 960 F. Supp. 2d 401, 404 (E.D.N.Y. 2013) ("The lawsuits need not be

identical [for application of the first-to-file rule], but the claims and the rights raised in the two

actions must not differ substantially.").

Moreover, although there may be "substantial overlap" among the *Defendants* in

the two actions, the *Plaintiffs* are – and as a matter of law must be – entirely different.  *See*

63

Section 107(f) of CERCLA, 42 U.S.C. § 9607(f) (liability for natural resource damages "shall be to the United States Government and to any *State* for natural resources within such State or belonging to, managed by, controlled by, or appertaining to such State" (emphasis added)), and Section 107(f)(2)(B) of CERCLA, 42 U.S.C. § 9607(f)(2)(B) (directing each *State* to designate officials "who may act on behalf of the public as trustee for natural resources" in seeking such damages). Because the Town is not a designated natural resources trustee under CERCLA, Defendants' attempt to equate the Plaintiffs in the two cases on the grounds that a municipality is a political subdivision of the State must fail. Moreover, the courts have recognized that municipalities in New York are legal entities that are separate from the State, and may take their own "action on issues of local concern including those affecting the safety, health and well-being of [their] inhabitants." *City of New York v. Beretta U.S.A. Corp.*, 315 F. Supp. 2d 256, 274 (E.D.N.Y. 2004) (Recognizing the legal distinction between the State and its municipalities in finding that the City was not precluded by *res judicata* from asserting claims against gun manufacturers after a prior adverse decision against the State, noting among other things that "[i]n practice, the interests of the City and the State are often different. They are frequently in litigation against one another, with the Attorney General representing interests adverse to those of the City" (citations omitted)).

While it is true that the parties need not be "identical," the courts consider the interests of differing plaintiffs in deciding whether a subsequent case should be dismissed under the first-to-file rule. Thus, in *Wyler-Wittenberg v. MetLife Home Loans, Inc.*, the court "recognize[d] vast similarities among the individual plaintiffs" in each of the cases, and applied the rule "considering the similar positions held by the plaintiffs in each of these matters." 899 F. Supp. 2d at 244. Here, only Federal or State trustees are authorized under CERCLA to bring a

natural resource damages lawsuit, and the Town has no statutory authority to recover such damages in its case.  Thus, if the Court were to dismiss the instant case under the first-to-file rule, it would preclude the State trustee from exercising its statutory right to seek "lost use" damages on behalf of the public.  For this reason I find the distinction that exists between the Plaintiffs in the two actions to be significantly more important than the overlapping identity of the Defendants.

Finally, although the facts relevant to determining the liability of the defendants in the two cases are in large measure the same, there are two important differences.  For purposes of CERCLA liability, Plaintiffs will be required to prove that the alleged release of hazardous substances at the Park caused the natural resource damages they claim, and putting aside who would pay for any damage assessment, they must establish the extent of such damages.  *See* Complaint ¶¶ 219-238.  Moreover, with respect to their common law nuisance claim, they must prove the value of the public's lost use of the Park.  These "lost use" claims raise issues in this case that are not before the Court in the Islip Action.

### 3.    Recommendation Regarding the First-to-File Rule

I recommend that the Court not apply the first-to-file rule to dismiss the case.  At the same time, I recognize the potential inefficiencies that are posed to the Defendants with respect to duplicative discovery.[34]  Therefore, I recommend that the Court consider addressing those concerns under Fed. R. Civ. P. 42 by consolidating the two actions for discovery or

---

[34]    The Court also should be alert to the problem of double recovery.  *See Alabama v. Ala. Wood Treating Corp.*, Civil Action No. 85-0642-CG-C, 2006 U.S. Dist. LEXIS 37372 (S.D. Ala. 2006).  However, given the distinction between the cost recovery claims asserted in the Islip Action and the "lost use" claims brought by Plaintiffs, I believe that to be less of a concern than the potential for duplicative discovery.  The Court should note that Section 107(f)(1) of CERCLA provides that "[t]here shall be no double recovery under this chapter for natural resource damages, including the costs of damage assessment or restoration, rehabilitation or acquisition of or the same release and natural resource."  42 U.S.C. § 9607(f)(1).

coordinating discovery with the Court in the Islip Action. *See, e.g.*, *Baughman v. Pall Corp.*, 250 F.R.D. 121, 125 (E.D.N.Y. 2008) (consolidating derivative action with class actions for discovery purposes and reserving decision on full consolidation for trial); *Glauser v. EVCI Career Colleges Holding Corp.*, 236 F.R.D. 184, 186 (S.D.N.Y. 2006) (same); *Mahapatra v. Fuqi Int., Inc.*, 2010 WL 11575585 *3 (S.D.N.Y. July 26, 2010) (same).

## VI.     Conclusion

I recommend that the Plaintiffs' negligence claim be dismissed for failure to state a claim upon which relief can be granted and that Defendants' motions to dismiss otherwise be denied.  This report is submitted pursuant to Fed. R. Civ. P. 53.  Under that rule, a party may file objections to, or a motion to adopt or modify the report or recommendations, no later than 21 days after a copy is served, unless the Court sets a different time.  Fed. R. Civ. P. 53(f)(2).

Dated: March 9, 2018

J. Kevin Healy, Special Master