UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------- X
BASIL SEGGOS, Commissioner of the New York State :
Department of Environmental Conservation and Trustee :   **CASE NO. 2:17-cv-02684-SJF-ARL**
of New York State's Natural Resources, and the :
STATE OF NEW YORK, :
:
       Plaintiffs, :
:
               -against- :
:
THOMAS DATRE, JR. et al., :
:
       Defendants. :
------------------------------------------------------------------- X

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
THE STATE'S MOTION REQUESTING ENTRY OF A
CONSENT DECREE SETTLING THE STATE'S CASE AGAINST
DEFENDANT TRITON CONSTRUCTION COMPANY, LLC**

**PRELIMINARY STATEMENT**

As discussed in the State's moving brief, "the usual federal policy favoring settlements is even stronger in the CERCLA context." Courts should defer to parties' settlement agreements so long as they are fair, reasonable, and consistent with CERCLA's purposes. A settlement meets CERCLA's fairness requirement if it reflects a rough estimate of the amount of harm caused by a settling defendant. Further, that rough estimate need not be based on "the best, or even the fairest, of all conceivable methods" of measuring the harm a defendant caused.

The State's settlement with Triton plainly meets CERCLA's fairness requirement. The settlement follows a commonly accepted approach for determining a settlement amount: it ties Triton's liability to the volume of waste attributable to it. The settlement payment reflects half of the truckloads of waste brought from Triton's construction site to the Park, and another defendant that worked at Triton's construction site is also liable for damages.

The defendants that object to the settlement ("objectors") argue mainly that the settlement is not fair because (1) more information—presumably in the form of discovery and expert testimony—is needed before Triton can settle, and (2) Triton's liability and the State's total damages could have been estimated with a different methodology. But these objections are really just objections to the structure of CERCLA and the standards for CERCLA settlements. The structure of CERCLA encourages early settlements, which often disadvantage non-settling defendants, and does not require discovery before parties can settle. The standards for CERCLA settlements require only "rational" estimates of a defendant's liability, and because the settlement meets that standard, it is not relevant that other rational methods could have been used. Additionally, the fact that the objections criticize the settlement as being both too low and too high shows that the settlement is fair.

The settlement is also reasonable and consistent with CERCLA because it amounts to adequate compensation to the State from one of more than thirty defendants and resolves part of the case. The Court should enter the proposed consent decree.

## BACKGROUND

Plaintiffs (together, the "State") incorporate by reference the factual, procedural, and statutory background set forth in their moving brief and declaration in support.

On November 20, 2018, the State served a motion requesting entry of a proposed consent decree resolving its claims against defendant Triton Construction Company, LLC ("Triton") for $100,131. *See* Consent Decree, ECF No. 344-1. Three oppositions to the State's motion were served by defendants New York Major Construction Inc. and M&Y Developers Inc. (together, "M&Y"); Building Dev Corp. and Dimyon Development Corp. (together, "Dimyon"); and C.O.D. Services Corp. ("COD") (collectively, the "objectors"). *See* ECF Nos. 356, 357, 361. Seven defendants filed letters adopting the objectors' arguments. *See* ECF Nos. 358-60, 362-64, 366.

## THE STATE'S SETTLEMENT WITH TRITON IS FAIR

Objectors do not dispute that CERCLA allows for rough estimates of a settling party's liability; that courts commonly approve volumetric approaches for estimating CERCLA liability; or that the Court should defer to the parties' settlement agreement so long as it is fair, reasonable, and consistent with the purposes of CERCLA. Objectors instead challenge the State's method of determining the settlement amount and seek additional information.

### I.    Truckloads of Waste Provides a Sound Basis for Estimating Volume of Waste and Triton's Liability

As discussed in the State's initial brief, CERCLA only requires "'some acceptable measure of comparative fault, apportioning liability among the settling parties according to

2

rational (if necessarily imprecise) estimates of how much harm each [potentially responsible party] has done.'" *New York v. Panex Industries, Inc.*, No. 94-CV-0400E(H), 2000 U.S. Dist. Lexis 7913, at *9 (W.D.N.Y. June 6, 2000) (quoting *United States v. Cannons Engineering Corp.*, 899 F.2d 79, 87 (1st Cir. 1990); *see also* State Mem. of Law Supp. ("State MOL") at pp. 7, 9-11. The settlement with Triton is fair because it corresponds to half of the waste brought to the Park from Triton's construction site, and another defendant at that site is also liable for damages.[1]

