UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

|  |  |
|---|---|
| BASIL SEGGOS, Commissioner of the New York State Department of Environmental Conservation and Trustee of New York State's Natural Resources, and the STATE OF NEW YORK, | : **Civil Action No.** : **2:17-cv-02684-MKB-LB** : |
| Plaintiffs, | : : |
| -against- | : : |
| THOMAS DATRE, JR. et al., | : : |
| Defendants. | : : |

---

**MEMORANDUM OF LAW IN SUPPORT OF
THE STATE'S MOTION FOR APPROVAL
OF CONSENT DECREES**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................... ii

PRELIMINARY STATEMENT ............................................................................. 1

STATUTORY BACKGROUND ............................................................................ 2

FACTUAL AND PROCEDURAL BACKGROUND ............................................ 4

THE PROPOSED SETTLEMENTS ...................................................................... 8

    The State's Estimate of Its Natural Resource Damages .................................. 8

        The value of a visit to the Park ................................................................... 8

        The number of Park visits that would have been made during the closure of the Park ..... 10

        Total natural resource damages ................................................................. 11

    The State's Allocation of Its Damages Among Defendants ........................... 11

        Each defendant's share without taking insolvency into account ............... 11

        Each defendant's share taking insolvency into account .......................... 13

        The settling defendants' shares .................................................................. 15

    The Proposed Consent Decrees ...................................................................... 17

ARGUMENT ...................................................................................................... 17

THE COURT SHOULD ENTER THE PROPOSED CONSENT DECREES ........... 17

    A. THE PROPOSED CONSENT DECREES ARE FAIR ..................................... 19

    B. THE PROPOSED CONSENT DECREES ARE REASONABLE AND CONSISTENT WITH THE PURPOSES OF CERCLA .................................................... 20

    CONCLUSION ................................................................................................. 21

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*55 Motor Ave Co. v. Liberty Indus. Finishing Corp.*,
    332 F. Supp. 2d 525 (E.D.N.Y. 2004) ..................................................................18

*Alaska Sport Fishing Ass'n v. Exxon Corp.*,
    34 F.3d 769 (9th Cir. 1994) ..............................................................................3

*Arizona v. City of Tucson*,
    761 F.3d 1005 (9th Cir. 2014) ..........................................................................18

*B.F. Goodrich Co. v. Betkoski*,
    99 F.3d 505 (2d Cir. 1996)...........................................................................4, 17

*Burlington N. & Santa Fe Railway Co. v. United States*,
    556 U.S. 599 (2009).....................................................................................4, 11

*City of Bangor v. Citizens Communs. Co.*,
    532 F.3d 70 (1st Cir. 2008)...................................................................18, 19, 22

*In re Cuyahoga Equip. Corp.*,
    980 F.2d 110 (2d Cir. 1992)............................................................................ 17-18

*New York v. City of Johnstown*,
    1998 U.S. Dist. Lexis 5037 (N.D.N.Y. Apr. 2, 1998) .................................18, 19, 23

*New York v. Next Millennium Realty, LLC*,
    160 F. Supp. 3d 485 (E.D.N.Y. 2016) ...................................................................2

*New York v. Next Millennium Realty, LLC*,
    No. 2:06-cv-01133 (E.D.N.Y. July 27, 2015), ECF No. 441 ........................... 18-19

*New York v. Panex Industries, Inc.*,
    2000 U.S. Dist. Lexis 7913 (W.D.N.Y. June 6, 2000) .....................................18, 19

*New York v. Pneumo Abex LLC*,
    2008 U.S. Dist. Lexis 16135 (W.D.N.Y. Mar. 3, 2008) ........................................18

*United States v. Akzo Coatings of Am., Inc.*,
    949 F.2d 1409 (6th Cir. 1991) ..........................................................................18

*United States v. Alcan Aluminum Corp.*,
    990 F.2d 711 (2d Cir. 1993)................................................................................2

*United States v. Cannons Engineering Corp.*,
  899 F.2d 79 (1st Cir. 1990)..............................................................18, 19, 21, 23

*United States v. Davis*,
  11 F. Supp. 2d 183 (D. R.I. 1998) ...........................................................19

*United States v. Davis*,
  31 F. Supp. 2d 45 (D. R.I. 1998)......................................................3, 21, 22

**Statutes**

42 U.S.C. § 9601(9) .....................................................................................3

42 U.S.C. § 9601(14) ...................................................................................3

42 U.S.C. § 9601(22) ...................................................................................3

42 U.S.C. § 9607(a) ...............................................................................1, 2, 3

42 U.S.C. § 9607(a)(2)-(4) ......................................................................3, 6

42 U.S.C. § 9607(a)(3).................................................................................5

42 U.S.C. § 9607(f)(1)..........................................................................1, 3, 4

42 U.S.C. § 9613(f)(2) ...........................................................................4, 17

42 U.S.C. § 9613(g)(1) ................................................................................3

**Federal Regulations**

43 C.F.R. § 11.23(e)(5).............................................................................1, 3

43 C.F.R. § 11.83(c)(2)(vi) .........................................................................20

43 C.F.R. § 11.83(c)(3)...............................................................................20

**Other Authorities**

*Making Sense of Superfund Allocation Decisions: The Rough Justice of
  Negotiated and Litigated Allocations*, 31 ENVTL. L. REP. 11098 (2001) ...............................20

National Oceanic and Atmospheric Administration, *Deepwater Horizon NRDA
  Injury Assessment*, gulfspillrestoration.noaa.gov/how-we-assess-injuries .........................4, 20

Portland Harbor Natural Resource Trustee Council, *Damage Assessment Process*,
  fws.gov/portlandharbor/damage-assessment ...................................................4, 20

## PRELIMINARY STATEMENT

In 2013 and 2014, tens of thousands of tons of construction waste containing hazardous substances—asbestos, pesticides, and heavy metals including lead—were dumped at Roberto Clemente Park (the "Park") in Brentwood, New York.  The Town of Islip cleaned up the Park, which required closure of the Park and deprived the people of Brentwood of a vital community park for three years.

