UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------------------------------------

BASIL SEGGOS, *as Commissioner of the New York State Department of Environmental Conservation and Trustee of New York State's Natural Resources*, and the STATE OF NEW YORK,

                              Plaintiffs,

                  v.

THOMAS DATRE, JR., et al.,

                              Defendants.

--------------------------------------------------------------

**MEMORANDUM & ORDER**
17-CV-2684 (MKB)

MARGO K. BRODIE, United States District Judge:

       Plaintiffs Basil Seggos, as Commissioner of the New York State Department of Environmental Conservation (the "DEC"), and the State of New York commenced this action on May 4, 2017, against two categories of Defendants — "Operator/Transporter Defendants," who allegedly transported construction waste containing hazardous substances from construction sites to Roberto Clemente Park in Brentwood, New York (the "Park"), and "Arranger Defendants," who either (1) allegedly acted as brokers between the construction site operators and Operator/Transporter Defendants for the removal and disposal of waste or (2) were allegedly contractors or subcontractors at the construction sites where the waste was generated — asserting claims pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et seq.*, New York Real Property Actions and Proceedings Law § 841, and New York common law.  (Compl. ¶¶ 5–43, Docket Entry No. 1.)  Plaintiffs contend that Defendants transported and then dumped "tens of thousands of tons" of construction and demolition debris containing hazardous materials at the Park.  (*Id.* ¶ 1.)  Following a lengthy

procedural history discussed further below, which includes Judge Sandra J. Feuerstein's August 5, 2019 Order directing that all other issues in this case be stayed until the Court decided the timeliness of Plaintiffs' CERCLA claim, (Order dated Aug. 4, 2019 (the "August 2019 Order"),[1] Docket Entry No. 386), twelve Defendants move for partial summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure on the grounds that Plaintiffs' CERCLA claim for natural resource damages is time-barred as a matter of law.[2]  (Defs.' Mem. in Supp. of Defs.' Mot. ("Defs.' Mem."), Docket Entry No. 415-42; Defs.' Reply in Supp. of Defs.' Mot. ("Defs.' Reply"), Docket Entry No. 415-93.)  Plaintiffs oppose the motion.  (Pls.' Mem. in Opp'n to Defs.' Mot. ("Pls.' Opp'n"), Docket Entry No. 415-44.)

For the reasons set forth below, the Court denies Defendants' motion.

## I.  Background

The following facts are undisputed unless otherwise noted.[3]

---

[1]  The case was reassigned to the undersigned on May 3, 2021.  (Order dated May 3, 2021.)

[2]  Twenty-one Defendants initially moved for partial summary judgment: Building Dev Corp.; Dimyon Development Corp.; IEV Trucking Corp.; New Empire Builder Corp.; COD Services Corp.; Touchstone Homes LLC; New York Major Construction Inc.; M & Y Developers Inc.; Atria Builders, LLC; Monaco Construction Corp.; Sparrow Construction Corp.; East Coast Drilling NY Inc.; Cipriano Excavation Inc.; Plus K Construction Inc.; 158 Franklin Ave. LLC; Alef Construction Inc.; All Island Masonry & Concrete, Inc.; ILE Construction Group, Inc.; Daytree at Cortland Square, Inc.; East End Materials, Inc.; and Triton Construction Company, LLC.  (Defs.' Mot. for Summ. J. 1, Docket Entry No. 415.)  However, nine of these Defendants — IEV Trucking Corp.; M & Y Developers Inc.; COD Services Corp.; Touchstone Homes LLC; Atria Builders, LLC; Monaco Construction Corp.; 158 Franklin Ave. LLC; Alef Construction Inc.; and Triton Construction Company, LLC — have since settled through Court-approved consent decrees and are no longer parties to this action.  (Min. Entry dated July 28, 2021, Docket Entry No. 455; Fourth Suppl. Consent Decree, Docket Entry No. 458.)

[3]  (Defs.' Stmt. of Undisputed Facts Pursuant to Local Rule 56.1 ("Defs.' 56.1"), Docket Entry No. 415-41; Pls.' Resp. to Defs.' 56.1 ("Pls.' 56.1"), Docket Entry No. 415-43, at 1–38; Pls.' Counter-Stmt. of Undisputed Facts ("Pls.' Counter-Stmt."), Docket Entry No. 415-43, at

### a.   Factual background

### i.   DEC structure and protocol

The DEC consists of several branches.  The Division of Law Enforcement (the "DLE") is

the law enforcement branch and consists of a force of New York State police officers made up of

investigators and Environmental Conservation Officers ("ECOs").  (Defs.' 56.1 ¶ 8.)  DLE

officers are trained to identify potential solid waste and solid waste violations.  (*Id.* ¶ 9.)

Investigation of a potential solid waste violation, including illegal dumping of solid waste,

typically begins with a DLE officer or personnel from the DEC's Division of Material

Management ("DMM") visiting the site.  (*Id.* ¶ 17; Pls.' 56.1 ¶ 17.)  Officers typically

photograph the site to document violations and make an initial assessment of whether there is a

potential solid waste violation.  (Defs.' 56.1 ¶ 17.)  DLE officers then consult with DMM's

environmental engineers, who characterize the nature of the material.  (Pls.' 56.1 ¶ 9; Defs.' 56.1

¶ 18.)  DMM engineers are aware of visual indicators of hazardous substances in solid waste.

(Defs.' 56.1 ¶ 22.)  The material then undergoes chemical analysis.  (*Id.* ¶ 18.)  To perform

chemical analysis, the solid waste must be sampled.[4]  (*Id.* ¶ 32.)

The timing for scheduling the chemical sampling varies, but this is typically done in the

range of one to three weeks "at the latest."  (Defs.' 56.1 ¶ 19 (quoting Dep. of Lt. Frank

---

39–67; Defs.' Reply to Pls.' 56.1 ("Defs.' 56.1 Reply"), Docket Entry No. 415-94, at 1–26;
Defs.' Resp. to Pls.' Counter-Stmt. ("Defs.' Counter-Stmt. Resp."), Docket Entry No. 415-94, at
27–58.)

[4]  Plaintiffs contend that there are visual indicators that solid waste could possibly contain
hazardous substances, but unless and until a sample undergoes laboratory analysis, it is unknown
whether the material is actually contaminated with hazardous substances, and to what degree.
(Pls.' 56.1 ¶ 22.)  They also contend that some solid waste may not undergo sampling for
chemical analysis if it contains visually recognizable materials, including uncontaminated
concrete, asphalt, rocks, bricks, and soil.  (*Id.* ¶ 18.)

Lapinski, former Investigative Lieutenant with the Bureau of Environmental Crime Investigations ("BECI") division of the DLE ("Lapinski Dep.") 34:16–23, 105:14–24, annexed to Pls.' Opp'n as Ex. 4, Docket Entry No. 415-49).)  Chemical testing results can be obtained within seven days of submission to the lab.  (*Id.* ¶ 34.)  In 2013 and 2014, the DEC had the ability to sample soil for hazardous substances.  (*Id.* ¶ 33.)  Items can be tested for asbestos by putting those items underneath a microscope.  (*Id.* ¶ 35.)  Whether those items contain asbestos can be determined in a single day.  (*Id.*)

For higher-level crimes, it is standard for ECOs to cede control of investigations to BECI officers.  (Pls.' Counter-Stmt. ¶ 13.)

### ii.   Contents of waste and debris

Construction waste from New York City typically contains hazardous substances. (Defs.' 56.1 ¶ 1.)  Indeed, the majority of the soil in New York City contains hazardous substances, including semi-volatile organic compounds ("SVOCs"), metals, and pesticides. (*Id.* ¶ 2.)  Metals that are commonly found in soil in New York City include lead, chromium, nickel, copper, zinc, and cadmium.  (*Id.* ¶ 3.)  Construction and demolition ("C&D") debris from construction waste in New York City typically contains hazardous substances unless they have been removed.  (*Id.* ¶ 7.)  Dumping C&D debris in a public park constitutes a solid waste violation.  (*Id.* ¶ 10.)  Dumping solid waste can be a crime even if the material does not contain hazardous substances.  (Pls.' Counter-Stmt. ¶ 5.)  Hazardous substances are distinct from hazardous waste.  (*Id.* ¶ 6.)

The presence of C&D debris in solid waste, when comingled with other materials, could be an indicator that the waste contains hazardous substances.  (Defs.' 56.1 ¶ 23.)  Abnormal coloration or odor is an indication that the material could potentially be contaminated.  (*Id.* ¶ 24.)

Coloration in soil that is not typical is another indicator of the presence of hazardous substances in C&D debris.  (*Id.* ¶ 25.)  Chemical odors, such as the smell of petroleum or a musky smell, can also indicate the presence of hazardous substances in C&D debris.  (*Id.* ¶ 26.)  Observation of asbestos-containing material or suspected asbestos-containing material in solid waste indicates that the waste may contain hazardous substances.  (*Id.* ¶ 27.)  Asbestos is listed as a hazardous substance in CERCLA regulations (40 C.F.R. § 302.4) and the DEC's list of hazardous substances (6 NYCRR § 597.3).[5]  (*Id.*)  The presence of unrecognizable debris — pulverized, crushed material — also indicates that the waste is potentially chemically contaminated.  (*Id.* ¶ 28.)  If solid waste is unrecognizable, the waste has to be tested for the presence of any chemical contamination through chemical analysis.  (*Id.* ¶ 31.)

Defendants contend that DLE officers are aware of visual indicators of C&D debris, such as the presence of multi-colored fines or slag.[6]  (*Id.* ¶ 20.)  Plaintiffs contend that fines and slag are potential indicators of chemical contamination, not C&D.  (Pls.' 56.1 ¶ 20.)

---

[5]  Plaintiffs contend that the presence of asbestos-containing material cannot be visually observed with the human eye and must instead be analyzed in a laboratory under a microscope. (*Id.* ¶ 27.)