As discussed in the State's initial brief (p. 10), a volumetric approach to liability like the one the State used to settle with Triton is a well-established approach to settlement under CERCLA. *See, e.g.*, *Cannons*, 899 F.2d at 87-88; *Panex Industries*, 2000 U.S. Dist. Lexis 7913, at *7, *12, *15 (approving consent decree based on defendant's estimated volume of waste despite a calculation error regarding that volume). Further, even if the settlement reflects a discount to the disadvantage of non-settling parties, that is permitted under CERCLA, particularly for a settlement early in the litigation. *See* State MOL at p. 10; *State of New York v. Next Millennium Realty, LLC*, No. 2:06-cv-01133 (E.D.N.Y. July 27, 2015), Order Entering Consent Decree, ECF No. 441 ("Order") at pp. 20, 22, 23 ("the court must not 'overemphasize[] the importance of its potential effect on the non-settlors'"; approving consent decree that included payment of "approximately seventy percent" of an already "substantially discounted" claim for natural resource damages) (alteration in original, citation omitted).

---

[1] COD notes that "Triton is allegedly responsible for delivering 12 out of the alleged 171 truckloads" of waste to the Park. COD Mem. of Law Opp'n ("COD MOL") at pp. 9-10. To be clear, the State does not allege that Triton itself delivered any truckloads of waste to the Park—other defendants were responsible for the actual delivery—but that twelve truckloads of waste were brought to the Park from Triton's site. *See* Compl. ¶ 24.

3

Objectors argue that the State mistakenly relies on *Panex* and that the State's settlement with Triton is unfair because further information was needed and the State apportioned liability for settlement purposes among the constructor contractor defendants without considering the liability of other defendants and non-defendants. None of these are grounds for the Court to disapprove the settlement with Triton.

### A. M&Y Has Failed to Distinguish *Panex*

M&Y attempts to distinguish *Panex* on a few grounds. First, M&Y implies that there was considerable discovery in *Panex* before the settlement was entered, but that is not so. M&Y Mem. of Law Opp'n ("M&Y MOL") at p. 6. Rather the court in *Panex* found that the non-settling defendants' relative culpability was sufficiently established based simply on a survey which stated that an entity related to the defendants had disposed of a certain volume of waste per year. *Panex*, 2000 U.S. Dist. Lexis 7913, at *12-13. The settlement amount "assumed" this waste consisted entirely of hazardous substances. *Id.* at *13; *see also* State MOL at p. 11. Further, as M&Y acknowledges, the settlement approved in *Panex* relied on a "somewhat specious" calculation of fault among defendants. M&Y MOL at p. 6 (quoting Panex, 2000 U.S. Dist. Lexis 7913, at *14).

Second, the fact that *Panex* involved settlements with multiple defendants does not make it irrelevant here. *See* M&Y MOL at p. 5 (citing *Panex*, 2000 U.S. Dist. Lexis 7913). The Triton settlement reflects adequate and proportional compensation from one of more than thirty defendants in this case, and will hopefully lead to additional settlements. It also resolves part of this case. Third, M&Y notes that non-settling parties had a full opportunity to participate in the negotiations in *Panex* while the State and Triton "negotiated privately." M&Y MOL at p. 5. M&Y cannot possibly mean that, when a defendant contacts the State to discuss settlement, the

State may negotiate with that defendant only if all the other defendants are involved in the negotiations. Indeed M&Y acknowledges that it and five other defendants met with the State to discuss settlement, without the participation of the rest of the defendants. *Id.* at p. 6. M&Y is of course is still free to negotiate with the State if it chooses to do so.

### B.  It Was Fair to Settle Without Further Discovery

Objectors argue that the amount of harm actually caused by Triton might not correspond to the number of truckloads of waste brought from its construction site to the Park. M&Y and COD contend that more information is needed to assess the accuracy of the estimate of this volume of waste, although they do not argue that the estimate is necessarily wrong. They would seek information about how much waste was in each truckload and how much waste in each truckload was actually dumped in the Park. M&Y MOL at p. 7; COD MOL at p. 9.