The Comprehensive Environment Response, Compensation, and Liability Act of 1980, ("CERCLA") provides for recovery of both cleanup costs and natural resource damages, which are damages for injuries to a state's natural resources, including the use of natural resources by the public, that are not remedied by cleanup actions.  *See* 42 U.S.C. § 9607(a); 43 C.F.R. § 11.23(e)(5).  CERCLA requires that natural resource damages be used "to restore, replace, or acquire the equivalent of such natural resources by the State."  *Id.* § 9607(f)(1).

In this action, plaintiffs Basil Seggos, as Commissioner of the New York State Department of Environmental Conservation and Trustee of New York State's Natural Resources, and the State of New York (together, the "State") seek natural resource damages under CERCLA and New York common law for the public's lost use of the Park.  The State sued thirty-three defendants: twenty-seven contractors at thirteen construction sites who arranged with waste brokers for construction waste to be removed from the sites, two waste brokers, and four transporters who hauled the construction waste to the Park and disposed of it there.

Last fall, the State moved for the Court's approval of a consent decree settling its claim against one of the two brokers, COD Services Corp., for $20,000; that motion remains pending. In this motion, the State requests the Court's approval of three additional consent decrees providing for the payment to the State of $606,944 in natural resource damages.  The First

Supplemental Consent Decree settles the State's claims against five construction contractors: Atria Builders, LLC; Triton Construction Company, LLC; Monaco Construction Corp.; Alef Construction Inc.; and 158 Franklin Ave. LLC.  The Second Supplemental Consent Decree settles the State's claims against the second of the two waste brokers, IEV Trucking Corp.  The Third Supplemental Consent Decree settles the State's claims against a sixth construction contractor, Touchstone Homes LLC.[1]

The State calculated its natural resource damages for purposes of settlement based on estimates of the monetized value of a Park visit and the number of visits to the Park by the public that would have been made during the three-year closure but for that closure.  The State then apportioned its estimated damages among the defendants based on the State's assessment of relative fault and adjusted its settlement amounts to reflect litigation risk and encourage early settlement.

The State requests that the Court approve the consent decrees because they are fair, reasonable, and further the goals of CERCLA.

## STATUTORY BACKGROUND

Under CERCLA, the State may sue responsible parties for both the costs of cleanup actions and for "damages for injury to, destruction of, or loss of natural resources" that result from a "release" of "hazardous substances" into the "environment" from a "facility."  42 U.S.C. § 9607(a); *see United States v. Alcan Aluminum Corp.*, 990 F.2d 711, 719-21 (2d Cir. 1993); *New York v. Next Millennium Realty, LLC*, 160 F. Supp. 3d 485, 505, 521 (E.D.N.Y. 2016).

---

[1] There are three separate consent decrees because the State (1) settled with five construction contractors; (2) separately settled with IEV because that is a joint settlement with the Town of Islip, which sued IEV for its cleanup costs; and (3) subsequently settled with a sixth construction contractor after the consent decree with the first five construction contractors had been executed.

2

Here the Town of Islip cleaned up the Park so in this action the State seeks only natural resource damages.  Complaint, ECF No. 1 at p. 40.

Responsible parties under CERCLA include any person who "arranged for disposal" of hazardous substances, any person who "accepted any hazardous substances for transport to disposal or treatment facilities," and any person who "operated any facility" at which hazardous substances were disposed.  *Id.* § 9607(a)(2)-(4).  The parties who "generate" the hazardous substances—in this case, the contractors at thirteen construction sites who arranged for disposal of construction waste—"bear primary responsibility for proper disposition of the hazardous wastes that they produced" and "that responsibility cannot be delegated to others."  *See United States v. Davis*, 31 F. Supp. 2d 45, 65 (D. R.I. 1998), *aff'd*, 261 F.3d 1 (1st Cir. 2001).

A "release" includes any "dumping, or disposing into the environment."  *Id*. § 9601(22).  "Hazardous substances" include substances that EPA has designated as hazardous.  *Id.* § 9601(14).  A "facility" includes "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located."  *Id.* § 9601(9).

Natural resource damages are awarded when cleanup actions "do not or will not sufficiently remedy the injury to natural resources without further action," 43 C.F.R. § 11.23(e)(5), and are typically assessed after a cleanup is completed or the cleanup remedy is selected, *see* 42 U.S.C. § 9613(g)(1).  Natural resource damages may include damages for the lost use of a natural resource, including recreational uses, during the time when hazardous substances are being cleaned up.  *See, e.g., Alaska Sport Fishing Ass'n v. Exxon Corp.*, 34 F.3d 769, 772 (9th Cir. 1994).  Natural resource damages recovered by the State may be used "only to restore, replace, or acquire the equivalent of such natural resources by the State."  42 U.S.C. § 9607(f)(1).

CERCLA provides that "the authorized representative of any State, shall act on behalf of the public as trustee of such natural resources to recover for such damages." *Id*. § 9607(f)(1). As the Commissioner of the New York State Department of Environmental Conservation, plaintiff Basil Seggos is the Trustee of New York State's Natural Resources and the authorized representative to bring such an action on behalf of the People of the State of New York.