[6]  The parties dispute the definitions of "fines" and "slag."  Defendants contend that "fines" are "small remnants of materials, including metals, rust, slag, and other eroded substances that often rise to the surface after a rain event."  (Defs.' 56.1 ¶ 29.)  Plaintiffs claim that "'fines' is a term that is used differently by different people" and that can mean something "less than an inch or three-eighths of an inch or half an inch" or "very small pieces of material, like powdered sand."  (Pls.' 56.1 ¶ 29 (first quoting Dep. of Syed H. Rahman, DEC Environmental Engineer 3 ("Rahman Dep.") 58:4–7, annexed to Pls.' Opp'n as Ex. 1, Docket Entry No. 415-46; and then quoting Lapinski Dep. 10:21–11:3).)  Defendants define slag as a byproduct of coal burning and welding, and as an indicator that material may contain contaminants and materials such as lead.  (Defs.' 56.1 ¶ 30.)  Plaintiffs similarly claim that the term slag is used differently by different people, as it can be a byproduct of smelting, (Pls.' 56.1 ¶ 30 (citing Dep. of Matthew Blaising, DLE Patrol Supervisor ("Blaising Dep.") 38:2–4, annexed to Pls.' Opp'n as Ex. 5, Docket Entry No. 415-50)), or can come from welding, (*id.* (citing Lapinski Dep. 33:11–15)).

### iii.   July 2013 Sage Street Site investigation

On July 26, 2013, in response to an anonymous complaint, Pappachan Daniel, an environmental engineer with the DMM, visited a site at 1625 Islip Avenue in Central Islip, located at Islip Avenue and Sage Street (the "Sage Street Site"). (Defs.' 56.1 ¶ 36.) The Sage Street Site is about 1.5 miles from the Park. (*Id.*) At the Sage Street Site, Daniel found waste consisting of C&D debris, including concrete, asphalt, and bricks mixed with soil. (*Id.* ¶ 38.) These materials had been illegally disposed of without a permit or authorization. (*Id.*) Daniel could not access the site directly but took pictures of the waste materials he observed and of a license plate of a truck parked at the Sage Street Site. (*Id.* ¶ 37.) The C&D debris from the Sage Street Site was "overflowing onto the sidewalks and into the neighboring areas." (*Id.* ¶ 39 (quoting Dep. of ECO Jeffrey Hull, who at the relevant times was a DEC ECO of New York Region 1, which encompasses the relevant area in this action ("Hull Dep.") 61:9–16, annexed to Pls.' Opp'n as Ex. 3, Docket Entry No. 415-48).) By this time, the DEC was familiar with non-moving Defendant Thomas Datre, Jr., who had committed prior environmental violations and who was then the subject of a criminal investigation undertaken by the Suffolk County District Attorney (the "SCDA"). (*Id.* ¶ 40.)

On July 29, 2013, Peter Scully, Regional Director of DEC Region 1, recognized a truck in one of Daniel's photographs of the Sage Street Site as a truck that belonged to a company owned by Datre. (*Id.* ¶ 41.) On September 5, 2013, Daniel returned to Sage Street and observed a truck unloading materials. (*Id.* ¶ 42.) During the visit, Daniel met with Christopher Grabe, who introduced himself as being hired by the property manager to clean the site. (*Id.*) By September 10, 2013, the DEC was aware of a connection between Grabe and Datre involving the

6

Sage Street Site.  (*Id.* ¶ 43.)  That same day, Scully suggested that the DLE interview Grabe, Datre, and the property owner.  (*Id.*)

Multiple pictures of the Sage Street Site from 2013 show an open gate to the fence surrounding it.  (*Id.* ¶ 49.)  In the fall of 2013, the DLE attempted to gain access to the Sage Street Site by the owner's consent by planning to serve a Notice of Violation.  (*Id.* ¶ 44.)  The DLE was unable to serve the property owner with the Notice.  (*Id.*)  The DEC asked the SCDA to issue a search warrant for the Sage Street Site, but its request was denied.  (*Id.* ¶ 45.)  Because the DEC did not have access to the site, (*id.* ¶ 48), the DEC did not sample or test the waste of the Sage Street Site until in or after May of 2014, (*id.* ¶ 47).

On May 1, 2014, Detective Ted Severino, who was assigned to the SCDA's Environmental Crimes Unit, found two pieces of "transite shingle" that spilled out onto Sage Street from the Sage Street Site.  (*Id.* ¶¶ 50, 121.)  Within one day, tests showed that one sample contained 16% asbestos.  (Defs.' 56.1 ¶¶ 51, 122; Pls.' 56.1 ¶ 51.)  In subsequent testing on samples from the soil, several hazardous substances were identified, including SVOCs, pesticides, metals, and asbestos-containing building materials.  (Defs.' 56.1 ¶ 52.)

### iv.   January 2014 Park investigation

In January of 2014, the DEC received a complaint that a truck belonging to a company affiliated with Datre had been dropping off potentially illegal solid waste at the Park.  (*Id.* ¶ 53.)  On January 24, 2014, ECO Ron Gross visited the Park but could not gain access because of a closed and locked gate.  (*Id.* ¶ 55; Pls.' 56.1 ¶ 55.)  He could not confirm that there was C&D debris at the Park because there was snow on the ground at the time.  (Defs.' 56.1 ¶ 55.)  ECO Gross subsequently made an inquiry to the Town of Islip (the "Town").  (*Id.*)  Joseph Montuori, who was at that time the Commissioner of the Town's Department of Parks, Recreation, and

Cultural Affairs, represented to the DEC that the placement of C&D debris had been an error and

that the material would be removed.  (*Id.*)  Montuori wrote that the Town was "aware of the

C&D dumping and that it was a misunderstanding" related to a reconstruction project and that

"all of the debris had been cleaned up."  (Pls.' 56.1 ¶ 55 (quoting DEC Compl. Form, Received

Jan. 24, 2014 at 4, annexed to Defs.' Mot. as Ex. 19, Docket Entry No. 415-20).)  Montuori also

represented that a Datre company had done work for the Town, but he would neither confirm nor

deny that any Datre affiliate had been responsible for the C&D debris.  (DEC Compl. Form.)

The DEC closed the case on or about February 7, 2014.  (Defs.' 56.1 ¶ 55.)

### v.   April 2014 Park investigation

On March 31, 2014, the DEC received another complaint of illegal dumping at the Park.

(*Id.* ¶ 57.)  The caller asserted that the dumping was from a grading project using C&D materials.

(*Id.*)  Lt. Matthew Blaising, a patrol supervisor at the DLE, directed ECO Hull to investigate the

complaint.  (*Id.* ¶ 58.)  By April of 2014, the DEC had received 4,095 complaints for dumping in

the Park.  (Pls.' Counter-Stmt. ¶ 15.)

### 1.   April 2, 2014 visit by ECO Hull

ECO Hull first visited the Park on April 2, 2014.  (Defs.' 56.1 ¶ 59.)  During this initial

visit, ECO Hull observed multiple piles of fill material on the soccer field at the Park.  (*Id.* ¶ 60.)

These contained some larger rocks and bricks, small pieces of poly sheeting and wire coating,

rusted steel, glass, and other materials that he considered indicative of C&D debris.  (*Id.*)  ECO

Hull memorialized his observations in written reports and took photographs.  (*Id.* ¶ 61.)  The

photographs showed solid waste, including processed concrete, fines, a pile of dark brown

material, and bricks.  (*Id.* ¶ 62.)  That same day, ECO Hull shared his findings by email with his

DEC colleagues and superiors.  (*Id.* ¶ 63.)  ECO Hull recommended that a "solid waste engineer

. . . observe the site to make a proper conclusion on whether the fill [was] in violation of their

permits." (Email dated April 2, 2014, annexed to Defs.' Mot. as Ex. 22, Docket Entry No. 415-23.) Within a few hours, Lt. Blaising directed DMM staff to inspect the Park. (*Id.*; Defs.' 56.1 ¶ 65.) DMM arranged for engineering staff to visit the Park the following day. (Defs.' 56.1 ¶ 65.)

### 2. April 3 visit and first interaction with the SCDA

Daniel, ECO Hull, and ECO Gross visited the Park on April 3, 2014, to determine whether there was a solid waste violation. (*Id.* ¶ 66; Pls.' 56.1 ¶ 66.) Daniel observed broken glass, wood, plastic, asphalt, and bricks in the Park and determined that the fill material was solid waste mixed with C&D materials and that its placement constituted a solid waste violation. (Defs.' 56.1 ¶ 67.) The C&D debris had been dumped at the Park's soccer field and recharge basin, a low-lying area of the Park where water collected and drained and which was normally not used for recreation. (Defs.' 56.1 ¶ 72; Pls.' 56.1 ¶ 72.) Daniel took a "grab sample" of the fill from the soccer field. (Defs.' 56.1 ¶¶ 66, 78.) The DEC never conducted chemical analysis of this sample.[7] (*Id.* ¶ 80.)

By April 3, DMM staff had "inspected the site and determined that the fill material [was] solid waste and that its placement constitute[d] a solid waste violation." (Email dated Apr. 3, 2014, annexed to Defs.' Mot. as Ex. 28, Docket Entry No. 415-29.) In an April 3, 2014 email, Scully wrote that the material was covered with materials that might have been brought to the Park from the Sage Street Site. (Defs.' 56.1 ¶ 69.) In that same email, Scully suspected that Datre was involved in illegal dumping at both the Park and Sage Street Site. (Email dated Apr. 3, 2014, annexed to Defs.' Mot. as Ex. 31, Docket Entry No. 415-32.) The DEC notified the

---

[7] Although Plaintiffs contend that grab samples are simply for preliminary analysis and are not sent to the laboratories for testing, (Pls.' Counter-Stmt. ¶ 18), there was no scientific reason that the DEC could not test this sample for hazardous substances, (*id.* ¶ 79).