For settlement purposes, the number of truckloads of waste brought to the Park from a site provides a rational and objective basis to compare sites and estimate contractors' liability. That is true even if discovery might eventually show that all truckloads were not equal. M&Y and COD's approach logically would require the additional information they seek regarding all thirteen construction sites and the more than 170 truckloads of waste discussed in the complaint. Otherwise, it would be impossible to compare the quantity of waste from Triton's site with the waste from the other sites. That would involve extensive discovery, some of which might be unavailable and which therefore could prove problematic. CERCLA does not require such discovery before parties can settle. *See Panex*, 2000 U.S. Dist. Lexis 7913, at *12-13; *Cannons*, 899 F.2d at 88; *In re Cuyahoga Equip. Corp.*, 980 F.2d 110, 119 (2d Cir. 1992); State MOL at pp. 10-12; *see also Agere Sys. v. Advanced Envtl. Tech. Corp.*, 602 F.3d 204, 234-35 (3d Cir.

5

2010) (affirming district court's estimation of amount of waste transported to a disposal site based on the size and number of truckloads of waste transported there).

M&Y also argues that Triton bears more liability than the State attributes to it because (1) the waste brought from Triton's site to the Park was especially hazardous and (2) Triton supposedly knew about the hazardous nature of its waste. M&Y MOL at pp. 3-4. COD would similarly seek information about the toxicity of each truckload of waste. COD MOL at p. 9. These arguments miss their marks.

First, and as discussed in the State's moving brief, the State need not consider the relative toxicity of waste, as opposed to the volume of waste, in estimating a defendant's liability. *See* State MOL at p. 10; *Next Millennium Realty, LLC*, Order at p. 17 (the State's determination of comparative fault need not reflect "the best, or even the fairest, of all conceivable methods") (quoting *55 Motor Ave. Co. v. Liberty Indus. Finishing Corp.*, 332 F. Supp. 2d 525, 531 (E.D.N.Y. 2004)). Second, as explained at length in the State's opposition to motions to dismiss and as found by the Special Master in his report and recommendation on the motions, CERCLA imposes strict liability and a defendant's knowledge of the nature of its waste is irrelevant. ECF No. 273 at pp. 29-34; ECF No. 313 at p. 43.

Finally, the State's September 21, 2018 letter to the Court seeking approval of the settlement incorrectly stated that the settlement reflected the total number of truckloads of waste brought from Triton's construction site to the Park. ECF No. 344. The State later corrected this and indicated that the settlement reflected about half of that number of truckloads. *See* ECF No. 350. Objectors argue that this changed description makes the settlement unfair. M&Y MOL at pp. 1-3; Dimyon Mem. of Law Opp'n ("Dimyon MOL") at pp. 5-6. But regardless of the State's

6

error, the State has explained that the settlement is based on a fair assessment of Triton's comparative fault.

### C. It Was Fair to Apportion Liability Among the Construction Contractors

COD argues that the State's volumetric approach is flawed because it apportions Triton's liability as compared to other construction contractors at the sites involved in the Park dumping and ignores the potential liability of the owners of the construction sites. COD MOL at p. 11. The site owners, however, are not defendants. COD of course is free to bring contribution claims against the site owners. *See* CERCLA, 42 U.S.C. § 9613(f)(1).

Dimyon and COD similarly argue that the State's approach ignores the liability of the waste brokers and transporters who were involved in transporting the waste from multiple construction sites to the Park. Dimyon MOL at pp. 1, 6-7; COD MOL at p. 11; *see also* M&Y MOL at p. 6; Compl. ¶¶ 12-14 (describing the role of the waste brokers and transporters). But again a settlement with Triton based on the truckloads of waste from its site is an appropriate methodology for assessing comparative fault, and Dimyon and COD cite no case law holding that the State's methodology fails if it does account for the fault of *every* defendant. Moreover, courts should defer to the State's method of allocating liability, "particularly when the [defendants] involved are numerous and the situation is complex." *Cannons*, 899 F.2d at 88. Indeed, if anything, Dimyon and COD's argument would mean that Triton is overpaying, so Dimyon and other defendants will not be prejudiced by the settlement. *See Next Millennium Realty, LLC*, Order at p. 19 (non-settling defendants were not prejudiced by high settlement payments from other defendants).