Where natural resource damages involve the lost use of a recreational area, federal agencies have based the damages on "the quantity of adversely affected trips [] multiplied by the 'unit value' of each trip." Portland Harbor Natural Resource Trustee Council, *Damage Assessment Process*, Natural Resource Damage Assessment Plan (June 1, 2010) § 5.2), fws.gov/portlandharbor/damage-assessment (choose "Final Assessment Plan") (last visited May 19, 2021); National Oceanic and Atmospheric Administration, *Deepwater Horizon NRDA Injury Assessment*, gulfspillrestoration.noaa.gov/how-we-assess-injuries (choose "Human uses of natural resources") (last visited May 19, 2021) (citing studies assessing "impacts to human use, including collecting data on shoreline visitation numbers").

Subject to narrow exceptions, liability under CERCLA is joint and several among responsible parties. *See Burlington N. & Santa Fe Railway Co. v. United States*, 556 U.S. 599, 614 (2009). To encourage settlement with the federal government and states, CERCLA provides that, when a private party settles its liability with the United States or a state, "[it] shall not be liable for claims for contribution regarding matters addressed in the settlement." 42 U.S.C. § 9613(f)(2); *see also B.F. Goodrich Co. v. Betkoski*, 99 F.3d 505, 527 (2d Cir. 1996).

## FACTUAL AND PROCEDURAL BACKGROUND

The State's complaint alleges as follows. Construction waste from the New York City metropolitan area typically contains hazardous substances. Complaint ¶ 62. Between August

2013 and April 2014, several thousand tons of construction waste were transported from thirteen construction sites in the metropolitan area and disposed in the thirty-acre Park. *Id.* ¶¶ 69, 76-80, 97. The waste contained hazardous substances, including asbestos, pesticides, and heavy metals including lead. *Id.* ¶¶ 88-89. The Park was a popular location for residents in the community and other members of the public to engage in a wide range of activities, including basketball, soccer, swimming, and widely-attended movie nights. *Id.* ¶¶ 69-70. The Town of Islip, where Brentwood is located, closed the Park in May 2014 for approximately three years for a cleanup, during which time the public was not able to use the Park. *Id.* ¶¶ 87, 101.

In May 2017, the State asserted claims against three categories of defendants under CERCLA and common law. First, the State asserted claims against twenty-seven contractors and sub-contractors (collectively, "construction contractors"), who were responsible for waste generation at the sites from which construction waste was transported to the Park, and who were sued as "arrangers" under CERCLA, *see* 42 U.S.C. § 9607(a)(3). Complaint ¶¶ 15-26, 28-43.[2] The complaint alleges that these contractors identified the construction waste at each site that would be disposed and arranged for its disposal. *Id.* ¶¶ 110, 121, 128-30, 137, 146, 157, 165, 173, 183, 191, 199, 207, 215. The complaint also alleges that the contractors knew or should have known that the construction waste that was disposed in the Park contained hazardous substances. *Id.* ¶¶ 116, 124, 132, 140, 151, 160, 165, 176, 186, 194, 201, 210, 218.

Second, the State sued two waste brokers, IEV and COD, who acted as brokers between the construction contractors and waste haulers and were also sued as "arrangers." *Id.* ¶¶ 13-14. Third, the State's suit named four waste haulers who transported the waste to the Park and

---

[2] The State also sued "John Doe" as an unknown excavation contractor at one of the construction sites, Complaint ¶ 27, but has not identified that John Doe.

disposed of it there (collectively, the "transporters"), who the State alleges are liable as "transporters" and "operators" under CERCLA, *see* 42 U.S.C. §§ 9607(a)(2), (4).  Complaint ¶¶ 8-12.  The complaint alleges that the brokers and transporters knew or should have known that the construction waste disposed in the Park contained hazardous substances.  *Id.* ¶¶ 116, 124, 132, 140, 151, 160, 165, 176, 186, 194, 201, 210, 218.

In July and August of 2017, eight defendants moved to dismiss and for judgment on the pleadings.  ECF Nos. 49, 51, 98, 172, 180, 181.  The Court stayed discovery during the pendency of those motions.  ECF No. 244.  In November and December 2017, the Court appointed a Special Master to issue a Report and Recommendation ("Report") on the pending motions.  ECF Nos. 294, 304.  The Special Master did so in March 2018.  ECF No. 313.  The Report recommended that the State's negligence claim be dismissed but that defendants' motion otherwise be denied.  *Id.* at 66.  The Report also observed that defendants' request to dismiss the State's CERCLA claims as untimely could be revisited after discovery.  *Id.* at 22.

In August 2019, the Court converted defendants' motion to dismiss for untimeliness into a motion for summary judgment, directed the parties to conduct discovery on timeliness and file further briefs on that issue, and held in abeyance any further ruling on the Report.  ECF No. 386 at 9-10.  The parties conducted that discovery and submitted a fully-briefed motion to the Court in July 2020.  ECF No. 415.  That motion is pending.

In September 2018, before the Court issued its August 2019 ruling, the State filed a letter requesting entry of a proposed consent decree settling its claims against Triton Company, LLC, which is also a settling defendant under the First Supplemental Decree.  ECF No. 344.  After several defendants submitted letters in opposition to the settlement, the Court ordered the parties

to submit briefs regarding the proposed consent decree and the parties did so.  ECF Nos. 351 (order requiring the parties to submit briefs), 370 (fully-briefed motion).

In September 2019, the Court rejected the proposed settlement with Triton based on two concerns about the application of the methodology the State used to estimate its total damages and to apportion liability to Triton based on relative fault.  *See* ECF No. 393.  First, like the consent decrees for which the State seeks approval here, the initial Triton consent decree relied on an estimate of the State's natural resource damages that was based on the value of a visit to the Park multiplied by the number of visits that would have been made to the Park while it was closed.  The Court did not express any concern about the State's basic methodology for estimating damages.  *See id.* at 5.  The Court found, however, that the State's calculation of the number of trips that would have been made to the Park was flawed because the State based that calculation on a report that analyzed park visits in Nassau and Suffolk Counties but then calculated visits to the Park based on the population of all of geographic Long Island, including Brooklyn and Queens.  *Id.* at 5-7.