SCDA about the dumping in the Park on April 4.  (Pls.' 56.1 ¶ 73.)  Scully noted that he called

the SCDA because of Datre's involvement in the Sage Street Site and the Park.

(Defs.' 56.1 ¶ 74.)

### 3.   April 9 and April 10 visits and follow-up with the SCDA

On or around April 8, 2014, the DEC informed the Town that the material being spread at

the site to renovate the soccer field was questionable in its makeup and asked the town to cease

all activity until the material could be examined or analyzed.  (Defs.' 56.1 ¶ 75.)  On April 9,

2014, Lt. Lapinski took the lead in investigating illegal dumping at the Park.  (*Id.* ¶ 81.)  That

day, the DEC received a complaint about ongoing activity at the Park's soccer field, and Lt.

Lapinski and other officers responded to the Park and saw that piles of C&D had been spread out

contrary to the instruction to not disturb the material.  (Pls.' Counter-Stmt. ¶ 55.)  Lt. Lapinski

later testified to the large size of the illegal dumping spot during his deposition.  (Defs.' 56.1

¶ 82 (quoting Lapinski Dep. 187:6–189:9, 61:21–62:6).)  He saw slag, broken bottles, chunks of

wood, pieces of glass, rock, broken ceramic tile, and other materials in the Park.  (*Id.* ¶ 87.)  Lt.

Lapinski explained that the slag was identifiable as looking like volcanic rock and further

explained that the material he observed was C&D debris that did not belong in a park.  (*Id.* ¶ 88.)

He saw that the sand and fines were different colors ranging from burgundy to gray, black, and

brown.  (*Id.* ¶ 87.)  He was concerned that "anything" could be in the material, which is why he

wanted it sampled.  (*Id.* ¶ 90 (quoting Lapinski Dep. 123:9–124:4).)  On or about April 9, Lt.

Lapinski recognized that there was a "good possibility" that hazardous substances could be in the

materials dumped at the Park.  (*Id.* ¶ 91.)

At this time, Lt. Lapinski was aware that Datre "ran a business," and he had heard

Datre's name several years earlier.  (Pls.' 56.1 ¶ 85 (quoting Lapinski Dep. 55:20–57:3).)

During Lt. Lapinski's visit to the Park on April 9, he spoke with Grabe, who had been involved

in Datre operations, and whom Lt. Lapinski had previously interviewed. (Defs.' 56.1 ¶ 87.) Grabe told Lt. Lapinski that the material at the Park was topsoil from a particular site in Long Island, New York. (*Id.* ¶ 92.) Lt. Lapinski knew that the site was the illegal sand mining site affiliated with Datre and that there was no topsoil there. (*Id.*) He believed Grabe's narrative was false. (*Id.*) The next day, on April 10, Lt. Lapinski again met Grabe at the Park. (*Id.* ¶ 93.) Grabe provided him with a copy of the supposed grading plan for the Park and a seven-page sample report of chemical analysis of material from a site at 96 Wythe Avenue in Brooklyn, which Grabe claimed was the source of the material at the Park. (*Id.* ¶ 93.) The report indicated detections of several hazardous materials, including lead and chromium. (*Id.*) Lt. Lapinski explained to Grabe that the material had the characteristics of fill from some other sites in New York City, and that most of the solid waste out of the city was contaminated with lead and metals, and occasionally arsenic and asbestos, "and the only means [he] had to find that out was to sample it." (*Id.* ¶ 94.) Based on public information about Wythe Avenue generally, (Pls.' 56.1 ¶ 95), Lt. Lapinski determined that the area had been populated by factories, and that because the area had been an industrial area, the material could contain contaminants, (Defs.' 56.1 ¶ 95.) During his April 10 visit, Lt. Lapinski discovered a second landfill operation at the second portion of the Park with a road that had been constructed with solid waste, deposited in a hole, and covered with recycled concrete aggregate. (*Id.* ¶ 97.) The DEC attempted to obtain security camera footage of the Park from the Town, but the Town refused. (*Id.* ¶ 98.)

    While DMM had initially planned to take samples from the Park for chemical analysis on April 9, Lt. Lapinski decided that the DEC's forensic sampling team would lead the sampling effort. (Defs.' 56.1 ¶ 83; Pls.' 56.1 ¶ 83.) Within the first half of April of 2014, the DEC had determined that the waste was solid waste and attempted to arrange for further laboratory

analysis.  (Defs.' 56.1 ¶ 107.)  By April 10 or 11, the DEC had come to the opinion that the

material dumped at the Park originated from New York City.[8]  (*Id.* ¶ 106.)  On April 11,

sampling was postponed due to weather and the assembly of the DEC's forensic sampling team.

(Pls.' Counter-Stmt. ¶ 65.)

On April 11, 2014, Lt. Lapinski met with Assistant District Attorney ("ADA") Maureen

McCormack of the SCDA Environmental Crimes Bureau and Detective Severino.  (Defs.' 56.1

¶ 100.)  Lt. Lapinski routinely notified and worked with the SCDA's office when environmental

crimes arose.  (*Id.* ¶ 101.)  He conveyed his observations and concerns to the SCDA's office and

suggested that they should take interest, as a criminal case for an environmental violation can be

brought by a district attorney's office or by the state attorney general.  (*Id.* ¶ 102.)  The DEC

worked together with the SCDA with regard to the investigation into dumping in the Park.  (Pls.'

56.1 ¶ 104.)  By April 15, Lt. Lapinski was trying to coordinate a concerted sampling effort with

the SCDA, which has its own sampling team and laboratory.  (Pls.' 56.1 ¶ 107; Pls.'

Counter-Stmt. ¶ 66.)  After several attempts to schedule sampling, the SCDA informed the DEC

that it would be hiring an outside contractor for further testing.  (Defs.' 56.1 ¶ 107.)  The SCDA

hired a contractor, Enviroscience, to complete the sampling and conduct testing.  (*Id.* ¶ 84; Pls.'

56.1 ¶ 84.)  Lt. Lapinski spoke to Detective Severino "fairly regularly" between mid-April and at

least May 6, 2014.  (Lapinski Dep. 269:11–21.)  On April 21, 2014, Lt. Lapinski assisted the

SCDA and served a subpoena on the Town that was issued by the SCDA.  (Defs.' 56.1 ¶ 108;

Pls.' 56.1 ¶ 108.)

---

[8]  Plaintiffs dispute this, as Lt. Lapinski also testified that the possibility that the material came from New York City was merely his "hypothesis."  (Pls.' 56.1 ¶ 106 (quoting Lapinski Dep. 279:20–281:19, 236:11–15).)

### 4. Sampling in late April of 2014

The parties disagree substantively as to the sequence of events in late April of 2014 that led to the eventual chemical sampling of materials from the Park.

### A. Defendants' allegations about sampling in April of 2014

Defendants contend that the DEC was aware on April 22, 2014 that the SCDA was going to conduct sampling at the Park, approximately one week before that sampling was scheduled to be done on April 28. (Defs.' 56.1 ¶ 110.) On April 22, Lt. Lapinski reported to Captain Timothy Huss, the captain for Region 1 — the region encapsulating the Park — and Scott Florence, the DEC's state-wide major in charge of the BECI, that he had discussed with Detective Severino the SCDA's plan to conduct sampling at the Park in the following week and that he had committed to providing at least one team from the DEC to assist with the sampling. (Defs.' 56.1 Reply ¶ 113.) In an email that same day to Captain Huss, Florence said that the following week's sampling would "draw some attention." (*Id.* (quoting Email dated April 22, 2014, annexed to Defs.' Mot. as Ex. 37, Docket Entry No. 415-38).)

Engineers from Enviroscience, hired by the SCDA to conduct the sampling, visited the Park on April 28 and collected transite shingle and other friable debris. (*Id.* ¶ 111.) Defendants allege that Lt. Lapinski testified that he was aware on or around April 28 that someone had found asbestos at the Park. (*Id.* ¶ 112 (citing Lapinski Dep. 98:11–100:5).) Lt. Lapinski met with the SCDA on April 29, 2014, for a meeting he recorded as a "Meeting re Sampling," and when presented with his notes during his deposition, he testified that it could be reasonably concluded that he learned of the asbestos sampling results verbally by Detective Severino. (Defs.' 56.1 Reply ¶¶ 112 (quoting Compilation of Investigation Report and Narratives, annexed to Defs.' Mot. as Ex. 27, Docket Entry No. 415-28), 116.)

### B.   Plaintiffs' allegations about sampling in April of 2014

Plaintiffs contend that on April 22, 2014, the DEC believed comprehensive sampling was going to occur on April 30 and May 1.  (Pls.' 56.1 ¶ 110.)  On May 2, comprehensive sampling was postponed until May 8 and May 9.  (*Id.*)  Captain Huss did not think that the sampling had occurred on May 5, 2014.  According to Plaintiffs, the SCDA conducted very limited sampling on April 28, and this differed from the sampling originally discussed by Lt. Lapinski and Captain Huss on April 22.  (*Id.*)  During this sampling, Enviroscience reportedly found one transite shingle containing non-friable asbestos and a single piece of "Friable debris/cloth."  (*Id.* ¶ 111 (first citing Enviroscience Asbestos Bulk Sample Results dated April 28, 2014, annexed to Defs.' Mot. as Ex. 7, Docket Entry No. 415-8; and then citing Search Warrant dated May 5, 2014 at 10, annexed to Defs.' Mot. as Ex. 16, Docket Entry No. 415-17).)