Dimyon mistakenly argues that the State's approach could result in the State collecting more than its actual damages. Dimyon MOL at p. 7. In the event that the State enters into

7

settlements for the full amount of its natural resource damages—whether $3,000,000 as it currently estimates or another amount once fact and expert discovery is completed—the State may collect no additional damages.

## II.     The State Adequately Estimated its Total Damages

As described in the State's moving brief and the declaration submitted in support, the State estimated its damages at $3 million based on a 2010 economic report by the Trust for Public Land entitled *The Economic Benefits and Fiscal Impact of Parks and Open Space in Nassau and Suffolk Counties* (the "Report").  *See* State MOL at p. 5.  The Report estimates the monetary value of trips to parks like the Park based on an economic methodology developed by the U.S. Army Corps of Engineers.  That methodology takes into account factors such as the type and quality of facilities in a park, the distance and accessibility of similar facilities, and the aesthetics of a facility.

Objectors also argue that the State's estimate of its total damages may be too high or too law, and its methodology could be adjusted in various ways.  M&Y and Dimyon both assert that the State's estimate is too high because the Park's facilities were in disrepair before it closed for a cleanup, and therefore Park visits were worth less than the State estimated.  M&Y MOL at p. 8; Dimyon MOL at p. 4.  Dimyon also contends that the total damages estimate is high because it did not use a "weighted average" of the estimated numbers of visits to the Park for general Park purposes, which have less value than visits for the use of sports facilities at the Park.  Dimyon MOL at pp. 4-5.  M&Y and COD also assert that that the estimate may be high because the State looked only at substitute parks in Brentwood, rather than in a larger geographical area.  M&Y MOL at pp. 8-9; COD MOL at p. 8.

8

Dimyon additionally asserts that the settlement may be too low because it does not account for inflation or the State's expert's costs. Dimyon MOL at p. 2 n.1. M&Y contends that the State's damages estimate might be low because it used an estimate of the number of park visits made by Suffolk County residents, but computed per person park visits based on the population in a larger area. M&Y MOL at p. 8. M&Y concludes that the State's estimate of its total damages should be "based upon a *Daubert*-compliant methodology." M&Y MOL at p. 9.

None of these arguments has merit. First, if the State' damages estimate is too high, then the Triton settlement will result in an overpayment and the settlement will benefit Dimyon, M&Y, and other defendants. Second, at this point in the case and for settlement purposes, it is entirely appropriate for the State to estimate its damages. *See Cannons*, 899 F.2d at 88 (noting that courts should defer to the State's approach for allocating liability, especially when "the situation is complex"). While the State could have used alternative formulations or adjusted its methodology, its approach was sound. The State relied on an economic report that values park visits in Suffolk County, and that provided a solid basis for its estimate. The argument that the report is insufficient because it does not specifically mention the Park is meritless. *See* M&Y MOL at pp. 7-8.

In arguing for a more exacting analysis of the State's damages, M&Y and Dimyon confuse the standards for expert testimony with the standards for an estimate of natural resource damages for the purpose of settlement. Economic experts are commonly used in CERCLA cases involving natural resource damages and lost recreational use, because of the complexity of that type of analysis. *See Ohio v. U.S. Dep't of the Interior*, 880 F.2d 432, 479-80 (D.C. Cir. 1989). But expert discovery is not needed at this juncture. *See supra* at pp. 5-6. An estimate for settlement purposes needs only to be reasonable and the State's use of an economic report that

9

valued visits to Suffolk County parks and an estimate of the number of visits to the Park based on the population of Brentwood was entirely reasonable. To the extent the settlement is low because it omits inflation or costs of an expert, those costs are currently unknown, but will likely be minimal and are proper as a discount to an early settling party.

## **CONCLUSION**

For the reasons stated above and in the State's moving papers, the Court should enter the proposed consent decree settling the State's case against Triton.

Dated: New York, New York
      January 3, 2019

                    Respectfully submitted,

                    Letitia James
                    Attorney General
                    State of New York
                    Attorney for Plaintiffs

      By:    /s/ Matthew J. Sinkman
                    Assistant Attorney General
                    Environmental Protection Bureau
                    28 Liberty Street, 19th Floor
                    New York, New York 10005
                    (212) 416-8446