Like the settlements with construction contractors at issue here, the Triton consent decree apportioned fault among the construction contractors based on the number of truckloads of construction waste transported to the Park from each of the construction sites.  The Court found that that "the truckload measure is both reasonable and practical."  *Id.* at 9.  However, the Court found that the State's apportionment of its total damages in its initial settlement only apportioned the liability of the construction contractors and that the State should also have apportioned the liability of the other categories of defendants, namely the waste brokers and transporters.  *Id.* at 10.

In October 2020 the State filed a motion seeking the Court's approval of a consent decree settling the State's claims against COD, one of the two waste brokers, for $20,000.  ECF No. 420.  Because that settlement was based on COD's limited ability to pay, the State did not use a methodology for assessing relative fault.  That unopposed motion remains pending.

## THE PROPOSED SETTLEMENTS

The State negotiated the settlements based on an estimate of the State's total natural resource damages for purposes of settlement, a formula for allocating the total damages among all defendants based on relative fault, and adjustments to that formula to account for litigation risk.

### The State's Estimate of Its Natural Resource Damages

To estimate the natural resource damages caused by closure of the Park for three years to clean up the construction waste dumped there, the State estimated the monetized value of a visit to the Park and multiplied that value by the estimated number of visits to the Park that the public would have made during the closure.  *See* Accompanying Declaration of John D. Davis ¶ 2.

*The value of a visit to the Park.*  To estimate the value of a visit to the Park, the State used two different approaches and then averaged the results.  *Id.* ¶ 3.  The first approach was based on a methodology developed by the United States Army Corps of Engineers to determine the value of a specific recreational facility.  *Id.* ¶ 4.  That formula is based on an estimate of how much an individual would be willing to pay to use the facility, taking into account various factors such as the type of activities available at the facility, the aesthetics of the facility, and the distance and accessibility of similar facilities.  *Id.* ¶¶ 4-6.  The Army Corp methodology assigns a point value to each of those factors for a specific facility (*e.g.*, a park that has more and higher-

quality recreational activities receives more points) and then estimates the monetary value of a visit based on a facility's total points. *Id.* ¶¶ 5-6.

Using the Army Corps methodology, the State assigned thirty-five total points to the Park, based on, among other factors, ten (out of a possible thirty) points for the types of activities available because the Park provides facilities for common activities such as baseball and soccer; six (out of a possible twenty) points for its average aesthetics; and one (out of a possible eighteen) points for availability of similar recreational opportunities because several substitutes are available within thirty minutes to an hour away. *Id.* ¶ 6. Thirty-five points corresponds to a monetized value between $6.21 (thirty points) and $7.77 (forty points) for a park visit and the State averaged those two amounts for a per-visit value of $6.99. *Id.* ¶¶ 7-8.

The State's second approach relied on a report prepared by the Trust for Public Land ("Trust Report") that used the Army Corps methodology to determine the value, in general, of visits to different types of parks in Nassau and Suffolk Counties. *Id.* ¶ 9. The Report estimated that visits to generic parks in Suffolk County that have sports facilities are worth $3.98. *Id.* ¶ 10. The Trust Report also provided lower and higher values for visits to parks in Suffolk County that are used for general park purposes (*e.g.*, playgrounds, walking) or for special uses (*e.g.*, festivals, attractions), respectively. *Id.* Because the Park has been used for all of these purposes, *see* Complaint ¶¶ 69-70, the State used the middle value of $3.98. Davis Decl. ¶ 10. The State then adjusted this amount (which was in 2009 dollars) for inflation to 2019 dollars (when the State developed its formula) using the Consumer Price Index for the New York metropolitan area, resulting in a per-visit value to the Park of $4.69. *Id.* ¶ 10 and n.3.

9

The State used the average of $6.99 as based on the Army Corps methodology and $4.69 as based on the Trust Report to estimate for settlement purposes that a visit to the Park is worth $5.84.  *Id.* ¶ 11.

*The number of Park visits that would have been made during the closure of the Park.*  To estimate the number of lost visits to the Park while it was closed, the State relied on statistical studies showing how many visits people make to local parks generally and how the number of those visits vary based on how far individuals live from parks.  *Id.* ¶¶ 12.  The State also accounted for nearby facilities that individuals might use instead of, or as substitutes for, the Park.  *Id.* ¶¶ 20, 23-25.  The State did not rely on the park visits data in the Trust Report, which had led to the Court's rejection of the previous Triton settlement, as discussed above.  *See* ECF No. 393 at 5-7.

Instead, the State relied on nationwide surveys finding that seventy-eight percent of people visit local parks twenty-four times each year.  Davis Decl. ¶¶ 13-15.  The State determined based on census data that 10,481 people live within one-half mile of the Park.  *Id.* ¶ 18.  Because seventy-eight percent of those residents are likely to make twenty-four annual visits to local parks, they are likely to make 196,204 annual visits to parks within one-half mile of where they live.  *Id.* ¶ 19.  In addition to the Park, there is one public school with playgrounds and fields within a half-mile radius of the Park so, based on the availability and acreage of the school facilities, the State determined that residents living within one-half mile of the Park are likely to visit it 178,546 times per year.  *Id.* ¶¶ 20-21.

The nationwide survey also found that sixty-four percent of visits to local parks are made by people who live within a half-mile radius.  *Id.* ¶ 22.  Because those 178,546 annual visits by people who live within one-half mile represent sixty-four percent of visits to the Park, 100,432

additional annual visits potentially would be expected to have been by people more than one-half mile from the Park.  *Id.* ¶ 23.  There are several other parks available to those people so the State adjusted those visits to 44,190.  *Id.* ¶¶ 24-25.