Plaintiffs dispute that Lt. Lapinski was aware on or around April 28 that someone had found asbestos at the Park.  Lapinski initially testified that he learned the results of the initial asbestos testing around April 28 and it could be reasonably concluded that the District Attorney ("DA") provided him the results at an April 29 meeting, but he later corrected his testimony to state that he could not recall the DA doing that prior to the execution of the search warrant at Datre Construction's headquarters on or about May 6, 2014.  (*Id.* ¶ 112.)  Lt. Lapinski was "not privy to" the sampling reportedly conducted by the SCDA and Enviroscience.  (*Id.* (quoting Lapinski Dep. 265:8–10).)

### 5.   The search warrant

Defendants contend that the DEC and the SCDA jointly served a search warrant on Datre Construction's headquarters on or about May 6, 2014.  (Defs.' 56.1 ¶ 124.)  Plaintiffs dispute that they jointly served the search warrant, stating that the SCDA executed the search warrant with Lt. Lapinski's assistance.  (Pls.' 56.1 ¶ 124.)  The search warrant was executed on behalf of

14

the People of the State of New York.  (Defs.' 56.1 ¶ 125.)  The search warrant alleged that

Datre's affiliates were thought to have engaged in activities constituting a violation of "ECL

§71- 2713(3) ('Endangering Public Health, Safety or the Environment in the Third Degree')

which prohibits a person from knowingly engaging in conduct which causes the release of more

than one thousand five hundred gallons or fifteen thousand pounds, whichever is less, of an

aggregate weight or volume of a substance hazardous to public health, safety or the

environment."  (*Id.* ¶ 126 (citing Search Warrant dated May 5, 2014).)

Plaintiffs contend that the search warrant was based on Detective Severino's affidavit and

thus "reflected the views of [the] SCDA, not [the] DEC or other New York State personnel."

(Pls.' 56.1 ¶ 126.)  Plaintiffs also contend that the DEC would have completed its pre-search

warrant execution surveillance of the Datre property at the latest on May 2, 2014.

(Defs.' 56.1 ¶ 130.)

In his sworn affidavit, Detective Severino states that: on March 24, 2014, a Town park

ranger observed five Datre trucks entering the Park to dump materials on the soccer fields; on

April 4, 2014, the DEC informed the SCDA of the illegal disposal of solid waste, and the DEC

ordered the Town to leave any piles of debris untouched; on April 9, 2014, he observed several

Datre trucks and workers alongside freshly spread dirt and trail marks on the soccer fields; on

April 11, 2014, together with Lt. Lapinski, he observed a "large debris field of C&D spread out

into the recharge basin"; on April 28, 2014, Detective Severino and three Enviroscience

consultants took samples of C&D that confirmed asbestos in those materials; and on May 1,

2014, as a result of these asbestos tests, Detective Severino visited the Sage Street Site and

picked up two pieces of transite shingle, which were tested and found to contain asbestos.

(*Id.* ¶ 129 (quoting Search Warrant dated May 5, 2014).)

### 6.   Park usage in April of 2014

The parties dispute the usage of the Park and, specifically, the status of the areas in contention — the soccer field and the recharge basin — in April of 2014.

Defendants contend that: in January of 2014, the DEC received reports about children sledding into debris in the area of the Park where the recharge area was located, indicating that "before the illegal dumping, that portion of the Park was used for some forms of public recreation," (Defs.' 56.1 Reply ¶ 72); by April 3, 2014, it was clear that the DEC knew that the public had lost the use of at least a portion of the Park because it was not safe to use those portions due to illegal dumping of solid waste, (*id.* ¶ 76); there is no evidence that anyone from the public used the areas where the C&D debris was dumped — the soccer field and the recharge basin — at any time in April of 2014, (*id.* ¶ 72), and the DEC was not aware of any public use of the Park outside of these areas in April of 2014, (*id.* ¶ 71); it was not safe for the public to use the soccer field and recharge basin at this time, (*id.* ¶ 72); and on April 24, 2014, the Park closed and did not reopen until after the remediation was complete in or about September of 2015, (*id.* ¶ 109).

Plaintiffs allege that the DEC was "not aware one way or the other about whether the public used the Park in April 2014." (Pls.' 56.1 ¶ 71.)  Plaintiffs contend that the recharge basin is a low-lying area of the Park where water collects and drains, and it is not normally used for recreation.  (*Id.* ¶¶ 72, 76–77.)  In addition, Plaintiffs allege that the soccer field has been undergoing rehabilitation since 2013.  (*Id.*)  Plaintiffs contend that the Town publicly announced that it had "temporarily" closed the park to allow for "a full investigation" of the dumping on April 24, 2014.  (*Id.* ¶ 109 (quoting Dep. of Eric Hofmeister, then the Town's Acting Supervisor ("Hofmeister Dep."), Docket Entry No. 415-51).)

On May 6, 2014, the Town issued a press release announcing the long-term, indefinite closure of the Park.  (Defs.' 56.1 ¶ 123.)  The Park reopened when the remediation was completed in or about September of 2015.  (*Id.* ¶ 109.)

### b.  Procedural background

Plaintiffs commenced this action against thirty-four Defendants on May 4, 2017, alleging violations of CERCLA, New York Real Property Actions and Proceedings Law § 841, and New York common law, against contractors who arranged for the disposal of construction waste from their construction sites, as well as the waste brokers and haulers with whom they dealt. (Compl. ¶ 2.)  Plaintiffs grouped Defendants into categories labeled "Operator/Transporter Defendants" and "Arranger Defendants," which include "Broker Defendants."  (*Id.* ¶¶ 8–43.)  In relevant part, Plaintiffs seek to recover natural resource damages "including the lost use of the Park during the time it was closed."[9]  (*Id.* ¶ 230.)

In late 2017, five Defendants — Daytree at Cortland Square Inc. ("Daytree"), IEV Trucking Corp. ("IEV"), New Empire Builder Corp. ("New Empire"), Building Dev Corp. ("Building"), and Dimyon Development Corp. ("Dimyon") — filed motions to dismiss.[10]  (*See* Defs.' Mots. to Dismiss, Docket Entry Nos. 268, 272, 279, 284.)  Daytree argued that the Court should dismiss the action pursuant to the "first-filed" rule after considering *Town of Islip v. Thomas Datre, Jr. et al.*, 16-CV-2156, a companion case before this Court.  (Def. Daytree's Mem. in Supp. of Def.'s Mot. 7–9, Docket Entry No. 268-5.)  Daytree also argued that the Court should dismiss Plaintiffs' claims for failure to state a claim upon which relief could be granted.

---

[9]  Plaintiffs do not seek recovery of remediation or removal costs.

[10]  Former Defendant COD Services Corp. also filed a Motion to Dismiss, but because it is no longer a party, the Court does not consider its motion.  (*See* Docket Entry No. 277.)

(*Id.* at 10–16.)  New Empire argued that Plaintiffs failed to allege valid claims against it.  (Def. New Empire's Mem. in Supp. of Def.'s Mot. to Dismiss, Docket Entry No. 272-4.)  Building and Dimyon argued that all of Plaintiffs' claims are governed by a three-year statute of limitations and are now time-barred.  (Defs. Building & Dimyon's Mem. in Supp. of Defs.' Mot. to Dismiss ("Building & Dimyon Mem.," Docket Entry No. 281.)  IEV argued that Plaintiffs' claims were time-barred, (Def. IEV's Mem. in Supp. of Def.'s Mot. to Dismiss ("IEV's Mem."), Docket Entry No. 284-1), that the Complaint should be dismissed under the "first-filed rule," (*id.* at 9– 10), that the claims against IEV are not plausible and should be dismissed, (*id.* at 10–11), and that Plaintiffs do not have standing to seek natural resource damages, (*id.* at 11–14), and cannot demonstrate arranger liability, (*id.* at 14–16).  IEV also argued that the state causes of action should be dismissed.  (*Id.* at 16–17.)

On November 27, 2017, Judge Feuerstein appointed J. Kevin Healy to serve as the Special Master for the purpose of issuing an omnibus report and recommendation concerning the motions to dismiss and/or for judgment on the pleadings that had been and could be filed in the action.  (Order dated Nov. 11, 2017, Docket Entry No. 294.)  The Special Master filed his report on March 9, 2018, recommending that the Court: find that Plaintiffs have standing to maintain the action; defer the determination of whether the state law claims are subject to a three-year or six-year statute of limitations as the facts were not sufficiently developed; deny Defendants' motions to dismiss the CERCLA claim for failure to state a claim; deny the motions to dismiss the public nuisance claim; grant the motions to dismiss the negligence claim; deny Daytree's motion to dismiss for failure to state a claim against it; and deny the motions to dismiss based on the "first-to-file rule."  (Special Master Report (the "Report"), Docket Entry No. 313; August 2019 Order 3.)  Several Defendants filed objections to the Report.  (*See* Defs.' Objs., Docket

Entry Nos. 315, 316, 317, 318, 319, 320, 321, 323; *see also* Mot. for Recons. filed by Def. Plus

K Construction Inc., Docket Entry No. 324.)  By order dated September 27, 2018, Judge

Feuerstein determined that all of the motions to dismiss would be decided simultaneously by the

Court.  (Order dated Sept. 27, 2018.)  By order dated March 26, 2019, Judge Feuerstein

determined that the objections to the Special Master Report and the Motion for Reconsideration

would also be determined at the same time.  (Order dated Mar. 26, 2019.)

### i.  The Special Master's recommendation regarding the statute of limitations

The Special Master considered Defendants' contentions that Plaintiffs' natural resource

damage claim under CERCLA is barred by the three-year statute of limitations period.  (Report

15–22.)  He ultimately recommended that the Court deny Defendants' motions to dismiss this

claim as time-barred, as the denial would not preclude Defendants from raising the statute of

limitations issue after the conclusion of discovery.