Adding those 44,190 visits to 178,546 visits to the Park by people living within one-half mile of the Park, residents of Brentwood would have visited the Park 222,736 times each year if it had not been closed, for a total of 668,208 lost visits over three years.  *Id.* ¶ 26.

*Total natural resource damages.*  Multiplying the value of each Park visit, $5.84, by the number of lost Park visits yields a total damages estimate of $3,902,335.  *Id.* ¶ 27.  The State rounded that number down to $3,900,000 for purposes of allocating the damages among the defendants.  *See* Accompanying Declaration of Matthew J. Sinkman ¶ 4.

## The State's Allocation of Its Damages Among Defendants

For purposes of settlement, the State presumes that all defendants are jointly and severally liable under CERCLA for all the State's natural resources damages, *see Burlington N.*, 556 U.S. at 614, and has apportioned the damages of $3,900,000 among the defendants based on an assessment of relative fault.  Sinkman Decl. ¶ 4.  That apportionment required a two-phase methodology because not all the defendants are solvent.  *Id.* ¶ 5.  In the first phase, the State calculated the share that each defendant would pay if all the defendants were solvent.  *Id.*  In the second phase, the State allocated the shares that had been apportioned to the insolvent defendants—so-called "orphan shares"—to the solvent defendants, as is appropriate because all the defendants are presumed jointly and severally liable for purposes of settlement allocation.  *Id.*

**Each defendant's share without taking insolvency into account.**  To assess relative fault for the purpose of calculating each defendant's share, the State divided the defendants into two groups: (1) construction contractors, and (2) brokers and transporters.  *Id.* ¶ 6.  The State

11

then allocated two-thirds of the damages ($2,600,000) to the construction contractors and one-third ($1,300,000) to the brokers and transporters. *Id.* ¶ 7.

The State allocated the larger share to the contractors because the construction waste was generated at their construction sites, they were in the best position to know that the waste contained hazardous substances, and they were responsible for ensuring that the waste was disposed at a waste facility appropriate for disposal of this type of waste material. *Id.* While the brokers bear some responsibility for failing to determine that the construction waste would be properly disposed and the transporters bear responsibility for dumping the waste material in the Park, the Park was closed for three years because the waste contained hazardous substances, for which the contractors bear greater responsibility. *Id.* The State's allocation therefore addresses the relative responsibility of all the various defendants, which the Court found that the State had failed to take into account in its previous settlement with Triton. *See* ECF 393 at 10.

As the State did in the earlier Triton settlement and the Court found reasonable, ECF No. 393 at 9, the State then apportioned $2,600,000 among the construction contractors based on the truckloads of construction waste that the State has alleged were transported to the Park from each construction site, which varied from two to forty truckloads. Sinkman Decl. ¶ 8; *see also* Complaint ¶¶ 104-211. Based on the State's allegation that 171 total truckloads were hauled to the Park, the State used a value of $15,205 per truckload. Sinkman Decl. ¶ 8. Because the State sued more than one contractor at most construction sites, Complaint ¶¶ 15-43, a construction contractor could settle by paying its site's entire negotiated share or by joining with the other contractors at its site to pay that share. Sinkman Decl. ¶ 17.

The State apportioned $1,300,000 in damages among the six brokers and transporters by dividing that amount among them, for a share of $216,667 apiece, because those defendants

12

worked in various combinations to dispose of the waste but discovery has not yet taken place that would clarify the precise role of each entity in that scheme.  *Id.* ¶ 9.

**Each defendant's share taking insolvency into account.**  Once the State had determined each defendant's share without taking insolvency into account, the State recalculated the shares taking it into account.  *Id.* ¶ 10.  Again, it is appropriate for the solvent defendants to be liable for the insolvent defendants' shares because every defendant likely is jointly and severally liable for all the natural resource damages.  *Id.* ¶ 4.

*The value of the orphan shares.*  The State took insolvency into account by calculating the sum of the shares that would otherwise be paid by insolvent defendants—the orphan shares— and then apportioning that sum to the remaining defendants.  *Id.* ¶ 10.  When the State calculated the orphan shares for the settling defendants except Touchstone, the State had reason to believe that both contractor defendants at the construction site at 867-869 45th Street in Brooklyn Complaint—Freedom City Contracting Corp. and Total Structure Services Inc., *see* Complaint ¶¶ 42-43—are insolvent because they defaulted in this action, ECF No. 238, and that, as a result, there are no solvent defendants to pay that site's share of damages.  Sinkman Decl. ¶ 11.  That site's share is $30,409 because the State has alleged that two truckloads of construction waste were hauled to the Park from the site, Complaint ¶ 211, at $15,205 per truckload under the State's formula.[3]  Sinkman Decl. ¶ 11.  As discussed below, the State later learned that both defendants at another construction site were also apparently insolvent and thus adjusted the orphan shares for its settlement with Touchstone.  *Id.*

---

[3] For simplicity, this memorandum presents monetary values generated by the State's formula as rounded to the nearest dollar amount, although the formula itself uses unrounded values.

13

When the State calculated the orphan shares for the settling defendants except

Touchstone, it also had reason to believe that five of the six broker/transporter defendants—

transporters Thomas Datre Jr., Christopher Grabe, 5 Brothers Farming Corp., Daytree at

Cortland Square Inc., and broker COD—are insolvent based on submissions those defendants

have made to the Court and the State.  *Id.* ¶ 12.  Under the State's formula, their shares are

$216,667 apiece for a total of $1,083,333, less $30,000 that the State anticipated would be paid

by broker COD, for an adjusted total of 1,053,333.  *Id.* ¶¶ 12-14.  As discussed below, COD later

entered into a joint settlement with the State and the Town of Islip under which it agreed to pay

$20,000 to the State; as a result, the State adjusted the orphan shares for its settlement with

Touchstone.  *Id.* ¶¶ 13, 16.