In reaching his recommendation, the Special Master noted that, in relevant part,

CERCLA's statute of limitations period states that: "no action may be commenced for damages

. . . unless that action is commenced within [three] years after the . . . date of the *discovery* of the

*loss* and its connection with the release [of hazardous substances] in question."  (*Id.* at 15

(emphasis added) (quoting 42 U.S.C. § 9613(g)(1)(A)).)  In determining what constitutes the

"loss" in the present case, the Special Master noted that the loss claimed by Plaintiffs is the "lost

use of the Park during the time it was closed."  (*Id.* at 18 (quoting Compl. ¶¶ 7, 230).)  Because

"loss" is not defined in CERCLA, the Special Master used a plain meaning definition of "loss."

(*Id.* at 17–19.)  He recommended that the date of the discovery of the "loss" should be the "date

Plaintiffs discovered that such disposal [of hazardous substances] caused the introduction of

hazardous substances to the Park at levels precluding its safe utilization for public recreation."
(*Id.* at 19.)

Relying on *Merck & Co. v. Reynolds*, 559 U.S. 633, 644–48 (2010), the Special Master
recommended that the Court interpret the phrase "date of the discovery" to mean "the date that
Plaintiffs first knew or with reasonable diligence would have known of the loss and its
connection with the release of [the] hazardous substance in question." (*Id.* at 19–20.)  For
accrual purposes for the CERCLA claim, the Special Master recommended that the "date of
discovery" be the date of constructive and not actual knowledge of the loss. (*Id.* at 20.)  He
concluded that Plaintiffs were required to commence an action seeking natural resource damages
under CERCLA within three years of the date that they "first knew or with reasonable diligence
would have known that the dumping caused contamination in the Park at levels precluding its
safe use as a recreational resource." (*Id.*)  He further declined to endorse Plaintiffs' contention
that the "loss" in this case should be the actual closure of the Park for remediation because
Plaintiffs could, "through [their] own action or inaction," control the accrual date. (*Id.* at 20
n.12.)  He also declined to endorse Plaintiffs' contention that as a matter of law, a "scientific
report" is necessarily required for the discovery of an actionable loss, referring to releases such
as the wreck of the Exxon Valdez oil tanker. (*Id.*)  The Special Master ultimately recommended
that the Court deny the motions to dismiss the Complaint's CERCLA claim as time-barred.
(*Id.* at 22.)

### ii.  August 2019 Order

Judge Feuerstein issued an order on August 5, 2019, discussing the Special Master
Report and considering in particular the timeliness of Plaintiffs' CERCLA claim.  Judge
Feuerstein adopted the Special Master's recommendations that for accrual purposes, the date of

discovery should be the date of constructive and not actual knowledge of the loss and that the date of accrual was "when [Plaintiffs] first knew, or with reasonable diligence would have known, of the public's loss of use of the Park and that such loss was connected to the release of the hazardous substances in question." (August 2019 Order 6, 8.) Judge Feuerstein considered that a closure of a facility by itself did not support a "loss of use" claim, "as a facility could be closed for many reasons unconnected to release of hazardous substances." (*Id.* at 8.) Similarly, knowledge that there has been a release would not trigger the statute until a loss connected to that release was discovered. (*Id.*) Judge Feuerstein determined that the "date the Park closed for remediation cannot be viewed in isolation as triggering the statute of limitations." (*Id.*)

After noting that the resolution of this issue may determine the outcome of the case, Judge Feuerstein ordered limited discovery to develop the facts necessary to decide whether the CERCLA claim was timely filed. (*Id.* at 9.) She ordered that the portion of Defendants' motions to dismiss regarding whether the CERCLA claim is barred by the statute of limitations be converted to summary judgment motions on this issue alone and ordered supplemental briefs. (*Id.* at 10.) All other issues raised in Defendants' motions to dismiss were held in abeyance pending resolution of the statute of limitations issue. (*Id.*)

## II. Discussion

### a. Standard of review

Summary judgment is proper only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Jingrong v. Chinese Anti-Cult World All. Inc.*, 16 F.4th 47, 57 (2d Cir. 2021); *United States v. Bedi*, 15 F.4th 222, 225 (2d Cir. 2021). The court must "constru[e] the evidence in the light most favorable to the non-moving party" and "resolve all ambiguities and draw all permissible factual

inferences in favor of the party against whom summary judgment is sought." *Lenzi v. Systemax, Inc.*, 944 F.3d 97, 107 (2d Cir. 2019) (first quoting *VKK Corp. v. Nat'l Football League*, 244 F.3d 114, 118 (2d Cir. 2001); and then quoting *Johnson v. Goord*, 445 F.3d 532, 534 (2d Cir. 2006)).  The role of the court "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Rogoz v. City of Hartford*, 796 F.3d 236, 245 (2d Cir. 2015) (first quoting *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010); and then citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986)). A genuine issue of fact exists when "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.  The "mere existence of a scintilla of evidence" is not sufficient to defeat summary judgment. *Id.* at 252.  The court's function is to decide "whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000).

### b.  Timeliness of CERCLA claim

Defendants contend that Plaintiff's CERCLA claim, which has a three-year statute of limitations, is time-barred.  (Defs.' Mem. 16–21.)  In support, Defendants argue that (1) the SCDA's actual knowledge of the presence of asbestos in the Park on or around April 28, 2014 should be imputed to the DEC; (2) Plaintiffs knew about the loss of the use of the Park due to the presence of hazardous substances in April of 2014; and (3) had Plaintiffs acted with reasonable diligence, they would have known about the presence of hazardous substances in the Park prior to April of 2014.  (*Id.*)

Plaintiffs claim that the three-year statute of limitations began to run on May 6, 2014, which means that their Complaint — filed May 7, 2017 — is timely.  (*See* Pls.' Opp'n 13–19.)

22

In support, Plaintiffs argue that (1) the SCDA's knowledge cannot be imputed to them because the SCDA does not represent the DEC Commissioner; (2) they did not know about the public's lost use of the Park until May 6, 2014, and they knew or reasonably would have known about the presence of hazardous substances in the Park on that same day; and (3) they acted with reasonable diligence in investigating the complaints in the Park prior to April of 2014.  (*Id.*)

CERCLA is a comprehensive federal statute with two primary purposes: "(1) to encourage the timely cleanup of hazardous waste sites; and (2) to place the cost of that cleanup on those responsible for creating or maintaining the hazardous condition."  *Price Trucking Corp. v. Norampac Indus.*, 748 F.3d 75, 79 (2d Cir. 2014) (quoting *W.R. Grace & Co.–Conn. v. Zotos Int'l, Inc.*, 559 F.3d 85, 88 (2d Cir. 2009)).  The statute is designed to "promote the 'timely cleanup of hazardous waste sites' and to ensure that the costs of such cleanup efforts [a]re borne by those responsible for the contamination."  *Burlington N. & Sante Fe Ry. Co. v. United States*, 556 U.S. 599, 602 (2009) (quoting *Consol. Edison Co. of N.Y., Inc. v. UGI Utils., Inc.*, 423 F.3d 90, 94 (2d Cir. 2005)); *see also MPM Silicones, LLC v. Union Carbide Corp.* (*MPM Silicones II*), 966 F.3d 200, 228 (2d Cir. 2020), *as amended* (Aug. 13, 2020) (noting that "CERCLA's manifest purpose [is] to 'encourag[e] the timely cleanup of hazardous waste sites' by private parties by 'placing the cost of that cleanup on those responsible for creating or maintaining the hazardous condition'" (second alteration in original) (quoting *Consol. Edison Co. of N.Y., Inc.*, 423 F.3d at 94)).  "Among other measures, CERCLA 'authoriz[es] private parties to pursue contribution or indemnification from potentially responsible parties ['PRPs'] for expenses incurred responding to environmental threats.'"  *MPM Silicones II*, 966 F.3d at 214 (first alteration in original) (quoting *Commander Oil Corp. v. Barlo Equip. Corp.*, 215 F.3d 321, 326 (2d Cir. 2000)); *Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*, 596 F.3d 112, 120 (2d

Cir. 2010) ("CERCLA empowers the federal government and the states to initiate comprehensive cleanups and to seek recovery of expenses associated with those cleanups.").  The statute "imposes strict liability on facility owners and operators, on persons who arranged for the disposal or treatment of hazardous waste at the relevant site, and on persons who transported hazardous waste to the site, often collectively referred to as [PRPs]."  *ASARCO LLC v. Goodwin*, 756 F.3d 191, 198 (2d Cir. 2014).  "But CERCLA 'provide[s] property owners an avenue of reprieve; it allows them to seek reimbursement of their cleanup costs from others in the chain of title or from certain polluters — the so-called [PRPs].'"  *Id.* (first alteration in original) (quoting *Niagara Mohawk Power Corp.*, 596 F.3d at 120).

Pursuant to CERCLA, upon release of hazardous substances into the environment, liability may be imposed for "damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release."  42 U.S.C. § 9607(a)(4)(C).  "The term 'natural resources' means land, fish, wildlife, biota, air, water, ground water, drinking water supplies, and other such resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by . . . any State or local government . . . ."  *Id.* § 9601(16); *see Idaho v. Hanna Mining Co.*, 882 F.2d 392, 394 (9th Cir. 1989) (citing 42 U.S.C. § 9601(16)).  Claims under CERCLA for natural resource damages must be commenced within three (3) years of "[t]he date of the discovery of the loss and its connection with the release in question."  42 U.S.C. § 9613(g)(1)(A); *see California v. Montrose Chem. Corp. of Cal.*, 104 F.3d 1507, 1512 (9th Cir. 1997) (quoting 42 U.S.C. § 9613(g)(1)); *Confederated Tribes & Bands of Yakama Nation v. Airgas USA, LLC*, 435 F. Supp. 3d 1103, 1121 (D. Or. 2019) ("Generally, a plaintiff must bring a claim for natural resource damages within three years of the plaintiff's 'discovery of the loss and its connection with the release in

question.'" (first quoting 42 U.S.C. § 9613(g)(1)(A); and then citing *United States v. Asarco, Inc.*, 214 F.3d 1104, 1105 (9th Cir. 2000))).  "Either the United States or the affected state may sue as trustee on behalf of the public to collect damages for injury to natural resources."  *Idaho*, 882 F.2d at 394 (first citing 42 U.S.C. § 9607(f); and then citing Frank B. Cross, *Natural Resource Damages Valuation*, 42 Vand. L. Rev. 269, 273–75 (1989); Note, *Developments in the Law — Toxic Waste Litigation*, 99 Harv. L. Rev. 1458, 1565–73 (1986); Susan T. Zeller & Lisa M. Burke, Note, *Theories of State Recovery Under CERCLA for Injuries to the Environment*, 24 Nat. Res. J. 1101 (1984)).