Adding together the orphan shares of the construction contractors and the orphan shares

of other defendants, the total orphan shares used to calculate the liability of the solvent

defendants except for Touchstone are $1,083,743.  *Id.* ¶ 14.

*Allocation of the orphan shares to the solvent defendants.*  Once the State had determined

that the total orphan shares were $1,083,743, it distributed that amount among the solvent

defendants using the same formula it had used to assess relative fault without taking insolvency

into account.  *Id.* ¶ 15.  Thus, the State allocated two-thirds, or $722,495, to the construction

contractors, which increased the per-truckload damages for the contractors to $19,480 for all the

settling contractors except Touchstone.  *Id.*

The State allocated the other one-third of the orphan shares, or $361,248, to the

remaining defendants. Because there is only one solvent defendant in that category—settling

defendant IEV—its share increased from $216,667 to $577,914.  *Id.* ¶ 18.

14

As discussed above, the orphan shares used to calculate Touchstone's liability were higher because, by the time the State began negotiations with Touchstone, it had learned that both contractors—Woori and Plus K—at the construction site at 209-43 45th Road in Queens, were insolvent and the State had settled with COD for $20,000 instead of $30,000, as it had anticipated. *Id.* ¶¶ 13, 16. The orphan share for the Woori/Plus K site on 45th Road was $106,433 because the State has alleged that seven truckloads of construction waste were hauled to the Park from that site, Complaint ¶ 169, at $15,205 per truckload. Sinkman Decl. ¶ 16. That orphan share and the decrease in what COD paid increased the total orphan shares from $1,083,743 to $1,200,175 and orphan shares to be paid by the contractors from $722,495 to $800,117. *Id.* That changed the liability of the solvent contractors to $3,263,275 ($2,600,000 plus $800,117 minus the contractor orphan shares of $30,409 and $106,433 (which the $800,117 takes into account)). *Id.* As a result, the per-truckload liability increased to $20,144 (based on 162 trips after taking out the 9 trips made from the two orphan sites). *Id.*

**The settling defendants' shares.** Once the State had allocated shares to each defendant, it discounted its settlement allocation to defendants by fifty percent based on the litigation risks. *Id.* ¶ 19. Those risk factors include (1) a motion for summary judgment against the State based on the statute of limitations remains pending, and (2) the State's estimate of natural resource damages was prepared by a staff scientist in the Attorney General's office for settlement purposes only and, if this case goes to trial, the State anticipates that it will retain one or more experts to prove its damages and that defendants likely will retain their own experts to challenge the amount of those damages. *Id.* To encourage early settlement—which will make funds available for the benefit of the Brentwood community more quickly—the State further negotiated each share that would be paid by the settling defendants. *Id.*

15

Based on the State's methodology, the settling defendants' shares and the agreed-upon

settlement amounts are as follows:

| Settling Contractors | Number of Truckloads Transported | Per Truckload Value | Total Share With 50% Adjustment | Final Settlement |
|---|---|---|---|---|
| Atria<br><br>(636 Louisiana Avenue, Brooklyn) | 13 (*see* Complaint ¶ 161) | $19,480 | $253,237 x .5 = $126,619 | $90,000 |
| Triton<br><br>(35-39 Cooper Square, Manhattan) | 12 (*see id.* ¶ 141) | $19,480 | $233,758 x .5 = $116,879 | $108,505 |
| Alef, 158 Franklin, and Monaco<br><br>(158 Franklin Avenue, Brooklyn) | 6 (*see id.* ¶ 177) | $19,480 | $116,879 x. 5 = $58,439 | $58,439 (jointly and severally) |
| Touchstone<br><br>(32 Sinclair Drive, Kings Point) | 22 (*see id.* ¶ 125) | $20,144 | $443,161 x .5 = $221,580 | $175,000 |
| **Settling Broker** | | | | |
| IEV | n/a | n/a | $577,914 x .5 = $288,597 | $175,000 |
| **Total** | | | | **$606,944** |

Sinkman Decl. ¶ 20.

**The Proposed Consent Decrees**

The proposed First Supplemental Consent Decree requires the payment by Atria of $90,000 over 18 months; the payment by Triton of $108,505 within 30 days; and the payment by Alef, 158 Franklin, and Monaco of $58,439 over 13 months based on party-specific factors.  *Id.*, Exhibit A ¶¶ 9-11.  The proposed Second Supplemental Consent Decree with IEV is part of a joint settlement with the Town of Islip, and it requires the payment by IEV to the State of $175,000 over 25 months.  *Id.*, Exhibit B at 3 and ¶ 9.  The proposed Third Supplemental Consent Decree with Touchstone Homes incorporates many of the provisions of the First Supplemental Consent Decree and requires the payment by Touchstone of $175,000 over 35 months.  *Id.*, Exhibit C ¶ 3.

Pursuant to CERCLA, 42 U.S.C. § 9613(f)(2), and similar provisions of federal and state law, all the consent decrees protect the settling defendants from contribution claims made by other defendants.  The consent decrees also contain reopener provisions, which allow the State to bring claims against the settling defendants if additional contaminants are discovered at the Park that cause the State to incur additional natural resource damages.  All the consent decrees provide that the Court has continuing jurisdiction to enforce their terms and to resolve any disputes that may arise under them.