### i.    The SCDA's knowledge cannot be imputed to the DEC

Defendants argue that because "Lt. Lapinski was conducting a joint investigation with the SCDA," the knowledge of the SCDA should be imputed to its "client," the State of New York.[11] (Defs.' Mem. 18.)

Plaintiffs argue that the SCDA's knowledge as of April 28 cannot be imputed to the State, as district attorneys are elected by and serve their county, and a county district attorney does not represent the DEC Commissioner as trustee on natural resource damages claims, which only the Commissioner may bring under 42 U.S.C. § 9607(f)(2)(B).  (Pls.' Opp'n 18.)

In support of their arguments that the knowledge of the SCDA should be imputed to the DEC, Defendants primarily rely on case law stating that district attorneys represent the State of New York rather than the local counties which they serve.  In their opening briefs, Defendants

---

[11]   Defendants also raise the fact that Lt. Lapinski admitted that it would be reasonable to conclude that he learned of the asbestos results "on or before the April 29 meeting."  (Defs.' Mem. 18 (quoting Defs.' 56.1 ¶ 116).)  Plaintiffs, in their 56.1 opposition, contend that although Lt. Lapinski testified that he learned of the results of the initial asbestos testing around April 28, during the same deposition, he later corrected his testimony to state that he could not recall the DA doing that prior to the search warrant.  (Pls.' 56.1 ¶ 112.)

25

rely on cases addressing whether county legislators can impose term limits on the office of a district attorney, *Hoerger v. Spota*, 21 N.Y.3d 549 (2013), and whether a district attorney is a state or local officer for purposes of section 1983 suits, *Baez v. Hennessy*, 853 F.2d 73 (2d Cir. 1988) and *Claudio v. City of New York*, 423 F. Supp. 2d 170 (S.D.N.Y. 2006). However, these cases, as Plaintiffs argue, "[have] no relevance to whether a district attorney's knowledge should be imputed to the State for purposes of CERCLA's statute of limitations." (Pls.' Opp'n 19.)

Similarly, the Court finds unpersuasive Defendants' reliance on *In re Agent Orange Product Liability Litigation*, 597 F. Supp. 740, 796 (E.D.N.Y. 1984), *aff'd sub nom.*, 818 F.2d 145 (2d Cir. 1987), to support their argument that the SCDA's knowledge should be imputed to Plaintiffs. In *Agent Orange*, the court explained that the knowledge of employees of one government agency could be imputed to another agency if there was a reason for the agency to seek the information. Unlike the facts before the Court, the government entities in *Agent Orange* were all federal entities within the same branch of government and within a single hierarchical structure consisting of upper and lower echelons. *See Agent Orange*, 597 F. Supp. at 796. As the court noted in *Agent Orange*, "[w]idespread knowledge among lower echelons can be attributed to the Executive." *Id.* The analysis in *Agent Orange* does not support Defendants' claim that the actions of employees of the SCDA, a county prosecutor's office, should be imputed to the DEC, a state agency.[12] Thus, the Court cannot conclude that the DEC knew or

---

[12] To the extent that the parties' argument that the SCDA's conduct can be imputed to Plaintiffs could be read to imply reliance on an agency relationship, such reliance is misplaced. Under New York agency law, "an agency relationship 'results from a manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and the consent by the other to act.'" *N.Y. Marine & Gen. Ins. Co. v. Tradeline, L.L.C.*, 266 F.3d 112, 122 (2d Cir. 2001) (quoting *Meese v. Miller*, 436 N.Y.S.2d 496, 499 (4th Dep't 1981)); *see Great Minds v. Fedex Off. & Print Servs., Inc.*, 886 F.3d 91, 95 (2d Cir. 2018) (noting that there is a "fundamental principle" that the acts of agents, while acting in the scope of their authority,

_____

are presumptively imputed to their principals (quoting *Kirschner v. KPMG LP*, 912 N.Y.S.2d 508 (2010))).  Knowledge acquired by an agent acting within the scope of its agency is imputed to the principal, even if the information was never actually communicated.  *See N.Y. Marine & Gen. Ins. Co*, 266 F.3d at 122 (citing *Christopher S. v. Douglaston Club*, 713 N.Y.S.22d 542, 543 (2d Dep't 2000)); *Cromer Fin. Ltd. v. Berger*, 245 F. Supp. 552, 560 (S.D.N.Y. 2003) (same).  In a governmental structure, the knowledge of employees of one agency may be imputed to those of another if there is some relationship between the agencies, either some reason for the agency without knowledge to seek the information or a reason for the knowledgeable agency to transmit the information.  *See In re Agent Orange Prod. Liab. Litig.*, 597 F. Supp. 740, 796 (E.D.N.Y. Sep. 25, 1984), *aff'd sub nom.*, 818 F.2d 145 (2d Cir. 1987). For example, knowledge can be imputed to a prosecutor where the evidence is "known to other members of the 'prosecution team,'" which "includes information known to other prosecutors in the same office," *Odle v. Calderon*, 65 F. Supp. 2d 1065, 1071 (N.D. Cal. 1999), and to others at an agency if working with the prosecution, *see United States v. Zuno-Arce*, 44 F.3d 1420, 1427 (9th Cir. 1995) ("[T]he prosecutor is 'deemed to have knowledge of and access to anything in the custody or control of any federal agency participating in the same investigation of the defendant.'" (quoting *United States v. Bryan*, 868 F.2d 1032, 1036 (9th Cir. 1989))); *United States v. Meregildo*, 920 F. Supp. 2d 434, 440–41 (S.D.N.Y. 2013) (holding that imputation is only proper when an agency can be considered "'an arm of the prosecutor' or part of the 'prosecution team'" (first quoting *United States v. Gil*, 297 F.3d 93, 106 (2d Cir. 2002); then citing *United States v. Morell*, 524 F.2d 550, 555 (2d Cir. 1975); and then citing *United States v. Bin Laden*, 397 F. Supp. 2d 465, 481 (S.D.N.Y.2005))), *aff'd sub nom. United States v. Pierce*, 785 F.3d 832 (2d Cir. 2015).  In addition, whether a particular government agency will be considered a part of the prosecution depends on its level of involvement and cooperation with the prosecuting agency.  *See Odle*, 65 F. Supp. 2d at 1072; *see also Meregildo*, 920 F. Supp. 2d at 441.  When the concept extends to knowledge held by agencies "interested in the prosecution," other circuits have considered this in the context of federal prosecutors working with federal executive agencies.  *See United States v. Wood*, 57 F.3d 733, 737 (9th Cir. 1995).

The record demonstrates that there was cooperation and collaboration between the DEC and the SCDA.  Lt. Lapinski, who led the project in the Park after April 9, 2014, testified to speaking with Detective Severino "fairly regularly."  (Lapinski Dep. 269:11–21.)  Lt. Lapinski routinely notified and worked with the SCDA when environmental crimes arose. (*Id.* at 72:10–19.)  In addition, Lt. Lapinski assisted Detective Severino in serving a subpoena on the Town.  (Defs.' 56.1 ¶ 108; Pls.' 56.1 ¶ 108.)  Although Plaintiff contends that it was the SCDA that executed the search warrant on Datre Construction's headquarters and that Lt. Lapinski only assisted, the DEC and the SCDA "[p]articipat[ed] in the [w]arrant," which was issued on behalf of the State of New York.  (DLE Significant Incident Report, annexed to Defs.' Mot. as Ex. 39, Docket Entry No. 415-40.)  There was a meeting on April 29, 2014, where Lt. Lapinski was in attendance and may have received the results of the asbestos sampling.  (*See* Lapinski Dep. 7:12–20, 251:3–7, 262:2–21.)  When the Town temporarily shut down the Park on April 24, 2014, the announcement stated that the Town was grateful for the "involvement of both the [SCDA] and the [DEC]."  (Press Release dated April 24, 2014, annexed to Pls.' Opp'n as Ex. 20, Docket Entry No. 415-65.)  Thus, the record supports the conclusion that the DEC and the SCDA worked together in conducting the investigation of the dumping at the Park.

should have known of the asbestos in the Park on April 28 based on the SCDA's knowledge of this information.

The Court therefore considers, as Defendants argue, whether Plaintiffs would have known about the hazardous substances in the Park in April of 2014 had they acted with reasonable diligence.

> **ii. The Court cannot conclude as a matter of law that Plaintiffs discovered or should have discovered the loss of the use of the Park in connection to the hazardous substances in April of 2014**

In determining whether Plaintiffs discovered or should have discovered the loss of the use of the Park in connection to the hazardous substances in April of 2014, the Court separately considers when Plaintiffs discovered or with reasonable diligence should have discovered, (1) the loss of the use of the Park and (2) the presence of hazardous substances in the Park.