## ARGUMENT

### THE COURT SHOULD ENTER THE PROPOSED CONSENT DECREES

Courts reviewing CERCLA settlements "have recognized that the usual federal policy favoring settlements is even stronger in the CERCLA context."  *B.F. Goodrich Co.*, 99 F.3d at 527.  A court reviewing a CERCLA settlement is required to ascertain whether the settlement is fair, reasonable, and consistent with the purposes of CERCLA.  *In re Cuyahoga Equip. Corp.*,

980 F.2d 110, 118-19 (2d Cir. 1992); *Arizona v. City of Tucson*, 761 F.3d 1005, 1011-12 (9th Cir.

2014); *City of Bangor v. Citizens Communs. Co.*, 532 F.3d 70, 86 (1st Cir. 2008); *United States*

*v. Cannons Engineering Corp.*, 899 F.2d 79, 85 (1st Cir. 1990); *New York v. Pneumo Abex LLC*,

No. 07-CV-794S, 2008 U.S. Dist. Lexis 16135, at *2 (W.D.N.Y. Mar. 3, 2008); *55 Motor Ave.*

*Co.*, 332 F. Supp. 2d at 529-30 (E.D.N.Y. 2004); *New York v. Next Millennium Realty, LLC*, No.

2:06-cv-01133 (E.D.N.Y. July 27, 2015), Order Entering Consent Decree ("Order") at 14-18,

ECF No. 441.  A court should not substitute its judgment for that of the parties.  *United States v.*

*Akzo Coatings of Am., Inc.*, 949 F.2d 1409, 1435 (6th Cir. 1991); *55 Motor Ave Co. v. Liberty*

*Indus. Finishing Corp.*, 332 F. Supp. 2d 525, 530 (E.D.N.Y. 2004).

Fairness refers to both the procedure through which the parties agree to a consent decree

and to the substance of the terms in the decree.  "To measure procedural fairness, a court should

ordinarily look to the negotiation process and attempt to gauge its candor, openness, and

bargaining balance."  *Pneumo Abex*, 2008 U.S. Dist. Lexis 16135, at *4 (quoting *Cannons*, 899

F.2d at 86).

A settlement decree is substantively fair if it "roughly correlates" with "'some acceptable

measure of comparative fault, apportioning liability among the settling parties according to

rational (if necessarily imprecise) estimates of how much harm each [potentially responsible

party] has done.'"  *New York v. Panex Industries, Inc.*, No. 94-CV-0400E(H), 2000 U.S. Dist.

Lexis 7913, at *9 (W.D.N.Y. June 6, 2000) (alteration in original) (quoting *Cannons*, 899 F.2d at

87); *accord* ECF No. 393 at 7-9 (collecting cases and noting that the State's determination of

comparative fault need not reflect "the best, or even the fairest, of all conceivable methods")

(quoting *55 Motor Ave. Co.*, 332 F. Supp. 2d at 531); *New York v. City of Johnstown*, Nos. 87-

CV-636, 87-CV-637, 1998 U.S. Dist. Lexis 5037, at *15-17 (N.D.N.Y. Apr. 2, 1998); *Next*

*Millennium Realty, LLC*, Order at 17-18 (citing *United States v. Davis*, 11 F. Supp. 2d 183, 190 (D. R.I. 1998), *aff'd in relevant part*, 261 F.3d 1 (1st Cir. 2001)).

The State's method for apportioning liability "should be upheld so long as the [State] supplies a plausible explanation for it." *Cannons*, 899 F.2d at 87-88 (noting that "[t]here is no universally correct approach" to measuring comparative fault," and "the best measure" "should be left largely to the [government's] expertise"). Courts should defer to the government's method of allocating liability, "particularly when the [defendants] involved are numerous and the situation is complex." *Id.* at 88.

A settlement is reasonable if it adequately compensates the public and appropriately reflects the strength of the parties' litigation positions. *City of Bangor*, 532 F.3d at 86; *Cannons*, 899 F.2d at 89-91; *City of Johnstown*, 1998 U.S. Dist. Lexis 5037, at *19. A settlement is consistent with CERCLA if it holds responsible parties accountable and promotes the timely cleanup of the environment and settlement over protracted litigation. *Cannons*, 899 F.2d at 90-91; *City of Johnstown*, 1998 U.S. Dist. Lexis 5037, at *14.

The Court should enter the three proposed consent decrees because they are procedurally and substantively fair and reasonable and consistent with the purposes of CERCLA.

## A.     THE PROPOSED CONSENT DECREES ARE FAIR.

The First, Second, and Third Supplemental Decrees are procedurally and substantively fair. They are procedurally fair because the State and the settling defendants engaged in good-faith, arm's length negotiations and they did so through counsel or directly with defendants who had access to counsel.

The terms of the decrees are substantively fair because the settlement amounts are based on the State's settlement formula, which provides a fair and reasonable basis for apportioning

19

damages among the defendants for purposes of settlement.  First, the State's estimate of its total

natural resource damages is fair because it is based on an estimate of the monetized value of a

visit to the Park and the number of trips to the Park that would have been made if the Park had

not been closed for cleanup.  *See, e.g.*, 43 C.F.R. §§ 11.83(c)(2)(vi), 11.83(c)(3) (United States

Department of Interior regulations authorizing natural resource damage assessments to utilize

methodologies that determine the unit values of lost recreational experiences, as well as "[o]ther

methodologies that measure compensable value in accordance with the public's willingness to

pay for the lost service"); Portland Harbor Natural Resource Trustee Council, *Damage*

*Assessment Process*, Natural Resource Damage Assessment Plan (June 1, 2010) § 5.2 (to

estimate lost recreational use damages at CERCLA site, "the quantity of adversely affected trips

is multiplied by the 'unit value' of each trip"), fws.gov/portlandharbor/damage-assessment

(choose "Final Assessment Plan") (last visited May 19, 2021); National Oceanic and

Atmospheric Administration, *Deepwater Horizon NRDA Injury Assessment*,

gulfspillrestoration.noaa.gov/how-we-assess-injuries (choose "Human uses of natural resources")

(last visited May 19, 2021) (citing studies assessing "impacts to human use, including collecting

data on shoreline visitation numbers").