In her August 2019 Order, Judge Feuerstein adopted the Special Master's recommendations that for accrual purposes, the date of discovery should be the date of constructive and not actual knowledge of the loss of the use of the Park and that Plaintiff's CERCLA claim began accruing "when they first knew, or with reasonable diligence would have

---

Despite this cooperation, the evidence does not support a determination that the SCDA's knowledge should be imputed to the DEC. Based on traditional principles of agency law, it does not appear from the record that either the DEC or the SCDA was "subject to [the other's] control" and that there was consent by the other to act. *N.Y. Marine & Gen. Ins. Co.*, 266 F.3d at 122. It is also unclear how the State can be considered the "client" of the SCDA, and Defendants do not offer any facts or relevant law to support this conclusion. (*See* Defs.' Mem. 18.) While it is true that either a district attorney's office or the state attorney general's office can commence a criminal case for an environmental violation, (Defs.' 56.1 ¶ 102), as Plaintiffs argue, only the DEC Commissioner may bring CERCLA natural resource damages claims, (Pls.' Opp'n 19 (citing 2 U.S.C. § 9607(f)(2)(B)).) Moreover, even if the State could be considered the SCDA's "client" in the SCDA's criminal prosecutions, the SCDA could not represent the DEC Commissioner on CERCLA claims. Thus, even under an agency theory, the Court cannot conclude that the knowledge of the SCDA can be imputed to the DEC for purposes of deciding when the DEC discovered the loss of the Park.

known, of the public's loss of use of the Park and that such loss was connected to the release of the hazardous substances in question." (August 2019 Order 6, 8.)

Defendants argue that by April 3, 2014, Plaintiffs knew illegal dumping of a huge volume of C&D "caused the public to lose access to portions of the Park," (Defs.' Mem. 16–17), and that Plaintiffs quickly learned that the C&D debris at the Park contained hazardous substances, (*id.* at 17–19). Thus, Defendants argue, if Plaintiffs had acted with reasonable diligence, they would have known about the hazardous substances in the Park in early April of 2014.[13] (*Id.* at 20–21.)

Plaintiffs argue that the State did not learn until May 6, 2014, when the Suffolk DA announced that he had found asbestos there, that the SCDA had found asbestos in the Park, (Pls.' Opp'n 16–18), and that the State diligently investigated the dumping of C&D at the Park, (*id.* at 19–23).

### 1. Discovery of the loss of the use of the Park

Because of conflicting evidence, the Court cannot determine that Plaintiffs discovered or should have discovered the loss of the use of the Park in connection to the hazardous substances in April of 2014.

---

[13] As Defendants acknowledge, there are few cases interpreting the statutes of limitations for CERCLA's natural resource damages. In their reply brief, Defendants ask the Court to consider CPLR § 214-c(2), the statute of limitations for New York State law claims based on environmental contamination, which uses a constructive knowledge standard. (Defs.' Reply 17–18.) Because Defendants raised this argument for the first time in their reply papers, the Court declines to consider it. *See United States v. Canada*, 858 F. App'x 436, 441 n.3 (2d Cir. 2021) ("We generally treat arguments raised for the first time in a reply brief as waived." (quoting *United States v. George*, 779 F.3d 113, 119 (2d Cir. 2015))); *Jericho Group Ltd. v. Mid-Town Dev. Ltd. P'ship*, 816 F. App'x 559, 564 (2d Cir. 2020) (citing *JP Morgan Chase Bank v. Altos Hornos de Mex., S.A. v. C.V.*, 412 F.3d 418, 428 (2d Cir. 2005) (explaining that courts generally do not consider arguments raised for the first time in reply briefs); *Aviva Trucking Special Lines v. Ashe*, 400 F. Supp. 3d 76, 80 (S.D.N.Y. 2019) ("Generally, 'a court should not consider arguments that are raised for the first time in a reply brief.'" (quoting *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 n.5 (2d Cir. 2006) (Sotomayor, J.))).

Defendants argue that by April 3, 2014, Plaintiffs knew that the soccer field and the recharge basin where the C&D debris was dumped "were not safe for the public to use and the areas had to be shut down." (Defs.' Mem. 16–17.)  The DEC advised the Town to "cease all activity at the site until the material could be examined or analyzed" the following week.  (*Id.* at 17.)  Defendants claim that Plaintiffs never saw any member of the public using the Park in April of 2014.  (*Id.*)  In addition, Defendants argue that the fact that the Town did not announce the "long-term closure of the Park until May 6, 2014" is irrelevant because, as Judge Feuerstein held in her August 2019 Order, permitting the date of closure to control the accrual of the claim would permit a plaintiff to control the accrual of the claim.  (*Id.*)

Plaintiffs argue that their claim is for natural resource damages for lost use of the entire Park, rather than the specific areas of the soccer field and recharge basin, and further argue that Defendants provide no authority that would permit them to reconfigure their claim.  (Pls.' Opp'n 14–15.)  Plaintiffs contend that Defendants' argument, at best, would bar the State from seeking natural resource damages for the portions of the Park that were not usable before May 6.  In addition, Plaintiffs argue that the recharge basin "is not used by the public" and the soccer field had been "undergoing rehabilitation since 2013," and thus Defendants have not shown that the community lost the use of the soccer field and recharge basin in April of 2014 because of the C&D.  (*Id.* at 15.)

 The evidence as to when Plaintiffs should have discovered the "loss" of the use of the Park is conflicting, and drawing all inferences in favor of Plaintiffs as the non-moving party, the Court cannot conclude that the loss occurred in early April as Defendants argue.  The evidence does not demonstrate whether individuals were using these areas or the Park more generally at the time in question, the extent of rehabilitation of the soccer field, or pre-existing usages of the

field prior to and during April of 2014, and, even assuming lack of usage, it does not show that any such lack of usage was caused by the C&D.  Defendants argue that in January of 2014, the DEC received reports about children sledding into debris in the area of the Park where the recharge area was located, indicating that "before the illegal dumping, that portion of the Park was used for some forms of public recreation," (Defs.' 56.1 Reply ¶ 72), and also argue that there is no evidence that anyone from the public used the areas where the C&D debris was dumped — the soccer field and the recharge basin — or anywhere else in the Park at any time in April of 2014, (Defs.' 56.1 ¶ 71–72).  However, Plaintiffs present evidence that the DEC was "not aware one way or the other about whether the public used the Park in April [of] 2014"; that the recharge basin is a low-lying area of the Park where water collects and drains and is not normally used for recreation; and that the soccer field had been undergoing "rehabilitation" since 2013,[14] (Pls.' 56.1 ¶¶ 71, 72, 76–77), suggesting that it was not being used because of rehabilitation rather than contamination.

In addition to the conflicting evidence regarding the use of the Park in April, on April 24, 2014 when the Park was closed temporarily for "investigation," the DEC had not conducted any testing of samples, and neither the DEC nor the SCDA had performed any chemical analyses. The DEC knew about C&D and solid waste violations, which were violations in their own right but were not the hazardous substances violations at issue before the Court.  The fact that construction waste from New York City can "potentially" contain hazardous substances, (Rahman Dep. 60:5–24), and that the presence of C&D debris in solid waste, when comingled

---

[14]   Detective Severino's affidavit in support of the search warrant issued on May 5, 2014, states that an individual whom he interviewed in April of 2013 said that the Town gave permission for a nearby church to "fill holes, put grass seed down and make minor repairs." (Search Warrant dated May 5, 2014 at 9.)

with other materials, could be an indicator that the waste contains hazardous substances, (Defs.' 56.1 ¶ 23), supports the inference that without testing, Plaintiffs would be speculating regarding the presence of hazardous substances in the Park.  C&D debris by itself in a public park constitutes a solid waste violation, (Defs.' 56.1 ¶ 10), and dumping solid waste can be a crime even if the material does not contain hazardous substances, (Pls.' Counter-Stmt. ¶ 4).  Thus, while there were clear indicators of a violation, there was no evidence that there had been a release of hazardous substances in the Park.  Because Plaintiffs' CERCLA claim accrued "when they first knew, or with reasonable diligence would have known, of the public's loss of use of the Park and that such loss was connected to the release of the hazardous substances in question," (August 2019 Order 8), the DEC's knowledge of C&D debris does not support the inference that it would have known with reasonable diligence of the loss of the use of the Park because of hazardous substances.[15]

When the Park closed on May 6, 2014, it was as a result of the asbestos sampling and was therefore connected to the release of the hazardous substances in question.  As Judge Feuerstein noted in her August 2019 Order, the "date the Park closed for remediation cannot be viewed in isolation as triggering the statute of limitations" because potential plaintiffs should not be able to control their dates of accrual based on action or inaction.  (August 2019 Order 8.) When considered in the context of the asbestos sampling rather than in "isolation," the date that the Park closed for remediation is a potential date of the discovery of the "loss" of the use of the Park.

---

[15] As discussed *infra* pp. 33–35, there is a genuine question of material fact as to whether Plaintiffs were reasonably diligent in their discovery of the hazardous substances in the Park during April of 2014.

### 2.  Plaintiffs' discovery of hazardous substances in the Park

As to the discovery of hazardous substances in the Park, the record does not clearly indicate when Plaintiffs knew or should have reasonably known about the presence of hazardous substance in the Park in April of 2014.

Defendants note that the DEC took an informal sample on April 3 but never tested the sample and contend that "[t]here is no reason the DEC could not have . . . arranged for comprehensive testing on or about April 4, the day after they confirmed a solid waste violation involving C&D debris at the Park, and received the results of that testing within seven days." (Defs.' Mem. 21.)  In addition, Defendants argue that by mid-April, Plaintiffs were aware that the C&D materials contained hazardous substances, as the presence of C&D debris in solid waste indicates that the material contains hazardous substances, the majority of soil in New York City contains hazardous substances, C&D debris from construction waste in the New York City metropolitan area typically contains hazardous substances, and Lt. Lapinski learned and confirmed that the debris was from New York City.  (Defs.' Mem. 17–18.)  Defendants also argue that the State knew that there was asbestos in the Park by April 28 because the SCDA learned about the presence of asbestos that day and Lt. Lapinski testified to learning of those results "on or around that day."  (Defs.' 56.1 ¶ 112 (citing Lapinski Dep. 98:11–100:5).)