Second, the State's settlement formula rationally apportions its damages among

categories of defendants, which is an approach commonly used in CERCLA cases.  *See* Robert

P. Dahlquist, *Making Sense of Superfund Allocation Decisions: The Rough Justice of Negotiated*

*and Litigated Allocations*, 31 Envtl. L. Rep. 11098, 11098 (2001) (when courts allocate costs to

responsible parties in CERCLA cases, they "frequently divide the liable parties into categories"

and then "allocate both between categories and among the members of each category"); *see also*

ECF No. 393, at p. 10 (a substantively fair allocation of liability to waste generator/arranger

defendants should also factor in the liability of the other categories of defendants).  The State's

two-to-one allocation of liability to the construction contractors on the one hand and the

transporters on the other hand is logical.  The Park was closed for three years because

construction waste was dumped there that contained hazardous substances.  The contractors were

responsible for the generation of the construction waste and were in the best position to know

that the waste contained hazardous substances and should be disposed at a facility that treats

hazardous substances.  While the brokers bore responsibility for failing to ensure that the

construction waste was properly disposed and the transporters bore responsibility for dumping

the waste in the Park, they did not generate the waste and thus were not in the best position to

know that it contained hazardous substances.  *See Davis*, 31 F. Supp. 2d at 65 (D. R.I. 1998)

("the generators bear primary responsibility for proper disposition of the hazardous wastes that

they produced. That responsibility cannot be delegated to others."), *aff'd*, 261 F.3d 1 (1st Cir.

2001).  Additionally, many more contractors than brokers and transporters are believed to be

solvent.  *See* Sinkman Decl. ¶¶ 11-12; Dahlquist, 31 Envtl. L. Rep. at 11098, 11103, 11106

(allocations are fact-intensive and depend on the circumstances of each case, but parties'

culpability and ability to pay may be considered).

      The allocation of damages among the construction contractors based on the volume of

waste from each construction site that was disposed of at the Park is fair.  *See Cannons*, 899 F.2d

at 87-88 (settling parties' comparative fault was properly based on the relative volume of their

waste); *Panex*, 2000 U.S. Dist. Lexis 7913,  at *7, *12-15 (similar); Dahlquist, 31 Envtl. L. Rep.

at 11101 ("volume is almost always the starting point for conducting Superfund allocations

among waste generators").  The number of truckloads of waste the State alleges were transported

from each construction site is a sound approximation of volume and thus is reasonable and

practical, as the Court found when it reviewed the earlier settlement with Triton.  *See* ECF No. 393 at p. 9.

The allocation of damages within the broker/transporter group evenly among those six defendants is also fair because those defendants worked in various combinations to dispose of the waste but discovery has not yet taken place that would clarify the precise role of each entity in that scheme.  Sinkman Decl. ¶ 9; *cf.* Dahlquist, 31 Envtl. L. Rep. at 11098, 11103 (damages may be allocated based on various equitable factors; relative culpability is a critical factor).  In any event, all but one of those defendants appears to be insolvent.  Sinkman Decl. ¶¶ 11, 18.

The consent decrees are also substantively fair because the State's settlement formula allocates the insolvent defendants' "orphan" shares among the solvent defendants according to the same methodology that initially apportioned damages between the construction contractors and broker/transporters, and then within the construction contractors based on their respective volumes.  *See Davis*, 31 F. Supp. 2d at 62 ("the fair share allocated to a defendant may include a portion of the liability attributed to 'orphan shares,' which refer to harm attributable to insolvent or unknown" responsible parties); Dahlquist, 31 Envtl. L. Rep. at 11106 (orphan shares may be divided among solvent defendants).

**B.     THE PROPOSED CONSENT DECREES ARE REASONABLE AND CONSISTENT WITH THE PURPOSES OF CERCLA.**

The proposed consent decrees are reasonable because they provide adequate compensation from the settling defendants and reflect the parties' litigation risks.  *See City of Bangor*, 532 F.3d at 86.  The decrees provide adequate compensation because they are based on an estimate of the lost value to the public of visits to the Park during the three years that the Park was closed.  The decrees reflect the parties' litigation risks because, among other reasons, a motion for summary judgment based on timeliness is pending and the State's estimate of damages was developed by a

22

staff scientist for purposes of settlement only.  If this case goes to trial, the State anticipates that it will retain an expert to prove its damages and that the defendants will also retain an expert, and the amount of damages likely will be contested.  The decrees are also consistent with CERCLA because they hold allegedly responsible parties accountable and they promote settlement over protracted litigation.  *Cannons*, 899 F.2d at 90-91; *City of Johnstown*, 1998 U.S. Dist. Lexis 5037, at *14.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should enter the First Supplemental Consent Decree settling the State's claims against Atria Builders, LLC, Triton Construction Company, LLC, Monaco Construction Corp., Alef Construction Inc., and 158 Franklin Ave. LLC, the Second Supplemental Consent Decree settling the State's claims against IEV Trucking Corp., and the Third Supplemental Consent Decree settling the State's claims against Touchstone Homes LLC.

Dated: New York, New York
     May 26, 2021

                                       Respectfully submitted,

                                       LETITIA JAMES
                                       Attorney General
                                       State of New York
                                       Attorney for Plaintiffs

By:    <u>/s/ Matthew J. Sinkman</u>
                                         Matthew J. Sinkman
                                       Channing Wistar-Jones
                                       Assistant Attorney General
                                       Environmental Protection Bureau
                                       28 Liberty Street, 19th Floor
                                       New York, New York 10005
                                       Matthew.Sinkman@ag.ny.gov
                                       Channing.Jones@ag.ny.gov
                                       (212) 416-8446

23