Plaintiffs contend that comprehensive sampling and testing for waste material for law enforcement purposes take time to plan and implement.  (Pls.' Opp'n 22.)  After the initial sample was taken for visual inspection, a sampling and testing protocol was established, pursuant to DEC protocol, and the DEC moved forward to "conduct comprehensive sampling of the C&D at the Park but the [SCDA] implemented its contractor's sampling for the [SC]DA's criminal investigation before [the] DEC implemented its sampling program."  (Id.)  Plaintiffs argue that based on what Lt. Lapinski had learned by April 14, 2014, Lapinski knew that it was "likely"

that the C&D in the Park had come from New York City and that C&D from New York City was "likely" to contain hazardous substances at some concentrations, as they are ubiquitous in urban environments.  (*Id.* at 16.)  In addition, Plaintiffs argue that the State would not actually know or constructively know that hazardous substances had been disposed at the Park or that they would present concerns for human health until Enviroscience confirmed the C&D in the Park contained asbestos.  (*Id.* at 17.)

On April 9, during his first visit to the Park, Lt. Lapinski was concerned that "anything" could be in the material, which is why he wanted it sampled.  (Lapinski Dep. 123:9–124:4.)  On or about April 9, Lt. Lapinski recognized that there was a "good possibility" that hazardous substances could be in the materials dumped at the Park.  (*Id.*)  When ECO Hull visited the Park at the beginning of April, his photographs showed solid waste, including "processed concrete, fines, a pile of dark brown material, and bricks."  (Email dated April 2, 2014, annexed to Defs.' Mot. as Ex. 23, Docket Entry No. 415-24.)  While solid waste may contain hazardous material, this is not always the case.  (Rahman Dep. 42:18–22.)  In fact, the record demonstrates that solid waste can be contaminated and nevertheless not contain any hazardous substances.  (*Id.* at 44:11–18.)  Although Plaintiffs could have speculated as to the presence or absence of hazardous substances in the Park, until scientific testing occurs, whether and to what extent material is chemically contaminated is unknown.[16]  (*See* Lapinski Dep. 236:7–10 ("Figuring out where the

_____

[16]  The Special Master declined to endorse Plaintiffs' contention that as a matter of law, a "scientific report" is necessarily required for the discovery of an actionable loss, referring to releases such as the wreck of the Exxon Valdez oil tanker.  (Report 20 n.12.)  In her August 2019 Order, Judge Feuerstein agreed with the Special Master.  (August 2019 Order at 8.)  The Court does not purport to hold that scientific testing is "necessarily required" for the discovery of an actionable loss.  However, based on the facts that emerged during the limited discovery, including information about DEC protocol, the Court cannot conclude that the DEC knew or should have known with reasonable diligence of the presence of hazardous substances prior to chemical testing and sampling.

origination was, there's a good chance of it.  But until you see [the result], you know, it's all speculative.").)

By mid-April, Lt. Lapinski had a "hypothesis" that the debris that was at the Park actually came from Brooklyn or Queens.  (Lapinski Dep. 280:15–25.)  Lt. Lapinski testified that it could be concluded that he learned of the asbestos sampling results at the April 29, 2014 meeting with the SCDA, (Defs.' 56.1 ¶ 116), but also testified during the same deposition that he thought he "had been informed of the results before the search warrant [on May 5, 2014] . . . [b]ut apparently [he] wasn't," (Lapinski Dep. 262:11–13).  When asked about the meeting with the SCDA the day after Enviroscience provided the results, Lt. Lapinski stated that the SCDA did not share any test results with him at the meeting on April 29, 2014.  (*Id.* at 97:17–20.)  The evidence demonstrates that by May 6, 2014, when the Park was closed indefinitely, Plaintiffs must have known about the presence of hazardous substances in the Park.  Whether Plaintiffs should have known between April and May of 2014, and before May 6, 2014, cannot be determined as a matter of law.  Drawing all reasonable inferences in Plaintiffs' favor, the record, which indicates that there were dozens of events compressed into a few short weeks in April and May of 2014, supports the conclusion that Plaintiffs acted with reasonable diligence, or at the least, that there are disputed issues of material fact about reasonable diligence that cannot be decided by the Court.  Construing the facts in the light most favorable to the non-moving party, there exists a genuine issue of material fact as to when Plaintiffs knew or should have known about the presence of hazardous substances in the Park.

### iii.   The Court cannot conclude as a matter of law that Plaintiffs failed to act with reasonable diligence and should have known about the presence of hazardous substances prior to April of 2014

There are disputed issues of material fact as to whether Plaintiffs failed to act with reasonable diligence and should have known that there were hazardous substances in the C&D

debris in the Park by early April of 2014, precluding the Court from granting Defendants' motion for summary judgment.

Defendants argue that if Plaintiffs had acted with reasonable diligence in investigating the illegal dumping in the relevant area of Brentwood starting in July of 2013, they would have known that there were hazardous substances in the C&D debris in the Park by early April of 2014. (Defs.' Mem. 20–21.) Specifically, Defendants argue that Plaintiffs should have further investigated (1) the Sage Street Site and (2) the January 2014 complaint to the DEC about the Park.

Plaintiffs claim that the State diligently investigated the dumping of C&D at the Park. (Pls.' Opp'n 19–23.)

When "discovery" is written directly into a statute, courts have typically interpreted the word to refer not only to actual discovery, but also to the "hypothetical" discovery of facts a reasonably diligent plaintiff would know. *Merck*, 559 U.S. at 645. Reasonable diligence is defined as "[a] fair degree of diligence expected from someone of ordinary prudence under circumstances like those at issue." *Reasonable Diligence*, Black's Law Dictionary (11th ed. 2019). Black's Law Dictionary also considers "reasonable diligence" synonymous with "due diligence," which is defined in relevant part as "[t]he diligence reasonably expected from, and ordinarily exercised by, a person who seeks to satisfy a legal requirement or to discharge an obligation." *Due Diligence*, Black's Law Dictionary (11th ed. 2019). The plain meaning of "due diligence" is the "care that a reasonable person exercises to avoid harm to other persons or their property." *Due Diligence*, Merriam-Webster (11th ed. 2014).[17]

---

[17] The Court notes that the parties did not provide definitions of "reasonable diligence." As a result, the Court relies on its plain meaning.

### 1.   July 2013 Sage Street investigation

Defendants argue that that Plaintiffs should have further investigated the Sage Street Site following July of 2013.  On July 26, 2013, Daniel visited the Sage Street Site, about a mile and a half from the Park.  (Defs.' 56.1 ¶ 36.)  Because the DEC did not have access to the site, (*id.* ¶ 48), the DEC did not sample or test the waste of the Sage Street Site until in or after May 2014, (*id.* ¶ 47.)  On May 1, 2014, Detective Severino found two pieces of "transite shingle" that had spilled out onto Sage Street from the Sage Street Site.  (*Id.* ¶¶ 50, 121.)  Within one day, tests showed that one sample contained 16% asbestos.  (Defs.' 56.1 ¶¶ 51, 122; Pls.' 56.1 ¶ 51.)

While the DEC might have been able to detect hazardous substances at the Sage Street Site between July of 2013 and April of 2014, the Sage Street Site is a mile and a half away from the Park and Plaintiffs are not claiming natural resource damages based on that Site.  Moreover, the State took a number of steps in investigating the Sage Street Site, including having Daniel return to the Site, attempting to serve the property owner (including waiting outside the post office where the owner had a personal P.O. Box, (Hull Dep. 61:17–62:5)), potentially reaching out to an attorney that the owner had in a prior matter, (Blaising Dep. 79:2–8), and asking the SCDA to issue a search warrant for the Sage Street Site.  The Court finds that the DEC's decision to not further investigate the Sage Street Site is not determinative of whether the State knew or should have known about the release of hazardous substances at the Park and the loss of use of the Park.

### 2.   January 2014 Park investigation

Defendants also argue that Plaintiffs should have further investigated the January 2014 complaint to the DEC that a truck belonging to a company affiliated with Datre had been "dropping off" potentially illegal solid waste at the Park.  (Defs.' 56.1 ¶ 53.)

After being unable to gain access to the Park when he visited the Park on January 24, 2014, and not being able to verify the presence of C&D because of the snow on the ground, ECO Gross questioned the Town as to whether there was C&D in the Park.  (Defs.' 56.1 ¶ 55.)  Joseph Montuori, who was at that time the Commissioner of the Town's Department of Parks, Recreation, and Cultural Affairs, represented to the DEC that the placement of C&D debris had been an error and that the material would be removed.  (*Id.*)  The DEC closed the case on or about February 7, 2014.  (*Id.*)

Based on the information available in the record, there is no indication that the State failed to act with "reasonable diligence" in investigating and eventually closing the January 2014 complaint.  ECO Gross investigated the complaint and visited the Park, could not enter, could not make any observations of C&D debris because of snow on the ground, and later made an inquiry of the Town.  The Commissioner of the Town's Department of Parks, Recreation, and Cultural Affairs represented to the DEC that the placement of C&D debris had been an error and that the material would be removed.  The State acted with reasonable diligence, or at the very least, there is a genuine question as to whether the State acted with reasonable diligence, in conducting its investigation and relying on the assurances of the Town official who was responsible for the Park that the material would be removed.

Because the Court cannot determine as a matter of law that Plaintiffs knew or reasonably should have known about the public's loss of use of the Park and that such loss was connected to the release of hazardous substances, the Court denies Defendants' motion for summary judgment based on timeliness.

**III.  Conclusion**

For the foregoing reasons, the Court denies Defendants' motion for summary judgment.

Dated: January 25, 2022
      Brooklyn, New York

                              SO ORDERED:


                              _____s/ MKB_____
                              MARGO K. BRODIE
                              United States District Judge